1                  UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   PRIME HEALTHCARE SERVICES,    .
    INC.,                          .
5                                  . Docket
                   Plaintiff,      . No. 14-cv-2553-GPC-RBB
6                                  .
                   v.              . February 20, 2015
7                                  . 1:38 p.m.
    SERVICE EMPLOYEES              .
8   INTERNATIONAL UNION, ET AL.,   .
                                   .
9             Defendants.          . San Diego, California
    . . . . . . . . . . . . . . . .

10
                      TRANSCRIPT OF MOTION HEARING
11            BEFORE THE HONORABLE GONZALO P. CURIEL
                   UNITED STATES DISTRICT JUDGE
12

13                   A-P-P-E-A-R-A-N-C-E-S

14  For the Plaintiff:      DLA Piper LLP
                            401 B Street, Suite 1700
15                          San Diego, California 92101
                            By:  AMANDA FITZSIMMONS, ESQ.
16                          – and –
                            DLA Piper LLP
17                          555 Mission Street, Suite 2400
                            San Francisco, California 94105
18                          By:  DAVID S. DURHAM, ESQ.
                            – and –
19                          DLA Piper LLP
                            500 8th Street, NW
20                          Washington, DC 20004
                            By:  EDWARD SMITH SCHEIDEMAN, III, ESQ.
21
    For the Defendant SERVICE EMPLOYEES INTERNATIONAL UNION and
22  MARY KAY HENRY:
                            Rothner Segall and Greenstone
23                          510 South Marengo Avenue
                            Pasadena, California 91101
24                          By:  GLENN ROTHNER, ESQ.

25  ///

```
1                    A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

2

3    For the Defendant CHANGE TO WIN, CtW INVESTMENT GROUP, and TOM
     WOODRUFF:
4                             Bredhoff & Kaiser PLLC
                              805 15th Street NW, Suite 1000
5                             Washington, DC 20005
                              By:  ANDREW DEAN ROTH, ESQ.
6

     For the Defendant SERVICE EMPLOYEES INTERNATIONAL UNION -
7    UNITED HEALTHCARE WORKERS WEST and DAVE REGAN:
                              Weinberg Roger and Rosenfeld
8                             1001 Marina Village Parkway
                              Suite 200
9                             Alameda, California 94501
                              By:  THEODORE FRANKLIN, ESQ.
10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Possell, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_possell@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
1            SAN DIEGO, CALIFORNIA; FEBRUARY 20, 2015; 1:38 P.M.

2                              -o0o-

3            THE CLERK:  Number 10 on calendar, 14-cv-2553, Prime

4    Healthcare Services, Inc., v. Service Employees International

5    Union, et al., for a motion hearing.

6            THE COURT:  Appearances, please.

7            MR. SCHEIDEMAN:  Good afternoon, Your Honor.

8    Ed Scheideman for plaintiff, Prime Healthcare, Inc., with my

9    colleagues, Amanda Fitzsimmons and David Durham.

10           THE COURT:  Good afternoon.

11           MR. ROTHNER:  For defendant Service Employees

12   International Union, Glenn Rothner of Rothner Segall and

13   Greenstone.

14           MR. ROTH:  Andrew Roth for the Change to Win

15   defendants.

16           MR. FRANKLIN:  Theodore Franklin for the defendants

17   SEIU United Healthcare Workers West and David Regan.

18           THE COURT:  Good afternoon.  Please be seated.

19       We are here on a motion to dismiss for failure to state a

20   claim.  The Court has reviewed all of the pleadings relating to

21   this motion.  I have a tentative as to the claim preclusion.

22   With respect to the claim preclusion issue, I am prepared to

23   find that allegations that relate to the earlier antitrust

24   action are subject to claim preclusion, so, as such, the

25   current action would not be able to rely upon those
```

1    allegations.  I am not going to go into great detail at this

2    time relating to that.  If the parties wish to be heard on

3    that, you may be heard.

4        With respect to the RICO conspiracy or the RICO extortion

5    allegations, I have a number of questions to pose relating to

6    the RICO.  I have also some questions to pose as to the 302,

7    the alleged 302 violation, Section 302, and some questions as

8    to the Section 303.

9        I note that -- I believe it's plaintiffs have brought an

10   easel and some boards, and to the extent that you would like to

11   begin your presentation with that demonstrative exhibit, you

12   are more than welcome.  But at this time, let me turn to the

13   plaintiffs.

14           MR. SCHEIDEMAN:  Okay.  Thank you, Your Honor.

15   Ed Scheideman for the plaintiff.

16       I guess, with the Court's indulgence, since you have your

17   tentative on the claim preclusion, maybe I can address that at

18   the outset?

19           THE COURT:  Sure.

20           MR. SCHEIDEMAN:  As I understand Your Honor's

21   tentative ruling, Your Honor has found that the post-antitrust

22   amended complaint, the post-September 2012 predicates are not

23   precluded --

24           THE COURT:  That's right.

25           MR. SCHEIDEMAN:  -- but the pre-2012 predicates are

1   precluded?

2        What I would say, Your Honor, is -- this is a RICO action.

3   The allegations that the defendants have set forth is that we

4   could have brought a RICO claim at the time of the first

5   amended complaint, back in September 2012, the antitrust claim,

6   so we can't then bring a RICO claim based on those actions.

7   They also contend -- this is on page 4 of the brief -- that

8   they are conferred freedom from liability from those actions.

9   But the important thing -- and I think we would ask Your Honor

10  to take under advisement and consideration -- is this is a

11  racketeering claim.  The standard for claim preclusion in the

12  Ninth Circuit is fairly low.

13       We cite the *Harkins* case, if Your Honor is familiar with

14  that one.  And there, in *Harkins*, the Court found that

15  10 percent different facts don't negate -- don't cause claim

16  preclusion to be found.  The *Pasternak* decision -- slight

17  differences in fact -- will not invoke claim preclusion.  And

18  the Supreme Court has expressly held, in a post-World War II

19  case of *Waller*, that claims that arise out of a continuing

20  course of conduct that provides the basis for an earlier claim

21  are not precluded.

22       We have heard, at least in the briefs, from the defendants

23  that it is a virtually identical complaint, but it's really

24  not.  As a matter of fact -- and we have a demonstrative.  And

25  actually, I have copies for defendants.

1          Accepting the defendants' characterization in the exhibit,

2     Your Honor, as true, that the -- it was Exhibit A -- that the

3     allegations are exactly the same, and if we don't count

4     parties, jurisdiction, and venue, to count, we actually have

5     145 out of 244 paragraphs, or 59 percent of the complaint, are

6     wholly different allegations.  And 36 percent, as you can see

7     on the chart, are post-September-2012 allegations.

8          Now, while there may be some overlap in the case, I think

9     it's important to look at it in the context of the racketeering

10    statutes.  By their very nature, the racketeering statutes call

11    for one to prove a pattern of racketeering.  Now, while we have

12    many post-2012 predicate acts in the complaint, by the very

13    nature, you are allowed to look back into prior pattern,

14    practice, and racketeering acts that happened before

15    September 2012.  And that's RICO.  It mandates a lookback.

16         So we cite the *LA Branch NAACP* case, which was a claim

17    preclusion case, where it said for the purpose of proving up

18    your claim, you should be allowed to introduce evidence

19    relating to those pre -- prior complaint activities.

20         And by way of example, our other demonstrative -- if I

21    could put it up -- is those particular predicate acts that

22    occurred post 2012.  And as Your Honor will see, there are

23    many.  We have 15 or 16 just by way of example.  This is not

24    meant to be an exhaustive list.

25         So when we talk about preclusion -- when we talk about

1    preclusion, clearly the predicate acts for post 2012 obviously

2    form the basis of a RICO claim, because as the case moves

3    forward, the prior acts, in order to prove the pattern of

4    racketeering, have to be considered by the Court.  And I think

5    in totality, it's interesting because if the argument is "You

6    could have brought a RICO claim back in 2012" -- we couldn't

7    have brought this RICO claim.  And this RICO claim includes the

8    post-2012 acts and the pre-2012 acts, which, in totality, forms

9    its own unique RICO claim.

10        To the extent Your Honor is crafting his opinion on

11   preclusion, we would ask him to keep in mind and consider that,

12   while the post-2012 predicate acts can be counted for purposes

13   of racketeering, I think when you start proving pattern, so on,

14   so forth, other predicate acts -- in other words, the RICO

15   statutes have a four-year statute of limitations for damages on

16   predicate acts, but the statutory scheme itself allows for a

17   ten-year lookback period.  The RICO statutes are obviously

18   unique.

19            THE COURT:  Certainly.  But at the same time, we

20   can't be mixing apples and oranges, to the extent that RICO is

21   drafted in such a way that it permits evidence to come in that

22   may otherwise be dated.  Here the question is whether or not,

23   under claim preclusion principles, you have an identity of

24   claims, and utilizing the multi-factor test, and then

25   determining whether or not there's a final judgment on the

        8

1   merits and privity.  So to the extent that there's a Ninth

2   Circuit case that has found that 10 percent is the cutoff for

3   claim preclusion, I don't think that they made this bright-line

4   test, that it's 10 percent, or 20 percent, 30 -- I think the

5   Ninth Circuit has made very clear as to the test that applies

6   in claim preclusion cases, and I would have to think it's case

7   by case, applying the test that the Ninth Circuit has

8   instructed these courts to take --

9            MR. SCHEIDEMAN:  Right.  And --

10            THE COURT:  -- to utilize.

11            MR. SCHEIDEMAN:  -- and we cited this in our brief.

12   The *Harkins* case showed the ten years.  *Pasternak*, *U.S. v.*

13   *Torrey, Beaver v. Washington* -- both Ninth Circuit decisions.

14   But when you look at the continuing course of conduct cases --

15   the *Waller* case out of the Supreme Court -- where it clearly

16   said claims that arise out of a continuing course of conduct

17   that provides basis for an earlier claim are not precluded.

18            THE COURT:  Let me ask you.  How do you distinguish

19   the *Feminist Women's Health* case, which found that there was

20   claim preclusion, where the original action was for harassment

21   in state court and then eventually a RICO action in federal

22   state?

23            MR. SCHEIDEMAN:  Was it a state court case?

24            THE COURT:  It originated as a state court case but

25   involved the same activities, essentially, that --

1            MR. SCHEIDEMAN:  Sorry.  I didn't mean to cut you

2       off.

3            There's a substantive difference in the law.  There's

4       state preclusion federal courts will apply when there's

5       something that originates in a state court and there's federal

6       preclusion.  That's why our case is the *Harkins* case,

7       *Pasternak*, *Lawlor* case -- are all federal cases.

8            To the extent that the cases rely on identity of interest

9       and claims and rights, Your Honor, on page 4 of the defendant's

10      brief, the way they characterize it -- in fact, this case does

11      not concern a right to compete in the healthcare market.  This

12      case does not concern an antitrust conspiracy.  This case does

13      not concern a foreclosure from the healthcare market.  It's not

14      going to impair any antitrust ruling, and the complaint here

15      alleges something entirely different.  It's that the defendants

16      are seeking to obtain Prime's property, both tangible property

17      and intangible property.  So really, it's apples and oranges.

18           When get into whether or not there's going to be any

19      impairment of any decision that might come down from the Ninth

20      Circuit relating to the antitrust claim, it's really, to use

21      Your Honor's phrase, if I heard you correctly, apples and

22      oranges here.

23           THE COURT:  Let me hear from the defendants on this

24      issue.

25           MR. ROTHNER:  Thank you, Your Honor.  I think there's

```
 1   a misunderstanding about claim preclusion on the plaintiff's
 2   side, which is that -- and I get that from the reference to the
 3   impairment of an antitrust ruling.
 4        Claim preclusion does not focus on the particular claim in
 5   the first action and whether any further claims under that
 6   legal theory are viable.  It focuses on the transactions.  And
 7   the transactions that were import from Prime I, the antitrust
 8   case, to Prime II, if precluded, preclude any other theory of
 9   recovery or remedy that could have been pled at the time of the
10   antitrust case.
11        A RICO claim could have been pled.  There's no need to
12   look back.  There's no need to worry about a continuum of
13   predicate acts.  Only two are required under RICO anyway.  And
14   if you simply take a look at the chart that we provided, which
15   is the most convenient way to do this -- which was an exhibit
16   to our -- Exhibit A to our motion -- there are about 12 to 15
17   transactions that predate and that were alleged in that
18   antitrust action that could have formed the basis for a RICO
19   theory of recovery.  That's the theory they are being used for
20   in this case, and they didn't do that.  They are precluded from
21   giving it a second try given the judgment in the first case.
22            THE COURT:  To the extent that the plaintiffs in this
23   action are focusing on the CHA UHW agreement, that that's their
24   focus in this action and that's an agreement that didn't come
25   into existence until 2014, and to the extent that that is a
```

1    very large part of this action, how do you respond to the

2    notion that, as far as a RICO action that was complete and

3    ready to proceed on, that that didn't occur until 2014?

4            MR. ROTHNER:  We have never taken the position -- I

5    think there was a misunderstanding on their side about this.

6    We have never taken the position that the new transactions that

7    postdate the first amended complaint in the antitrust case are

8    precluded.  We don't take that position.

9            THE COURT:  No, and I understand that.  But I think I

10   hear the plaintiffs saying that what happened pre 2012 is

11   relevant as it relates to the plaintiff's RICO theory, but that

12   ultimately, the linchpin of this RICO theory, which was not

13   available in 2012, is essentially this neutrality agreement,

14   this CHA UWF --

15           MR. ROTHNER:  There are occasions when they deny that

16   the CHA agreement is a neutrality agreement.  They characterize

17   it as something more nefarious than that.  And sometimes they

18   say it has a hallmark of a neutrality agreement.  But there's

19   nothing about those allegations that were imported from Prime I

20   that predate the first amended complaint in that case that have

21   any relationship to the CHA agreement, what they characterize

22   as the unlawful agreement.

23       What they were talking about in the first case, the

24   Prime I, was agitation toward a true, pure, neutrality

25   agreement.  It wasn't agitation towards the California Hospital

1    Association agreement.  There's nothing to suggest that in

2    those prior allegations, unless what they are doing is

3    suggesting that my clients are simply bad actors generally and

4    we ought to look at all of their prior conduct and make a

5    determination as a matter of evidence that they are prone to

6    commit bad acts.

7        That certainly is not admissible evidence under the

8    federal rules.  But, more importantly, it would cut out the

9    underpinnings of the claim preclusion doctrine, which, among

10   other things, provide my client with relief from theories of

11   recovery as to those prior transactions that could have been

12   pled in that first action.

13       I don't want to spend too much time on this, Your Honor.

14   I will simply say that I think I know what they are hoping for,

15   which is something in the Court's order at the end of the day

16   here that suggests that the prior evidence supporting the

17   precluded transactions is somehow relevant.  I think that's

18   premature.  I don't know why the Court did that in that

19   *Los Angeles Unified School District* case, which is really

20   sui generis.  It was about de jure segregation in the

21   Los Angeles schools.  As far as I was concerned, it was dicta.

22   And I would rather see this question of whether that would even

23   be proper evidence discussed if the case goes forward on a

24   discovery motion than to have some premature, broad ruling

25   suggesting that that's all fair game for discovery in this

1    case.

2             THE COURT:  All right.

3             MR. ROTHNER:  I don't know if the Court needs it; I

4    did have a response to the *Harkins* case, which is their main

5    case.

6             THE COURT:  All right.

7             MR. ROTHNER:  And the response is simply by reference

8    to a published decision of this district -- not this court but

9    this district -- from 2007, *Single Chip Systems Corporation v.*

10   *Intermec IP Corporation*, 495 F.Supp.2d. 1052, and the relevant

11   passage is at page 1062, and this is from 2007 -- where the

12   Court distinguished *Harkins* and, more than that, made it very

13   clear that the loose language in *Harkins* ought to be narrowly

14   construed or perhaps ignored.

15        And just to paraphrase, quickly, the Court in *Single Chip*

16   *Systems* said, look, res judicata -- in this case, claim

17   preclusion -- rests on the time frames involved.  And they

18   talked about the different periods of time represented by the

19   different allegations of the respective complaints and

20   concluded -- the district court did -- thus, the slight

21   difference in the specific factual contentions, which was

22   reflected in part by the different time frame involved, was

23   enough to negate a finding of res judicata.  Accordingly, to

24   the extent that the 2004 counterclaim -- the first action --

25   and the 2007 complaint contained different factual allegations

1    reflected by the different time frames involved, res judicata

2    may not bar the subsequent suit.

3         It's all about time.  Otherwise, if it's not about time,

4    then you can resuscitate a claim based on transactions that

5    were resolved and should have barred the -- the claim should

6    have been pled and the evidence and the allegations that should

7    have been barred would effectively negate the claim preclusion

8    doctrine.

9              THE COURT:  Let me turn to RICO, and specifically the

10   extortion allegations and, even more specifically, the question

11   of obtaining of property, acquiring property.  And that's a

12   big-ticket item here, whether or not what's at play constitutes

13   a property that is capable of being acquired.

14        And so let me ask Prime, with respect to a number of the

15   forms of property that they allege are the subject of the

16   extortion, how those rights or property rights are obtained and

17   acquired by the defendants.  And I am referencing a footnote

18   that was provided in the opposition papers by Prime where they

19   set out 12 or 13 different forms of property, and that's found

20   at page 8 of the response, and it's footnote 9.

21        And specifically, let me ask.  There's a reference to

22   property of the right to exclude representatives of defendants

23   from Prime's property, Prime's control over its business

24   operations.  And I am wondering, how are these property rights

25   being acquired by the defendants?

1          MR. SCHEIDEMAN:  Right.  Your Honor, I would point

2     Your Honor to I think one of the more fulsome analytical

3     frameworks that have been looked at in the federal court, the

4     *Smithfield* case.  The allegations are -- it's out of Judge

5     Payne, out of the Eastern District --

6          THE COURT:  It is a district court?

7          MR. SCHEIDEMAN:  It is.  It is not binding.  But it

8     provides a good example of the framework which courts look at

9     this and analyze it.

10          THE COURT:  Have other courts utilized the *Smithfield*

11     analysis?

12          MR. SCHEIDEMAN:  I don't know if other courts have

13     utilized the *Smithfield* analysis, but *Smithfield* looked at

14     *Gotti*, which was directly -- a 2006 case, a Second Circuit

15     opinion, which interpreted *Scheidler*, a case highly relied on

16     by the defendants --

17          THE COURT:  And this Court should, too, shouldn't it?

18          MR. SCHEIDEMAN:  I am sorry?

19          THE COURT:  *Scheidler*.  The Court should rely upon

20     *Scheidler* to a great extent as well; is that right?

21          MR. SCHEIDEMAN:  That's right.  It was a Supreme

22     Court case.

23          THE COURT:  In *Scheidler*, don't you have a situation

24     there where the Court found that the right to seek medical

25     services, the right to perform jobs, the right to conduct

1    business did not constitute property rights that were subject

2    to --

3            MR. SCHEIDEMAN:  No.  I think we would characterize

4    it a little bit differently, with the Court's indulgence, and I

5    will explain.

6        *Scheidler* was the antiabortion case.

7            THE COURT:  Correct.

8            MR. SCHEIDEMAN:  In *Scheidler*, the court analyzed

9    whether or not deprivation of somebody's rights, whether that

10   could be obtaining property under the extortion statutes.  And

11   there, the Court looked to the intent of the extortionist.  And

12   there, the Court said they didn't intend to get anything for

13   themselves; what they intended to do was foreclose the abortion

14   clinics from operating.

15       And in a response to Judge Stevens' dissent, Your Honor,

16   in footnote 6, the Court specifically said that we are not even

17   reaching, much less overturning, the legion of cases which

18   hold, for example, that intangible property rights -- I think

19   they cited *U.S. v. Tropiano,* which is also a Second Circuit

20   decision -- the right to conduct one's business as one sees fit

21   is the intangible and transferable property right in that

22   particular instance.

23           THE COURT:  Ultimately, didn't *Scheidler* in fact

24   reverse -- if not reverse, disagree with earlier law,

25   specifically about these protests, that -- I am not sure if it

1  was the Fourth Circuit, but there's reference to a case where

2  the Court found that affecting the rights of individuals to

3  utilize abortion clinics did involve property rights that could

4  be the subject of an extortion claim or extortion prosecution.

5  And here, in *Scheidler*, you essentially have the Supreme Court

6  saying that's not the case.

7          MR. SCHEIDEMAN:  Focusing on the intent of the

8  extortionist.

9      In other words, for example, in *U.S. v. Gotti* and looking

10  directly at the *Scheidler* decision, the *Gotti* court held the

11  defendants had obtained, and therefore extorted, union members'

12  LMRDA rights to participate in the affairs of the union by

13  selecting representatives, an actor's intangible right to

14  decide with whom he will work, a business owner's intangible

15  property rights to make business decisions.

16      The *Larson* case, which obviously is not binding on this

17  Court -- that was Chief Judge Skretny, in the Western District

18  of New York -- in facing a similar fact said a pattern of

19  coerced acceptance of a Collective Bargaining Agreement or --

20  or a similar agreement constitutes property under the Hobbs Act

21  and it can be obtainable.

22      Here, we have a list of the intent and the objective of

23  the extortion scheme.

24          THE COURT:  Where did *Scheidler* premise this test on

25  intent?

1          MR. SCHEIDEMAN:  Let me see if I have the pin cite
2    with me, Your Honor.
3        I don't have the pin cite, but I can easily provide it to
4    the Court, in looking at the intent.  And the *Gotti* decision
5    examines that thoroughly.
6        It is what is the intent?  Do you intend to obtain, or do
7    you intend merely to coerce?
8          THE COURT:  But in *Scheidler*, the Court was asked by
9    the women's rights group to find that the right to seek medical
10   services from the clinics constituted property.
11         MR. SCHEIDEMAN:  Right.  But the protesters there
12   didn't seek to obtain for themselves that property.
13         THE COURT:  How does one obtain for themselves the
14   right to seek medical services from the clinics that belongs to
15   somebody else?
16         MR. SCHEIDEMAN:  I think that is what the Supreme
17   Court based its decision on.  In that case, they couldn't
18   intend to obtain it.  The Supreme Court found they didn't
19   intend --
20         THE COURT:  With that being the case, how would it be
21   possible for the defendants to exercise the right to exclude
22   representatives of defendants from Prime's property?
23         MR. SCHEIDEMAN:  Right.  What the defendants are
24   seeking to do is impose and enforce a unionization scheme on
25   Prime.  So what they are trying to do through that is obtain

1    Prime's property in the form of increased union dues, money,

2    customers, goodwill, the right to control and operate a

3    business.

4         And as a matter of fact, we have a writing here that shows

5    that they want to control --

6              THE COURT:  That's three of the 13 or so different

7    forms of property that are noted.  But there are also the

8    spelling out of asserted property claims that there's the right

9    to refuse to recognize the UHW as a bargaining agent; Prime's

10   recognition of the defendant as a bargaining agent; Prime's

11   right to insist on secret balloting elections.  That is why I

12   am not clear as to how it is that the defendants would be

13   asserting or would be acquiring those rights.

14             MR. SCHEIDEMAN:  Because what happens is when you,

15   through extortionate conduct, impose a unionization scheme,

16   where there will be a transfer of both tangible and intangible

17   property -- in other words, the union gets a seat at the table,

18   so they are able to exercise control over the intangible right;

19   for example, how to run your business.  They have a seat at the

20   table, a say in what is happening.  That is the transfer in

21   this particular case.

22             THE COURT:  Having a say in the process constitutes

23   acquiring of a right?

24             MR. SCHEIDEMAN:  Sure.  In other words, for

25   example -- *Smithfield* again, what Judge Payne there said the

right of a person to operate his business as he or she sees fit

is one of the most valuable property rights that a business

has.  And then, when you have a forced unionization campaign,

you are in a sense ceding, transferring that property right

away from you and letting another person get a seat at the

table and then dictate how one exercises their property right

to run their business as they see fit.

THE COURT:  I see a disconnect between that and

*Scheidler*, where the Court, the Seventh Circuit, had

essentially found the clinic's right to conduct business did

constitute property under the Hobbs Act --

MR. SCHEIDEMAN:  It did.

THE COURT:  -- and the Supreme Court reversed the

Seventh Circuit, and so, ultimately, it appears that the

Supreme Court is saying that the clinic's right to conduct

their business is not a property.

MR. SCHEIDEMAN:  No, I think there's a distinction

here that's important.  It may be a property right, but in that

case, it's not obtainable; in other words -- this goes back to

what I was saying earlier -- the intent of the extortionist

wasn't to take that from them and exercise it and use it for

themselves.  That's the critical difference, Your Honor.

THE COURT:  That's one of the things that Prime is

claiming, that Prime's autonomy and control over its business

operations has been threatened.

```
1              MR. SCHEIDEMAN:  Absolutely.  And that is obtainable.
2         See, the difference is, in Scheidler, where you have
3    coercion, you are saying, "You can't do this; you can't do
4    this."  I am going to coerce somebody not to do something.
5         Here, what is different and what the Supreme Court in
6    Scheidler said is, "Wait a minute, Justice Stevens.  We are not
7    overruling Tropiano, which says that the right to conduct your
8    business is transferable.  We are finding under this particular
9    fact pattern and we are narrowing the definition of property
10   under the Hobbs Act.  We are finding that coercion is not" --
11   again, this focuses on the intent of the extortionist.  What do
12   they want out of this?  Do they want to get property for
13   themselves, or stop you from exercising your property?  So
14   that's the distinction.
15        They still found it to be a property interest, but it is
16   the obtaining property element that Scheidler turned on.  And
17   again, that goes back to the intent there.
18        So while it is a property interest -- and I don't think
19   the Supreme Court said it wasn't -- and said here the intent
20   was not to obtain.
21        And then we have a legion of cases that we cite where,
22   clearly, even post Scheidler, agreements, the right to run your
23   business as you see fit is clearly a property right that can be
24   obtained.  I mentioned Judge Larson, coerced exceptions of
25   Collective Bargaining Agreements or similar agreements
```

1   constitutes property under the Hobbs Act.

2       The *Wackenhut* case they cite, they said this is a property

3   interest here, but in that particular case, under those

4   particular facts, they didn't plead, unlike us, that they were

5   attempting to obtain it for themselves.

6       That's a species of intangible property rights that is at

7   play here.  And I think the circuits and courts, both pre and

8   post *Scheidler* -- again, look at footnote 6 in *Tropiano*, and

9   the cases we cite in our brief, in a footnote, clearly show --

10  it is the *Dooley* case, out of the Northern District, California

11  District Court case -- not precedent here -- but it is another

12  example of how this intangible property right is clearly

13  susceptible to being obtained.

14          THE COURT:  Prime asserts that Prime's money in the

15  form of union dues paid to defendants by Prime on behalf of

16  employees, as well as contributions by Prime to other funds,

17  also constitutes property that's, in this case, at issue.

18          MR. SCHEIDEMAN:  That's right.

19          THE COURT:  Is that directly a product of this

20  neutrality agreement or the CHA agreement?

21          MR. SCHEIDEMAN:  No.  That's an interesting point

22  Your Honor brings up.  I think the characterization in the

23  motion to dismiss was that this just concerns the neutrality

24  agreement.  And you know, I counted; they use the word

25  "neutrality agreement" 24 times in a 25-page brief.  But it's

1  not.

2      We mentioned money -- for example, the tangible property

3  they are trying to extort, and also the intangible property,

4  the right to control and operate your business; goodwill, which

5  the California legislature has found is a transferable property

6  right.

7      And there's another interesting -- let's assume, Your

8  Honor, going right to the --

9          THE COURT:  Well, as a practical matter, how would

10  the defendants acquire the goodwill?

11          MR. SCHEIDEMAN:  We outline this in the complaint.

12      The defendants represent unionized healthcare providers.

13  To the extent they pursue these threats and extortion campaign

14  and they try to slur Prime's name in the public domain, trying

15  to obtain property from us, and the goodwill will be

16  transferred to union-operated healthcare.

17      And *Scheidler* says, and defendants conceded in the

18  original brief, that the property interest has to be

19  transferable and obtained, but it also can go to a third party.

20          THE COURT:  It is the goodwill being obtained by the

21  defendants, or is it essentially being damaged by the

22  actions --

23          MR. SCHEIDEMAN:  Both.  Both.  If you have an area

24  where you have two hospitals, for example; one is engaging in

25  an extortion campaign, making up allegations about septicemia

1 | or what have you, and your goodwill goes down, the other

2 | hospitals in the marketplace -- necessarily union hospitals --

3 | are set to gain from that.

4 | THE COURT:  All right.  Continue.

5 | MR. SCHEIDEMAN:  So Your Honor mentioned a neutrality

6 | agreement.  And I said that they say the word -- reference

7 | "neutrality agreement" 24 times in a 25-page paper.

8 | It's important to note here that even if Prime only

9 | alleged that it was a neutrality agreement at issue here -- and

10 | we don't -- that can still be a thing of value, and that's a

11 | fact-specific inquiry.  We cite the Eleventh Circuit case of

12 | *Mulhall*, which is a 302 case.  But the important thing about

13 | the *Mulhall* case was the court said, "Look, the neutrality

14 | agreement is at issue here.  What is a neutrality agreement?"

15 | By the way, there is no uniform neutrality agreement.

16 | This is not a neutrality agreement.

17 | But the value -- whether it is a thing of value and thus a

18 | property right or property interest, whether it is a thing of

19 | value is set by the desire to have the thing.  And it depends

20 | on the individuals and it depends on the circumstances.  So

21 | that ultimately is a fact question.

22 | THE COURT:  Obviously, *Mulhall* appears to be at odds

23 | to some extent with *Adcock*, from the Fourth Circuit, and *Sage*,

24 | from the Third Circuit.

25 | MR. SCHEIDEMAN:  We would disagree.

 1          THE COURT:  You do?

 2          MR. SCHEIDEMAN:  And if Your Honor would afford just

 3   a quick opportunity to explain why, we would be happy to do

 4   that.

 5          THE COURT:  Sure.

 6          MR. SCHEIDEMAN:  The *Adcock v. Freightliner* case

 7   found that that particular neutrality agreement wasn't a thing

 8   of value; in other words, that was merely an access agreement.

 9   And I think the Fourth Circuit in *Adcock* used the analogy of a

10   vacuum salesman coming in and making a pitch.

11       We have a writing here, the memorandum of understanding,

12   and the code of conduct.  I mean, the agreement at issue here

13   is not just a quote/unquote "be neutral," it is a code of

14   conduct which necessarily states how you are going to operate

15   your business, what you are going to do and what you are not

16   going to do.  In paragraph 220 onward in our complaint, we

17   outline in great detail what that is.

18       *So the Adcock v. Freightliner* case did not say, does not

19   hold, that neutrality agreements cannot be a thing of value.

20   It's that that particular one, based upon the facts and

21   circumstances pled before that particular court, was not a

22   thing of value.

23       And the *Sage Hospitality* agreement or the *Sage Hospitality*

24   case, a Third Circuit case in 2004, said that particular --

25   that particular neutrality agreement before it did not involve

1   a payment, loan, or delivery of anything.  It never said that

2   neutrality agreements cannot be things of value.  But more

3   appropriately, the Eleventh Circuit said, "Wait a minute.

4   Whether something is a thing of value" -- it's sort of like

5   motive and intent is a fact determination.  So you have to look

6   at the facts and circumstances, and it depends on the

7   individual and the circumstances to find out if it is a thing

8   of value.  And that's what we have here.

9         THE COURT:  What about the concern of the Third

10  Circuit that, to find that neutrality agreements constitute

11  something of value, there's a danger of upsetting the balance

12  of laws governing the recognition of unions?

13        MR. SCHEIDEMAN:  Okay.  I will respond to that

14  directly.  And this sort of goes into the claim-of-right issue,

15  the Hobbs defense, the wrongfulness defense.

16     Nowhere in the Taft-Hartley legislation, nowhere in the

17  labor laws at all is there a mention of neutrality agreements

18  as being a legitimate objective.  It doesn't exist.  They would

19  have cited it in their papers if it existed.  Cases don't hold

20  that these are a legitimate objective from the standpoint of

21  labor.

22     The *JP Morgan* case, the *Marriott* case, which they cite,

23  held we are not going to find them illegal.  They can go ahead

24  if they want to enter into that type of agreement, but it's not

25  a sanctioned or legitimate objective.

1          THE COURT:  Well, we have the Labor-Management

2    Cooperation Act that seems to encourage cooperation agreements

3    between labor and management.  Wouldn't that be evidence of

4    Congress' view that these types of agreements are to be strived

5    for?

6          MR. SCHEIDEMAN:  Well, I think then you have to say

7    how does Section 7 come into play?  In other words, labor --

8    unions get their power, their authority, from employees.

9       In other words, they have two options here.  When a new

10   employer -- or a union wants to unionize a new employer, you

11   have two options.  You can have a certified election, and you

12   can ask, and if the employer says no -- the employer has a

13   statutory right to say no -- and then they have to go and get

14   their election if they want to represent.  So they have a right

15   to be free from the threat of harm here, clearly, under the

16   labor statutes.

17      So if they were a representative of the employees here,

18   they would have a different bevy of rights that would come into

19   play.

20      But I will direct Your Honor, if I could, to then Judge

21   Sotomayor, when she was on the Southern District and faced a

22   similar situation, and that's the *A. Terzi* decision.  She said

23   until unions are certified as representatives, they are an

24   outside meddler with no lawful claim to the property.

25      And that's what we have here.  We have an outside meddler

1    with no claim to the property.

2         The *Larson* case, again, when unions pursue agreements with

3    new employers through threats and fear, they have no lawful

4    platform upon which to claim the property of the employer.

5         The *Smithfield* case, until unions prevail in a valid NLRB

6    certified election, a company has a property right not to

7    recognize the union and operate its business free form

8    interference.  This is no less than efforts to obtain property

9    than the effort in *Gotti*, pointing to the Second Circuit.  They

10   are certainly free under the labor statutes to pursue their

11   legitimate objectives.  If they want to represent Prime's

12   employees, go do it the statutorily sanctioned way.

13             THE COURT:  Let me hear from the defense.

14             MR. ROTH:  Thank you, Your Honor.  Andrew Roth.  I

15   have been assigned the task to respond to the RICO issues on

16   behalf of all of the defendants.  Thank you for having me in

17   court today.

18             THE COURT:  Thank you.

19             MR. ROTH:  I think I would like to take a step back

20   because I think it really facilitates analysis to state that,

21   when you look at this first amended complain, there really are,

22   in essence, two separate RICO extortion schemes being alleged

23   in that complaint.  One is that, through various economic

24   pressure tactics, the defendants have demanded that Prime enter

25   into a neutrality agreement with UHW.  That is one separate

 1   RICO extortion scheme that's alleged.

 2        That scheme supposedly dates back to 2010, and that's why

 3   we have argued that that particular RICO claim, based on the

 4   demand for a neutrality agreement, is precluded.

 5        So you know, I understand Your Honor's tentative ruling,

 6   but I would still like an opportunity because Your Honor may

 7   want to consider an alternative ground for saying, even if it's

 8   not precluded, that that particular RICO claim does not state a

 9   claim.

10        Their separate RICO claim -- and for RICO purposes, it's

11   critical to focus on what the demand is, because you can't

12   analyze what property is allegedly trying to be obtained and

13   whether there's some wrongfulness in the conduct unless you

14   focus in on what the demand is.

15        So there's two separate courses of conduct, really, in

16   this complaint.  The latter, which we have not made a claim for

17   preclusion, is the separate scheme to allegedly -- again, using

18   similar economic pressure tactics -- to try to coerce Prime

19   into signing on to the CHA UHW agreement, which didn't come

20   into effect until 2014.  Very similar means -- the economic

21   pressure tactics allegedly are similar, but they are two very

22   separate courses of conduct in relation to what the demand

23   that's being alleged in the complaint is.  For analytical

24   purposes, it's critical the Court bear that in mind.

25        With that sort of as the background, let me say, with

1    respect to the technically precluded RICO claim, with respect
2    to the demand for a neutrality agreement, that fails on two
3    separate grounds as we have set forth in our brief.  There's
4    no -- when you make a demand for -- when unions make a demand
5    for a neutrality agreement, they are not seeking to obtain any
6    property right of an employer.  And it also fails on the ground
7    that that demand for a neutrality agreement is not wrongful
8    within the meaning of the court's -- Ninth Circuit's recent
9    decision in the *Carpenter* case.  And let me take each one in
10   turn.
11       When a union -- what is a union doing when it demands a
12   neutrality agreement?  It is demanding the employer not
13   exercise certain rights that it has under the law.  It -- an
14   employer has the right -- even if a union shows him cards, the
15   employer can say, "Prove it at an election.  I am not
16   recognizing you voluntarily."  The union, in a neutrality
17   agreement, turns to the employer and says -- uses economic
18   pressure to try to get the employer to agree -- that, "If we
19   can demonstrate," through cards or some other device --
20   sometimes neutrality agreements provide for private elections
21   not supervised by the NLRB.
22       If the employer agrees that it will not exercise its right
23   to insist on a secret ballot election -- if the employer agrees
24   to that, the union doesn't now have the employer's right to
25   insist on a secret ballot election.  It's just basically gotten

1    the employer to waive that right.  It doesn't gain it.

2         Similarly, what else is a neutrality agreement?  It sets

3    ground rules for that organizing.  The union is accorded

4    certain rights.  This is not a fact-based inquiry; this is

5    alleged -- if you look at paragraph 66 to 68 of the first

6    amended complaint, it describes what these corporate campaigns

7    are about, what neutrality agreements are.  They are seeking to

8    get the union to be -- the union is trying to get the employer,

9    in paragraph 66, to not exercise its right to insist on a

10   secret ballot.  In paragraph 67, it's trying to get the

11   employer to be neutral in the organizing campaign.  So not to

12   exercise -- an employer has a right, under 8(c) of the National

13   Labor Relations Act, to express an opinion about unionization.

14   The union is putting economic pressure on the employer to waive

15   that right.

16        This sort of best illustrates the silliness of the

17   argument on the other side.  The union now doesn't have the

18   right to oppose itself.  It doesn't acquire that right.  Or to

19   support itself.  It's basically trying to pressure the employer

20   to waive its right.  It is not obtaining anything.

21        Similarly, with respect to paragraph 68, neutrality

22   agreement, the other common ingredient of a neutrality

23   agreement -- which is alleged in this complaint and case law

24   says the same thing -- is access rights.  That was at issue in

25   *Freightliner*.  So is neutrality, mind you.  It's not true it

 1  was just access rights.  The neutrality agreement in the Fourth

 2  Circuit decision in *Freightliner* also involved a neutrality

 3  pledge.

 4      So again, the employer -- in a neutrality agreement, if

 5  the employer agrees to it -- it has the right to exclude the

 6  union from its premises under the National Labor Relations Act

 7  and under state law property rights, but the union is getting

 8  it to waive that.  The union doesn't then acquire the

 9  employer's property.  The union just -- the employer is not

10  exercising its right to exclude the union organizers from its

11  property.

12      That, Your Honor, is exactly -- with respect to a

13  neutrality agreement, that is the precise holding of the *Magic*

14  *Laundry* decision out of the Central District of California.  It

15  is the holding of the *Wackenhut* decision.  Those cases, from an

16  obtaining of property standpoint, are on all fours with this

17  case.

18      And to be sure, the plaintiff relies on *Smithfield*.

19  *Smithfield* did come out the other way.  The *Magic Laundry* court

20  specifically said -- found the reasoning of *Smithfield*

21  unpersuasive.  The *Wackenhut* court did not address *Smithfield*

22  in terms, but its analysis -- it rejects the *Smithfield*

23  analysis without even mentioning *Smithfield*.

24      And those are other district court decisions, to be sure,

25  but *Smithfield* -- the rationale of *Smithfield*, that a union

1    acquires an employer's right to run its business, is flatly

2    inconsistent not only with *Scheidler* but the Supreme Court's

3    decision more recently, post *Smithfield*, in the *Sekhar* case.

4    The Supreme Court ridiculed that notion as sophistry.

5         In that case, there, the -- it was like -- not neutrality;

6    it was a free speech notion.  The employer -- the allegation

7    was -- by the government, was they were trying to coerce the

8    controller assistant to make a recommendation.  And the Court

9    said that's coercion.  That's not obtaining -- you don't

10   acquire -- if you are successful in that endeavor, you don't

11   then acquire the person's free speech right.  You are basically

12   compelling them to exercise it in a certain way that you favor.

13        And that's -- *Smithfield* went the other direction on that,

14   but it's not consistent with binding Supreme Court authority,

15   and it should be rejected by this court, just as it was

16   explicitly rejected in the *Magic Laundry* case.

17             THE COURT:  There was, I believe, an attempt to graft

18   the *Mulhall* decision, which related to 302 as to a thing of

19   value, onto the law relating to extortion.  And do you have any

20   response to that?

21             MR. ROTH:  I think when you read *Mulhall* and you read

22   *Sage Hospitality* and you read the *Freightliner* decision, they

23   are really -- there's some tension in the reasoning; but in the

24   final analysis, there really isn't tension in the results.

25   They all -- even the *Mulhall* decision says that a union and

1    employer may set ground rules for an organizing campaign even

2    if -- yes, that's a value in some sense to the union, when you

3    set those ground rules, particularly the neutrality pledge.  It

4    is a value.  But all those decisions say it is not a 302

5    violation because -- let me say two things about that.

6        The statute, 302, doesn't use "thing of value" in the

7    abstract.  302 says it is unlawful to pay, lend, or deliver

8    money or other thing of value.

9        So what the Third Circuit said in *Sage Hospitality* is

10   there's no payment or delivery.  That connotes -- it is similar

11   to the obtaining of property.  And in fact, 302 is an

12   antiextortion statute.  It prevents extortion by a union.

13       The paradigm case of a 302 violation is a union

14   representative going to an employer and saying, "You pay me

15   $10,000, and I will go the other way; I won't try to organize

16   your shop."  That's extortion.  That's what is 302 -- that's

17   corrupting a union, by not doing what the union is supposed to

18   be doing.

19       When a union is seeking a neutrality agreement, it is not

20   getting a transfer of any employer's rights.  This is what the

21   Third Circuit said in *Sage Hospitality* -- or the Fourth Circuit

22   said.  What 302 is designed to prevent is a transfer of assets

23   or something of ascertainable value from the employer to the

24   union to corrupt the union to get the union to do something

25   that a union is not supposed to be doing.  Unions exist to

1    increase representation of employees.  So a neutrality

2    agreement furthers that goal and is as far from corruption as

3    you can possibly be.

4            THE COURT:  Let me ask you.  Prime read *Scheidler* to

5    hold that the reason that the clinic's right to conduct

6    business wasn't "property" was because there wasn't this intent

7    to deprive or acquire.  *Mulhall* speaks in terms of intent to --

8    it says as follows:  "Whether something qualifies as a payment

9    depends not on whether it is tangible or has monetary value but

10   on whether its performance fulfills an obligation.  If

11   employers offer organizing assistance with the intention of

12   improperly influencing the union, then the policy concerns in

13   302, curbing bribery and extortion, are implicated."

14       Do you agree with that?

15           MR. ROTH:  I don't.  I don't agree with everything --

16   there's a lot of dicta.  There's a lot of statements in the

17   Eleventh Circuit decision I don't think are right.

18       Intent is relevant in the following sense:  Intent is

19   relevant in the sense of what is the union demanding?  What are

20   they trying -- just like in *Scheidler*, the antiabortion

21   protesters weren't -- their intent was relevant in the

22   following sense:  They weren't trying to acquire the abortion

23   clinic for themselves and perform abortions.  They were trying

24   to stop.  So they weren't intending to acquire anything.

25       Similarly, with a neutrality agreement, intent is relevant

 1    in the sense of what is the -- what is this endeavor about?

 2    What is the union trying to do in getting a neutrality

 3    agreement?  A union is not trying to gain the employer's right

 4    to bash the union and exercise that for itself.  It's not

 5    trying to gain the employer's right to insist on a secret

 6    ballot election.  It is trying to gain representation rights

 7    for the workers at that facility and to establish a set of

 8    ground rules in which that can be done.  And there is no

 9    obtaining of property in that whatsoever.

10        That's the holding of *Magic Laundry*.  That's the holding

11    of *Wackenhut*.  And it is exactly consistent and exactly right

12    under the Supreme Court rationale both in *Scheidler* and the

13    most recent decision in *Sekhar*.

14            THE COURT:  With respect to wrongful means, is that a

15    defense that's available in this case where the plaintiffs rely

16    upon state extortion statutes?

17            MR. ROTH:  The Ninth Circuit squarely held in the

18    recent *UBC* decision, at pages 8 -- 770 F.3d., 833 to 834 --

19    they don't even plead Hobbs Act extortion because it has a

20    wrongfulness requirement they can't meet.  So they try to evade

21    that by pleading state law extortion.  I don't think state law

22    extortion actually -- in California certainly -- doesn't

23    dispense with the wrongfulness requirement.

24        But the salient point is, under the Ninth Circuit

25    decision, you can't end-run the Hobbs Act that way.  You have

1    to prove -- to establish a RICO predicate act of extortion, you

2    have to show something that's generically extortion.  And the

3    Hobbs Act definition is the generic definition of extortion:

4    Obtaining of property through wrongful means.

5        That's why, in *Scheidler*, Your Honor, the Supreme Court

6    spent ten pages saying this doesn't make Hobbs Act extortion,

7    and took one page -- I think page 409 of the opinion -- they

8    said, "Well, given that they haven't met the definition of

9    extortion under the Hobbs Act, they haven't met the generic

10   definition of extortion, which is identical in all essential

11   respects, and therefore their state law extortion claims fail,

12   and they have no RICO claim at all."

13           THE COURT:  All right.  Thank you.

14       Let me move on to Section 303.  And specifically, let me

15   inquire of the plaintiffs with respect to the injury component

16   and whether or not there are sufficient facts alleged in the

17   complaint relating to the precise injury.

18           MR. SCHEIDEMAN:  Thank you, Your Honor.  With the

19   Court's indulgence -- and I beg your indulgence -- could I just

20   respond to two points he just made?  Because I think we left

21   something very, very important off the table here.

22       302 also makes it illegal not to pay, not to lend, not to

23   deliver, but for a union to demand anything that's a thing of

24   value.  We again heard, respectfully, "neutrality agreement,

25   neutrality agreement, neutrality agreement."  We have alleged

1   multiple things of value.  It's convenient to call it a

2   neutrality agreement, but there is a writing here.  Now, it's

3   not a neutrality agreement.  If I may, Your Honor, the

4   agreement is a code of conduct agreement.  The agreement

5   requires not neutrality, but for us to be positive with respect

6   to the union's efforts.  Paragraphs 243 to 249 of the

7   complaint, the agreement requires us to forego rights to seek

8   redress against the UHW with the courts and administrative

9   agencies.  The agreement requires and demands that we cede

10  business control over labor and employment relations, including

11  wages, terms, and conditions of employment.  The agreement

12  requires a joint advocacy fund of $100 million.  The agreement

13  also calls for a quid pro quo for this thing of value.

14       And let me read directly from the unlawful agreements.

15  The unlawful agreements says that, "The differences, if any,

16  between the unions and Prime and any signatory shall be

17  addressed in a positive manner.  No party shall engage in

18  personal attacks or make a derogatory comment."  So, is this a

19  neutrality agreement?

20       If this is imposed upon hospitals in California, and all

21  of a sudden -- let's take a representative demographic sample.

22  The hospital, which is nonunion, is not allowed to make any

23  derogatory comments about the unionization efforts.  So a boss

24  of a nurse comes up to the nurse -- say it's a single mother

25  with two children -- says, "I am hearing from higher up,

 1    there's going to be a union campaign.  You'd better support
 2    it."  What is that person going to do to keep their job?  They
 3    are going to support it.
 4         Also, the quid pro quo in this agreement calls for
 5    antiemployer activities to stop.
 6         It's important -- we are talking about the wrongfulness
 7    element as a defense to RICO.  That applies to economic
 8    extortion, not noneconomic extortion, not the Section 302
 9    violation.
10         Let me read to you from the agreement.  As the quid pro
11    quo -- says that the unions will stop actions commonly
12    associated with corporate campaigns.  It will stop reputational
13    attacks.  It will stop economic attacks.  It will stop personal
14    attacks.  It won't instigate or support any of the following:
15    It won't instigate or support litigation with the exception of
16    litigation to enforce the terms of an existing collective
17    bargaining agreement; in other words, real litigation, not sham
18    litigation.  It won't support any adverse action by any
19    governmental entity.
20         So to say this is not a thing of value at this particular
21    stage, the motion-to-dismiss stage, when this is an absolute
22    fact-specific inquiry, I think would be wrong, Your Honor.
23         Now, I believe Your Honor wanted to turn the subject to
24    damages.
25              THE COURT:  303.

1          MR. SCHEIDEMAN:  Yes.  303.  The suffering of injury.

2      The 303 claim, a violation of Section 8(b)(4) of the NLRA,

3  when a union threatens, restrains, or coerces any person to

4  cease doing business with another person.

5      We have alleged that the SEFIU and the UHW has threatened

6  and coerced Daughters of Charity Hospital System to cease doing

7  business with Prime, discussions of a business arrangement by

8  protesting, filing an ERISA lawsuit, requesting that the SEC

9  conduct an investigation.

10     Now, the important thing here -- and this is absolutely

11  critical; this is the Supreme Court, the *NLRB v. Denver*

12  *Buildings and Trades Council* case -- in doing any of those

13  actions, if any part of their motive -- 1 percent,

14  .01 percent -- if any part of that motive was to interfere with

15  the neutral, which would be Daughters of Charity, that's a

16  violation.

17     Now, talking about suffering and injury -- and I think

18  they cited the *American President* case.  That case simply

19  says -- I think the pin cite is 1153 -- injury is whether the

20  person was aimed at or hit.  And so that would be Prime,

21  whether Prime was aimed at or hit.

22     The *R.L. Coolsaet* case, you don't have to prove the exact

23  amount of damages.  It has to be some injury, out-of-pocket

24  expenses paid to third parties.

25     The *Frito-Lay* case, which is a Ninth Circuit case, in

footnote 11, goes through the broad definition of injury:
Expenses not normal to business operations or occasioned by the
conduct, in this case, of the unions.

    We have alleged that we have incurred out-of-pocket costs,
legal fees -- not in this action, but certainly in responding
and defending to the attacks on the neutral.  And this is,
again, something that we need to put in front of a jury; the
amount, the exactitude of what those damages are.  There's
clearly no standing issue.  The *American President* case is
misquoted for that.

        THE COURT:  Let me ask you about the protest you just
referenced.  With respect to the protest, the defendants assert
that there's insufficient facts as to specifically what type of
protest, whether or not it's one that's considered to be lawful
or unlawful.  What is your response?

        MR. SCHEIDEMAN:  I would point Your Honor to the
*Point Ruston* case.  It's not from this district.  It's from the
Western District of Washington.  Same allegation; the Court
looked under Rule 8, notice standards, and said this really
depends on the factual context, the factual record, and the
defendants may develop -- the defendants may develop facts
showing the no support for the 303 case.

    And protests -- we have alleged protest.  That has been
held -- if you look at the *Kentov* case, an Eleventh Circuit
case, it's a mixture of conduct and communication.  It is the

```
 1   conduct.  So again, with regard to the protest, any motive --
 2   any motive shown makes it a violation.
 3              THE COURT:  All right.  Let me hear from the defense
 4   with respect to the 303.
 5              MR. ROTHNER:  Thank you, Your Honor.
 6        On the last point about the allegations regarding the
 7   protest and the allegations of injury in regard to legal
 8   expenses and other expenses and responding to conduct, the
 9   point here that I think they have missed is that there are some
10   conclusory allegations that the protest is unlawful.  There are
11   some conclusory allegations that they had to expend resources
12   in defending themselves.  But they haven't plausibly pled
13   injury for purposes of that very important standing threshold
14   requirement under Section 303.  We pointed out in our briefs
15   that there must be plausibly pled injury for standing purposes.
16        And I do want to return to the American President Line
17   case, v. The International Longshore Warehouse Union, because
18   counsel raised it and I think glossed over the significance of
19   the holding that it referred to.
20        There are two parts of that analysis that are very
21   important here.  The first is that the Court held that to
22   determine whether Section 303 standing exists, a district court
23   must look to, one, the nexus between the injury and the
24   statutory violation; and two, the relationship between the
25   injury alleged and the form of injury that Congress sought to
```

1   prevent or remedy by enacting the statute.

2        Section 303 is a statute that allows for damages where

3   there's standing for purposes of unlawful secondary activity

4   that violates Section 8(b)(4).  And there is no plausible,

5   factual theory pled in regard to the protests -- that they are

6   alleged as protests, they are alleged to be unlawful, but no

7   plausible, factual theory, except in a very conclusory fashion,

8   as to why they violate Section 8(b)(4) for purposes of a 303

9   damage action.

10       Then, to move on, the court, in *American President Line*,

11  really quoting another Ninth Circuit decision, a case called

12  *Fulton* -- which is contained within the page cite counsel gave

13  you, the cite to *Fulton* -- but the Court said to determine the

14  relationship between the injury and the statutory violation, we

15  examine whether the plaintiff, quote, "Was within the target

16  area of the defendant's illegal practices and was not only hit

17  but was also aimed at," end quote.

18       So what's clear about that is that they have alleged, in a

19  very conclusory fashion, that they have been injured without

20  explaining why.  They have also alleged that Daughters of

21  Charity was aimed at.  I am not sure they have alleged that

22  Daughters of Charity was hit, but perhaps they have.

23       But they haven't alleged, for purposes of *Twombly* and a

24  viable plausible complaint, precisely what the rest of the harm

25  is, what the injury is to Prime by virtue of this conduct aimed

```
1    at a third party.  We understand they are trying to purchase

2    Daughters of Charity, but they haven't ever explained, while

3    Daughters of Charity remains functioning as a separate entity

4    and has all the capacity it needs, presumably, to defend itself

5    against lawsuits and other activities and to seek relief for

6    those, that somehow Prime was injured by virtue of that

7    conduct.

8              THE COURT:  So to the extent that there were certain

9    activities taken against the hospital, the Daughters of --

10             MR. ROTHNER:  Daughters of Charity.  It is a system,

11   several hospitals.

12             THE COURT:  The Daughters of Charity.  And

13   ultimately, they were aimed at, essentially, at pushing Prime

14   towards agreeing to the neutrality agreement, and so Prime,

15   viewing these actions against the Daughters as being ones

16   actually meant to coerce Daughters not to sell, that Prime took

17   certain measures, they employed attorneys to assist the

18   Daughters hospital, would those acts, in obtaining attorneys to

19   fight off or fend off the SEC investigation or the protests,

20   provide standing?

21             MR. ROTHNER:  I am not sure because it hasn't been

22   alleged.  If we look at the complaint, paragraph 19, which they

23   referred to as support for their theory they have alleged

24   injury -- and this is really the, sort of, emblematic problem

25   with this allegation, or lack of allegation, regarding injury
```

1    under the *American President Line* analysis.

2        So Prime does not want to enter into the unlawful

3    agreements, Prime does not want to join the UHW-controlled

4    employer organization created by the unlawful agreements --

5    that's the cooperation agreement -- and Daughters of Charity

6    Health System wants to, and is attempting to, do business with

7    Prime despite the UHW threats and campaign.

8        And then they jump to, "Prime has incurred significant

9    costs, including substantial legal fees, in defending against

10   UHW's unlawful conduct in violation of NLRA Section 303."

11       Now, where is the plausible, logical connection and

12   explanation for precisely why it is, by directing its activity

13   towards Daughters of Charity Health System, UHW has caused

14   Prime to incur significant costs, including substantial legal

15   fees?  That's unstated.  Simply not alleged.

16           THE COURT:  All right.

17       I will let Prime have one last reply.

18           MR. SCHEIDEMAN:  All right.  Thank you, Your Honor.

19       *American President* -- were they aimed at?  Were they hit?

20   We alleged they are aiming at us.  Fact question.  They are

21   using a neutral, which is absolutely prohibited under 303 to do

22   it.  That's a fact question.

23       We have alleged we have incurred costs.  We are going to

24   give them the costs in discovery.  We have alleged it.  There's

25   a Rule 8 notice pleading standard.  And even if it were even a

```
 1   close call here -- I don't think it is -- all reasonable
 2   inferences should be given to Prime in pleading.  So where they
 3   are aiming is a fact question.
 4        We are going to show -- we are going to show the jury that
 5   they are using this neutral, trying to coerce it, to aim at us.
 6   And clearly, we allege we suffered damages, costs, in regard to
 7   this.
 8             THE COURT:  All right.  Thank you.
 9        The Court will take the matter under submission, and we
10   will take up the next matter that we have on calendar.
11             MR. ROTHNER:  Thank you, Your Honor.
12             MR. SCHEIDEMAN:  Thank you, Your Honor.
13        (End of proceedings at 2:48 p.m.)
14                              -o0o-
15
16
17
18
19
20
21
22
23
24
25
```

1                     C-E-R-T-I-F-I-C-A-T-I-O-N

2

3           I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11           DATED:  March 3, 2015, at San Diego, California.

12

13                        /s/  Chari L. Possell
                          _____
14                        Chari L. Possell
                          CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25