1
2
3
4
5
6
7

8        **UNITED STATES DISTRICT COURT**

9        **SOUTHERN DISTRICT OF CALIFORNIA**

10   PRIME HEALTHCARE SERVICES,          CASE NO. 14cv2553-GPC-RBB
     INC.,
11                                        **ORDER GRANTING IN PART AND
                                          DENYING IN PART
12                            Plaintiff,  DEFENDANTS' MOTION TO
                                          DISMISS PLAINTIFF'S FIRST
13        v.                              AMENDED COMPLAINT**

14   SERVICES EMPLOYEES                   [Dkt. No. 50.]
     INTERNATIONAL UNION, ET AL.,
15
                            Defendants.
16

17
                          **INTRODUCTION**
18
         Plaintiff Prime Healthcare, Inc. ("Prime Healthcare") brings this civil action
19
     alleging violations of the Racketeering Influenced and Corrupt Organizations Act
20
     ("RICO") and the Labor Management and Relations Act ("LMRA").  Before the Court
21
     is a motion to dismiss filed by Defendants Service Employees International Union
22
     ("SEIU"), Service Employees International Union - United Healthcare Workers West
23
     ("UHW"), Change to Win, CTW Investment Group, Mary Kay Henry, Dave Regan,
24
     and Tom Woodruff (collectively, "Defendants").  (Dkt. No. 50.) The Parties have fully
25
     briefed the motion. (Dkt. Nos. 57-58.)  For the reasons set forth below, the Court
26
     **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss.
27
     ///
28
     ///

**FACTUAL BACKGROUND**

Prime Healthcare brings this action against various union-related entities and individuals for allegedly unlawfully conspiring to unionize hospitals owned by Prime Healthcare.  (Dkt. No. 47, First Amended Complaint ("FAC") ¶ 5.)

**A.    The Parties**

Plaintiff Prime Healthcare is a hospital management company which, along with an affiliated foundation, operates twenty-eight acute care hospitals in eight states, including fifteen hospitals in California.  (*Id.* ¶¶ 1, 22-23.)  Prime Healthcare describes itself as "largely non-union."  (*Id.* ¶ 3.)

Defendant SEIU is an unincorporated labor association that represents units of workers and negotiates terms and conditions of employment for the workers it represents.  (*Id.* ¶ 24.)  Defendant UHW is a local union affiliate of SEIU located in California.  (*Id.* ¶ 25.)  UHW represents individuals working in California's hospitals and clinics, including nurses, aids, case managers, clerks, maintenance workers, and housekeeping staff, and negotiates terms and conditions of employment for the healthcare workers it represents.  (*Id.*)

Defendant Change to Win is a union federation made up of three member unions: SEIU, the International Brotherhood of Teamsters, and the United Farm Workers of America.  (*Id.* ¶ 30.)  Defendant CTW Investment Group is the investment arm of Change to Win.  (*Id.* ¶ 36.)  Prime Healthcare alleges that Change to Win approves of SEIU's tactics, and supports them through CTW Investment Group.  (*Id.* ¶¶ 31-35.)

The remaining Defendants are individual executives of the above entities. Defendant Mary Kay Henry is the President of SEIU and Secretary-Treasurer of Change to Win.  (*Id.* ¶ 27.)  Defendant Dave Regan is President of UHW, Vice President of SEIU, and Vice President of the SEIU Leadership Council.  (*Id.* ¶ 28.) Finally, Defendant Tom Woodruff is the Executive Director of Change to Win's Strategic Organizing Center, and also previously served as an SEIU International Executive Vice President for more than a decade.  (*Id.* ¶ 36.)

**B.    Alleged Unlawful Conduct**

Prime Healthcare alleges that Defendants have unlawfully conspired to force Prime Healthcare to unionize its hospitals through a "corporate campaign" that employs extortion.   (*Id.* ¶¶ 5, 8, 47.)   For example, since around 2010, Defendants have allegedly:

•      attempted to thwart Prime Healthcare's acquisition of additional hospitals;

•      attacked investment partners of Prime Healthcare through false and disparaging public accusations of wrongdoing;

•      produced false and misleading reports and studies for the sole purpose of damaging Prime Healthcare's business goodwill;

•      worked with complicit media outlets to publicize sham and baseless allegations;

•      initiated certain sham and baseless complaints causing regulatory and administrative investigations, sham and baseless litigation, and inquiries by accreditation agencies;

•      coerced, harassed, and threatened patients who use Prime Healthcare's services;

•      persuaded writers, government agencies, and politicians to raise specious allegations about Prime Healthcare's conduct;

•      targeted the California Hospital Association with sham ballot initiatives to impose a top-down neutrality agreement on its members (including Prime Healthcare); and

•      violated federal labor laws.

(*Id.* ¶¶ 9, 115.)

Prime Healthcare alleges that through their extortionate activities, Defendants have acquired and are attempting to acquire substantial money and property, including tens of millions of dollars, Prime Healthcare's goodwill, Prime Healthcare's rights to grow its business through hospital acquisitions and oppose unionization of its employees, and Prime Healthcare's customers and related revenues. (*Id.* ¶¶ 14, 110.)

///

### C.    Prior Prime Healthcare Litigation

On November 15, 2011, Prime Healthcare previously brought an antitrust action alleging that SEIU, UHW, and several Kaiser-related entities had conspired to eliminate Prime Healthcare from the healthcare services market and increase healthcare workers wages. *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-CV-2652-GPC-RBB (S.D. Cal.) ("*Prime Healthcare I*").   On September 21, 2012, Prime Healthcare filed a first amended complaint. (*Id.* at Dkt. No. 46.)  On July 25, 2013, this Court dismissed Prime Healthcare's first amended complaint under Federal Rule of Civil Procedure 12(b)(6), but granted leave to amend. *See Prime Healthcare I*, 2013 WL 3873074 (S.D. Cal. July 25, 2013).  After Prime Healthcare did not file a second amended complaint, this Court granted the defendants' motion to dismiss with prejudice for lack of prosecution under Federal Rule of Civil Procedure 41(b). *See Prime Healthcare I*, 2013 WL 6500069 (S.D. Cal. Dec. 11, 2013).   Prime Healthcare's appeal of this Court's dismissal orders is still pending. *See Prime Healthcare I*, No. 13-57185 (9th Cir.).

**PROCEDURAL HISTORY**

On August 25, 2014, Prime Healthcare filed the instant action in the Northern District of California ("*Prime Healthcare II*").  (Dkt. No. 1.)  On October 24, 2014, the Northern District of California ordered the case transferred to the Southern District of California.  (Dkt. No. 38.)  On November 14, 2014, the case was reassigned to the undersigned judge.  (Dkt. No. 45.)

On November 17, 2014, Prime Healthcare filed the operative First Amended Complaint ("FAC"), which superseded its original complaint.  (Dkt. Nos. 47, 52.) Prime Healthcare alleges eight RICO claims, 18 U.S.C. §§ 1961 *et seq.* (counts I-VIII) and three LMRA claims, 29 U.S.C. §§ 186 *et seq.* (counts IX-XI).  (Dkt. No. 47 ¶¶ 270-340.)

1   On December 16, 2014, Defendants filed a motion to dismiss the FAC.[1]  (Dkt.

2   No. 50.)  Prime Healthcare filed its opposition on January 16, 2015.  (Dkt. No. 57.)

3   Defendants filed their reply on January 30, 2015.  (Dkt. No. 58.)

4   On February 20, 2015, the Court held a hearing regarding Defendants' motion

5   to dismiss.[2]  (Dkt. No. 67.)  Attorneys Ed Scheiderman, Amanda Fitzsimmons, and

6   David Durham appeared for Prime Healthcare.  Attorneys Theodore Franklin, Andrew

7   Roth, and Glenn Rothner appeared for Defendants.

8   **LEGAL STANDARD**

9   A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the

10  sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

11  Dismissal is warranted under Rule12(b)(6) where the complaint lacks a cognizable

12  legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.

13  1984); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule12(b)(6)

14  authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

15  Alternatively, a complaint may be dismissed where it presents a cognizable legal theory

16  yet fails to plead essential facts under that theory.  *Robertson*, 749 F.2d at 534.  While

17

18  [1]Defendants also filed a supporting request for judicial notice.  (Dkt. No. 50-3.)
    Defendants seek judicial notice of (1) court records in *Prime Healthcare I*; (2) the

19  complaint in an ERISA lawsuit mentioned by Prime Healthcare in the instant FAC; and
    (3) an announcement on the website of Daughters of Charity Health System ("DCHS")

20  that DCHS and UHW had reached a new, three-year collective bargaining agreement
    covering DCHS employees represented by UHW.  Prime Healthcare only challenges

21  Defendants' request for judicial notice of the ERISA lawsuit complaint, and does not
    dispute that UHW was the bargaining representative for DCHS.  (Dkt. No. 57 at 31,

22  33.)  Under Federal Rule of Evidence 201, a court may take notice of facts not subject
    to reasonable dispute that are capable of accurate and ready determination by resort to

23  sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).  The
    Court finds that Defendants' requests for judicial notice are properly noticeable, and

24  therefore takes judicial notice of the documents.  *See United States ex rel. Robinson
    Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e

25  'may take notice of proceedings in other courts, both within and without the federal
    judicial system, if those proceedings have a direct relation to matters at issue.'"

26  (citation omitted)); *In re Tourism Assessment Fee Litig.*, No. 08-CV-1796-MMA, 2009
    WL 10185458, at *4-5 (S.D. Cal. Feb. 19, 2009) (taking judicial notice of press release

27  on website).

28  [2]On March 3, 2015, Prime Healthcare filed an Ex Parte Motion for Leave to File
    a Supplemental Memorandum, which the Court **GRANTS**.  (Dkt. No. 68.)

a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee v. Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

## DISCUSSION

### A.    Claim Preclusion

As a preliminary matter, Defendants contend that Prime Healthcare's RICO claims resting on allegations asserted in their prior antitrust action, *Prime Healthcare I*,

1    are barred by claim preclusion. (Dkt. No. 50-1 at 8-14.)³ Claim preclusion, also known
2    as res judicata, "prohibits lawsuits on 'any claims that were raised *or could have been*
3    *raised*' in a prior action." *Stewart v. U.S. Bankcorp*, 297 F.3d 953, 956 (9th Cir. 2002)
4    (citation omitted). It "is motivated primarily by the interest in avoiding repetitive
5    litigation, conserving judicial resources, and preventing the moral force of court
6    judgments from being undermined." *Int'l Union of Operating Eng'rs-Emp'rs Constr.*
7    *Indus. Pension, Welfare & Trg. Trust Funds*, 994 F.2d 1426, 1430 (9th Cir. 1993)
8    (citation and internal quotation marks omitted).

9         Prime Healthcare primarily responds that claim preclusion does not apply here
10   because it alleges new wrongdoing that has occurred since its amended complaint in
11   its prior antitrust action, *Prime Healthcare I*. (Dkt. No. 57 at 10, 12-16.) Prime
12   Healthcare is correct that claim preclusion does not bar claims that could not have
13   previously been asserted because they concern events that took place after the prior
14   action. *See United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139,
15   1151 (9th Cir. 2011) ("If the harm arose from different facts at a different time, . . . then
16   the plaintiff could not have brought the claim in the first action."); *Frank v. United*
17   *Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("A claim arising after the date of an
18   earlier judgment is not barred, even if it arises out of a continuing course of conduct
19   that provided the basis for the earlier claim."). However, Prime Healthcare
20   misconstrues Defendants' argument. Defendants do not contend that "*any* RICO
21   claim" is barred and they are entitled to "perpetual immunity." (Dkt. No. 57 at 12.)
22   Rather, Defendants contend only that Prime Healthcare's RICO claims based on
23   allegations previously asserted in *Prime Healthcare I* are barred. (Dkt. No. 50-1 at 8;
24   *see also* Dkt. No. 58 at 2.) Defendants admit that in the instant lawsuit Prime
25   Healthcare also alleges new conduct subsequent to *Prime Healthcare I* that would not
26   be barred. (Dkt. No. 50-1 at 8, 24-27; *see also* Dkt. No. 58 at 2.)

27

28       ³Page number citations such as this one are to the page numbers reflected on the
     Court's CM/ECF system and not to page numbers assigned by the parties.

Prime Healthcare relies heavily on *Harkins Amusement Enter., Inc. v. Harry Nace Co.*, 890 F.2d 181, 183 (9th Cir. 1989), which held that a second antitrust action was not barred by a prior antitrust action because the second action alleged new antitrust conduct subsequent to the prior action.  The Ninth Circuit noted that the second action alleged facts that "are at least 10 percent different" from the prior action, and alleged "conduct that occurred in a different time period." *Id.*  However, *Harkins* did not hold that the second antitrust action was not precluded at all.  Rather, *Harkins* considered whether the second action was "completely prevented" based on the prior action.  *Id.* at 182.  The Ninth Circuit stated that "[t]here can be no doubt" that the antitrust claims for the time period covered by the prior action were barred by claim preclusion.  *Id.*  Therefore, *Harkins* does not support Prime Healthcare's position.

As such, for the claim preclusion analysis, the Court will only focus on whether Prime Healthcare's RICO claims based on allegations asserted in *Prime Healthcare I* are barred, and will not consider the new subsequent allegations which Defendants concede are not barred.  *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) ("While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731, 740-41 (9th Cir. 1984) (en banc) (holding that claim preclusion barred segregation claims for acts occurring before prior lawsuit, but did not bar claims for acts occurring after prior lawsuit); *Knox v. Donahoe*, No. 11-CV-2596-EMC, 2012 WL 949030, at *4-5 (N.D. Cal. 2012) (holding that claim preclusion barred employment discrimination claims to the extent they were based on events covered by prior lawsuit, but not to the extent the claims were based on events which took place after prior lawsuit).  In other words, for the claim preclusion analysis, the Court will only focus on alleged conduct that took place before September 21, 2012, when the operative first amended complaint was filed in *Prime Healthcare I.*

Claim preclusion applies where there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917 (9th Cir. 2012) (citation and internal quotation marks omitted). The Court now turns to these three elements.

### 1.    Identity of Claims

Courts considers four factors in determining an "identity of claims": "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts." *Id.* at 917-18 (citation omitted). These factors are "tools of analysis, not requirements." *Int'l Union of Operating Eng'rs-Emp'rs Const. Ind. Pension, Welfare, & Trg. Trust Funds v. Karr*, 944 F.2d 1426, 1430 (9th Cir. 1993) (citation and internal quotation marks omitted). However, "[t]he last of these criteria is the most important." *Turtle Island Restoration Network*, 673 F.3d at 918 (citation and internal quotation marks omitted).

### a.    Same Transactional Nucleus of Facts

As it is the most important factor, the Court first considers whether *Prime Healthcare I* and *Prime Healthcare II* arise from the "same transactional nucleus of facts." "Whether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and whether they could conveniently be tried together." *Id.* (citation and internal quotation marks omitted). "In most cases, the inquiry into the 'same transactional nucleus of facts' is essentially the same as whether the claim could have been brought in the first action." *Id.* (citation and internal quotation marks omitted).

Defendants contend that *Prime Healthcare I* and *Prime Healthcare II* relate to the same set of facts because both actions allege that since 2010, Defendants have been demanding that Prime Healthcare enter into a "neutrality agreement" with UHW, and

have been backing up that demand with various forms of economic pressure, including attempts to thwart Prime Healthcare's acquisition of hospitals, attacks on Prime Healthcare's investment partners, the production and public dissemination of reports injurious to Prime Healthcare's business reputation, and the initiation of complaints resulting in government investigations of Prime Healthcare.  (Dkt. No. 50-1 at 10.) Defendants also include a chart which shows over twenty common sets of allegations between *Prime Healthcare I* and *Prime Healthcare II*.  (Dkt. No. 50-2 (Exh. A).)

Prime Healthcare counters that the two actions do not arise out of the same transactional nucleus because they involve a "distinct set of facts." (Dkt. No. 57 at 15.) However, Prime Healthcare fails to elaborate how, aside from new conduct subsequent to *Prime Healthcare I*, the two actions involve distinct facts.

The Court concludes that both actions are related to the same set of facts.  For example, both actions allege that Defendants: (1) produced and publicized false and misleading reports and studies about Prime Healthcare, such as not being in compliance with earthquake safety laws and high rates of septicemia (*compare Prime Healthcare II* FAC ¶¶ 129-43 *with Prime Healthcare I* FAC ¶¶ 265-66, 270-90); (2) campaigned to block the bankruptcy sale of Victor Valley Community Hospital to Prime Healthcare (*compare Prime Healthcare II* FAC ¶¶ 147-58 *with Prime Healthcare I* FAC ¶¶ 293-94, 296); (3) supported California Senate Bill 408 to restrict Prime Healthcare's ability to acquire additional hospitals (*compare Prime Healthcare II* FAC ¶¶ 186-88 *with Prime Healthcare I* FAC ¶¶ 291-92); (4) advocated for the passage of California Senate Bill 1285 which would require hospitals such as Prime Healthcare to adjust charges for out-of-network emergency care (*compare Prime Healthcare II* FAC ¶¶ 189-94 *with Prime Healthcare I* FAC ¶¶ 312-17); (5) wrote to the Securities and Exchange Commission stating that  Prime Healthcare affiliate Medical Properties Trust had not made adequate financial disclosures concerning the cost of remedying deficiencies at Prime Hospitals (*compare Prime Healthcare II* FAC ¶¶ 128, 130 *with Prime Healthcare I* FAC ¶¶ 267-69); and (6) prepared and obtained signatures for two ballot

1   initiatives that would financially harm non-union hospitals such as Prime Healthcare,

2   and then abandoned the initiatives once UHW entered into a 2012 agreement with the

3   California Hospital Association (*compare Prime Healthcare II* FAC ¶¶ 204-06 *with*

4   *Prime Healthcare I* FAC ¶¶ 207-09).  Because of these related facts, Prime Healthcare

5   "could have brought" their RICO claims in *Prime Healthcare I*, and their antitrust and

6   RICO claims premised on these facts "could conveniently be tried together." *Turtle*

7   *Island Restoration Network*, 673 F.3d at 918 (citation and internal quotation marks

8   omitted).

9        Therefore, the RICO claims in *Prime Healthcare II*, to the extent they are

10  premised on conduct covered by *Prime Healthcare I*, "arise out of the same

11  transactional nucleus of facts" as the antitrust claims in *Prime Healthcare I*.  This

12  factor weighs heavily in favor of an identity of claims.

13               **b.**    **Same Evidence**

14        The Court next considers whether "substantially the same evidence" is presented

15  in both *Prime Healthcare I* and *Prime Healthcare II*.  Defendants contend that both

16  actions involve substantially the same evidence because, as outlined above, they both

17  require evidence of Prime Healthcare's alleged attempts to thwart Prime Healthcare's

18  acquisition of hospitals, to attack Prime Healthcare investment partners, to produce and

19  publicly disseminate reports injurious to Prime Healthcare's business reputation, and

20  to initiate complaints resulting in government investigations of Prime Healthcare.

21  (Dkt. No. 50-1 at 11-12.)  Prime Healthcare responds that the evidence presented in the

22  instant RICO action "will reach beyond that presented in the antitrust action," but fails

23  to elaborate how, aside from new conduct subsequent to *Prime Healthcare I*, the two

24  actions involve different evidence.  (Dkt. No. 57 at 15.)

25        The Court agrees with Defendants that both actions involve "substantially the

26  same evidence."  Both actions require evidence of Defendants' alleged conduct

27  outlined above.  As such, this factor also weighs heavily in favor of an identity of

28  claims.

### c.      Infringement of Same Right

The Court next considers whether *Prime Healthcare I* and *Prime Healthcare II* involve "infringement of the same right." Defendants contend that both actions allege the infringement of the same right, which is Prime Healthcare's "right to compete in the healthcare market free from defendants' allegedly unlawful interference." (Dkt. No. 50-1 at 11.) Prime Healthcare responds that the rights asserted in both actions differ, and the instant action alleges that "Defendants are extorting [it] to surrender its own property," not a "right to compete in the healthcare market" or "an antitrust conspiracy." (Dkt. No. 57 at 14-15.)

The Court finds instructive the Ninth Circuit's decision in *Feminist Women's Health Ctr. v. Codispoti*, 63 F.3d 863 (9th Cir. 1995). In that case, the plaintiffs, a clinic that provided abortions and other health services, brought a state court action for harassment by protestors, and then later brought a federal RICO action. In holding that claim preclusion barred the later RICO action, the Ninth Circuit determined that both actions involved infringement of the same right.[4] *Id.* at 868. The Ninth Circuit acknowledged that "[t]he state claim focused on the Center's constitutional right to provide abortions, as well as the patients' constitutional right to receive abortions" and "[t]he federal claim concerns infringement of the Center's right to operate its business free from a pattern of racketeering." *Id.* However, both actions "arose from an alleged right to be free from appellants' disruptive activities." *Id.*

Similarly, here, *Prime Healthcare I* focused on Prime Healthcare's right to be free from an antitrust conspiracy to eliminate it from the healthcare market and increase healthcare workers wages, while *Prime Healthcare II* focuses on Prime Healthcare's right to be free from extortion designed to force it to unionize its hospitals. However, both actions arise from Prime Healthcare's alleged right to operate its business free from Defendants' allegedly unlawful disruptive activities.

---

[4] Although *Feminist Women's Health Ctr.* applied claim preclusion under Washington state law, the factors for an identity of claims mirror federal claim preclusion law. *Id.* at 867.

1    Therefore, the Court concludes that both actions involve "infringement of the
2    same right."

3              **d.**      **Rights or Interests Destroyed by Prosecution of Second Action**

4    Finally, the Court considers whether "rights or interests" established in *Prime*
5    *Healthcare I* would be "destroyed or impaired by prosecution" of *Prime Healthcare II.*
6    Prime Healthcare contends that *Prime Healthcare I* established Defendants' freedom
7    from liability concerning their alleged use of economic pressure to induce Prime
8    Healthcare to enter into a neutrality agreement with Defendant UHW.  (Dkt. No. 50-1
9    at 11.)  Defendants note that the Court's prior dismissal order stated that the *Prime*
10   *Healthcare I* FAC "suggests the union engaged in traditional union activities to
11   pressure non-labor entities to become unionized," rather than illegal antitrust activities.
12   *Prime Healthcare I*, 2013 WL 3873074, at *13.  Defendants argue that *Prime*
13   *Healthcare II* alleges that this same economic pressure violates the federal RICO
14   statute, and would, if upheld by this Court, destroy Defendants' freedom from liability.
15   (Dkt. No. 50-1 at 11.)

16   Prime Healthcare counters that *Prime Healthcare II* cannot impair the earlier
17   judgment in *Prime Healthcare I* because the two actions involve "infringement of
18   different rights and a distinct set of facts."  (Dkt. No. 57 at 15.)  However, the Court
19   determined above that both actions involve infringement of the same rights and arise
20   from the same transactional nucleus of facts.

21   Nonetheless, the Court finds that a judgment in *Prime Healthcare II* would not
22   impair the rights and interests established in *Prime Healthcare I*.  *Prime Healthcare I*
23   established Defendants' right to be free from antitrust liability.  *Prime Healthcare II*
24   concerns whether Defendants should be liable under RICO.  A finding that Defendants
25   are liable under RICO would not impair its right to be free from antitrust liability.

26   In sum, the Court concludes that overall there is an identity of claims between
27   the antitrust claims in *Prime Healthcare I* and the RICO claims in *Prime Healthcare II*
28   (to the extent they are premised on conduct covered by *Prime Healthcare I*).  Most

importantly, both claims arise from the same transactional nucleus of facts.  In addition, both claims involve substantially the same evidence and infringement of the same right. The Court's determination that prosecution of *Prime Healthcare II* would not impair the judgment in *Prime Healthcare I* does not undermine this conclusion.  *See Karr*, 944 F.2d at 1430 (common nucleus criterion is often outcome determinative without reaching other factors).  Thus, the first element of claim preclusion is satisfied.

### 2.    Final Judgment on the Merits

The Court next considers whether *Prime Healthcare I* resulted in a final judgment on the merits.  Defendants contend, and Prime Healthcare does not dispute, that there was a final judgment on the merits in *Prime Healthcare I*.  (Dkt. No. 50-1 at 12.)

The Court dismissed *Prime Healthcare I* for failure to prosecute under Federal Rule of Civil Procedure 41(b).  *See Prime Healthcare I*, 2013 WL 6500069, at *3.  A dismissal under Rule 41(b) is a final judgment on the merits.  *See* Fed. R. Civ. P. 41(b) (dismissal for failure to prosecute or comply with a court order "operates as an adjudication on the merits" unless the dismissal order states otherwise); *Owens v. Kaiser Found. Health Plan*, 244 F.3d 708, 714 (9th Cir. 2001) (unless otherwise specified, dismissal with prejudice of an action for failure to prosecute operates as an adjudication on the merits for claim preclusion purposes).  The pending appeal in *Prime Healthcare I* does not impact whether there is a final judgment on the merits. *See Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir. 1985) ("The federal rule on the preclusive effect of a judgment from which an appeal has been taken is that the pendency of an appeal does not suspend the operation of an otherwise final judgment for purposes of res judicata.").

As such, the Court concludes that this element is satisfied for claim preclusion.

### 3.    Privity Between Parties

Lastly, the Court considers whether there is privity between the parties for *Prime Healthcare I* and *Prime Healthcare II*.  Defendants contend, and Prime Healthcare also

1   does not dispute, that there is privity between the parties in both actions. (Dkt. No. 50-
2   1 at 12-14.)

3          "Even when the parties are not identical, privity may exist if there is 'substantial
4   identity' between parties, that is, when there is sufficient commonality of interest."
5   *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1081 (9th
6   Cir. 2003) (citation and internal quotation marks omitted).  Here, Plaintiff Prime
7   Healthcare and Defendants SEIU and UHW were all parties in *Prime Healthcare I*, so
8   they clearly meet the privity requirement.  The other Defendants in *Prime Healthcare II*
9   are in privity with Defendants SEIU and UHW so they also meet this requirement.
10  Defendant Mary Kay Henry is President of SEIU and Defendant Dave Regan is
11  President of UHW.  (FAC ¶¶ 27-28.)  SEIU is a member of Defendant Change to Win,
12  whose investment arm is Defendant CTW Investment Group and whose Executive
13  Director of its Strategic Organizing Center is Defendant Tom Woodruff, and Prime
14  Healthcare alleges that these Defendants approve of and support SEIU's tactics.  (*Id.*
15  ¶¶ 30-36.)

16          As such, the Court finds that there is privity between the parties in both actions,
17  and this element of claim preclusion is also satisfied.

18          Thus, having determined that all three elements are met, the Court concludes that
19  Prime Healthcare's RICO claims in *Prime Healthcare II*, to the extent they are
20  premised on conduct covered by *Prime Healthcare I*, are barred by claim preclusion.[5]
21  Accordingly, the Court **GRANTS** Defendants' motion to dismiss Prime Healthcare's
22  RICO claims premised on conduct covered by *Prime Healthcare I*.  The Court now
23  turns to Prime Healthcare's additional allegations of more recent conduct that is not
24  barred by claim preclusion.

25  **B.      RICO and LMRA § 302 Claims Based on New Conduct**

26          Prime Healthcare alleges that Defendants are violating both RICO and § 302 of

27  ────────────────

28          [5]As a result, the Court does not reach Defendants' alternative arguments that
    these allegations fail on the merits.  (Dkt. No. 50-1 at 14-24.)

the LMRA by demanding that Prime Healthcare sign onto an "unlawful" 2014 agreement between the California Hospital Association ("CHA"), various signatory CHA-member hospitals, and Defendant UHW ("CHA-UHW Agreement"), and by putting economic pressure on Prime Healthcare to do so.  (FAC ¶¶ 214-65, 270-326.)

To allege a civil RICO claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *United Bhd. Of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO* ("*UBC*"), 770 F.3d 834, 838 (9th Cir. 2014) (citation and internal quotation marks omitted). "'[R]acketeering activity' includes . . . 'any act which is indictable' under the Hobbs Act, 18 U.S.C. § 1951, or 'any act or threat involving . . . extortion, . . . which is chargeable under State law.'" *Id.* (quoting 18 U.S.C. § 1961(1)(A), (B)).  A person violates the Hobbs Act where he or she "obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires to do so."  18 U.S.C. § 1951(a).  Under the Hobbs Act, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under the color of official right."[6]  *Id.* § 1951(b)(2).  "Racketeering activity" also includes violations of § 302 of the LMRA.  18 U.S.C. § 1961(1)(C).

LMRA § 302(a)(2) makes it unlawful for an employer to pay, lend, or deliver, "any money or other thing of value" to a union, and § 302(b)(1) makes it unlawful for a union to demand or accept the same. 29 U.S.C. § 186(a)(2), (b)(1).  Congress enacted LMRA § 302 to attack practices that were "inimical to the integrity of the collective bargaining process," including bribery by employers during collective bargaining,

---

[6]Prime Healthcare alleges that Defendants conduct constitutes a RICO predicate act because it violates state extortion laws from California, New Jersey, the District of Columbia and Kansas, as well as the Travel Act, but does not mention the Hobbs Act. FAC ¶¶ 273, 280, 286, 292.  However, as Defendants note, the generic definition of extortion applies under RICO, not "any conduct criminalized under any state's 'extortion' statute."  *UBC*, 770 F.3d at 843.  (Dkt. No. 50-1 at 15 n.7.)  Prime Healthcare does not argue otherwise in its opposition.  As such, the Court applies the generic definition of extortion found in the Hobbs Act.

extortion by employee representatives, and abuse of power by union officers who have sole control over welfare funds. *Arroyo v. United States*, 359 U.S. 419, 425-26 (1959); *see also Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219, 1227 (9th Cir. 1979) ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers.").

The Court first addresses the alleged violations of LMRA § 302, and then addresses whether Prime Healthcare has sufficiently stated a RICO claim predicated on extortion rather than an alleged violation of LMRA § 302.

### 1.   LMRA § 302

Prime Healthcare alleges that the CHA-UHW Agreement violates LMRA § 302 for two reasons. First, Prime Healthcare particularly challenges the portion of the CHA-UHW Agreement creating a "Joint Advocacy Fund." Second, Prime Healthcare challenges other "neutrality agreement" provisions setting ground rules for union organizing.

### a.   Joint Advocacy Fund

Prime Healthcare alleges that the CHA-UHW Agreement violates LMRA § 302 because it creates a "Joint Advocacy Fund" administered by a "Labor Management Cooperation Committee" ("Committee") and funded in part by $80 million from CHA and its signatory member hospitals, which constitutes an illegal direct payment to UHW. (FAC ¶¶ 228-40, 251-56.)

Defendants argue that this payment is not illegal because § 302 explicitly excepts payments by employers through an industrywide labor management committee established under the Labor Management Cooperation Act of 1978 ("LMCA"). [7] (Dkt.

---

[7] Defendants note that in *Prime Healthcare I*, this Court held that allegations that a $50 million payment from Kaiser Permanente to a Labor Partnership Trust created under an agreement between Kaiser and SEIU did not plausibly allege a violation of § 302 because of the LMCA exception. (Dkt. No. 50-1 at 25-26). *See Prime Healthcare I*, 2013 WL 3873074, at * 8. Prime Healthcare counters that this Court's ruling in *Prime Healthcare I* is irrelevant because here Prime Healthcare has alleged

No. 50-1 at 25-27.)  *See* 29 U.S.C. § 186(c)(9).[8]  Prime Healthcare responds that the LMCA exception does not apply because it has alleged that UHW will unlawfully use the money in the Joint Advocacy Fund "as its own slush fund" to "advance whatever agenda it chooses, without regard to the limited purposes for those funds permitted under the LMCA."  (FAC ¶¶ 230, 235-36, 238; Dkt. No. 57 at 27-28.)  However, as Defendants point out, Prime Healthcare's own allegations show that the CHA-UHW Agreement limits the money to purposes allowed under the LMCA.  (Dkt. No. 50-1 at 26-27; Dkt. No. 58 at 8 n.5.)  Prime Healthcare alleges that the Committee's scope is limited to five specific purposes which mirror the LMCA, as well as a catch-all for "other mutually agreed upon issues as permitted by the LMCA." (FAC ¶¶ 251-52.) Prime Healthcare also acknowledges that the money may not be spent without the equal approval of both the employer and UHW representative.  (*Id.* ¶ 216 ("decision making is a 50/50 split"), ¶ 229 ("cannot spend any money, without approval of both" of the leaders of CHA and UHW, ¶ 230 (President of UHW stated that "'we each have to agree how to spend it equally'").)  Prime Healthcare's speculation that despite these limitations UHW will improperly use the money for its own ends does not pass the plausibility standard.

In addition, Prime Healthcare contends that the LMCA exception does not apply because the Committee is not a legitimate industrywide labor management committee under the LMCA.  (Dkt. No. 57 at 27.)  Specifically, Prime Healthcare alleges that the Committee does not qualify because UHW "is not the bargaining representative of CHA's employees and is not seeking to represent those employees" but instead is seeking to represent "employees at CHA's member hospitals, such as Prime

---

that the Committee falls outside the LMCA, and that UHW plans to use the money in the Joint Advocacy Fund, not a trust, to serve its own ends and not for the limited purposes enumerated in the LMCA.  (Dkt. No. 57 at 28 n.21.)

[8]LMCA § 5(b) authorizes the establishment of industrywide labor committees which "are established for the purpose of improving labor management relationships, job security, organizational effectiveness, enhancing economic development or involving workers in decisions affecting their jobs including improving communication with respect to subjects of mutual interest and concern." 29 U.S.C. § 175a(a)(1)(B).

[Healthcare]." (FAC ¶ 239.) However, Prime Healthcare provides no legal authority for a requirement that the labor organization must be the representative of the employees of every employer participating on the labor management committee. The LMCA states only that the labor organization "represent[s] employees in that plant, area, or industry," and there is no dispute that UHW represents employees in the healthcare industry. 28 U.S.C. § 175a(a)(1)(A).

Prime Healthcare also alleges that the Committee does not qualify as a legitimate industrywide labor management committee under the LMCA because one of the purposes of the CHA-UHW Agreement is to "discourage the exercise of an employee's rights under the [National Labor Relations Act ("NLRA")] Section 7, 29 U.S.C. § 157" by "restrict[ing] employees' freedom of association and right to choose *not* to form, join, or assist a labor organization or to *not* have a union bargain collectively on their behalf by . . . granting UHW access to signatory hospital facilities, giving UHW control over the communications and other rights of signatory hospitals, and by surrendering to UHW full control over any signatory hospital's labor relations." (FAC ¶ 240.) The LMCA provides that a labor management committee "may not have as one of its purposes the discouragement of the exercise of rights contained in section 157 of this title, or the interference with collective bargaining in any plant, or industry." 29 U.S.C. § 175a(b)(3). In turn, § 157 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U.S.C. § 157.

The Court finds that Prime Healthcare has not plausibly alleged that one of the purposes of the Committee is to discourage employee rights under NLRA § 157. As

support that the Committee has this ulterior purpose, Prime Healthcare alleges that the CHA-UHW Agreement discourages employee rights because it: (1) grants UHW "access rights" to at least 30,000 non-union hospital employees (FAC ¶ 241); (2) requires that the signatory hospitals give UHW "control over that signatory's communications" because the Agreement requires that the parties not make disparaging communications about each other or engage in "Anti-Union Activities" (*id.* ¶¶ 243-45); and (3) requires that the signatory hospitals give UHW "control of its labor relations" because it allows the Committee to address "other mutually agreed upon issues as permitted by the LMCA" (*id.* ¶¶ 250-52).  None of these allegations sufficiently show that a purpose of the Committee is to discourage employee rights under § 157.  For example, merely granting UHW "access" to these employees and prohibiting disparaging communications does not suggest that a purpose of the Committee is to discourage employee rights.  Likewise, it is illogical that allowing the Committee to address "other mutually agreed upon issues as permitted by the LMCA" would lead to the inference that a purpose of the Committee is to discourage employee rights in violation of the LMCA.

As such, the Court concludes that Prime Healthcare fails to sufficiently allege that the Joint Advocacy Fund is not covered by the LMCA exception and violates LMRA § 302.

### b.    Neutrality Agreement Provisions

Prime Healthcare also alleges that the CHA-UHW Agreement, while "containing some of the hallmarks of a neutrality agreement – the CHA signatories agreed to not disparage UHW or engage in 'Anti-Union activities' and UHW agreed to not disparage those signatories or engage in 'Anti-Employer Activities'" – is unlawful because its "reach is much more pervasive." (FAC ¶ 217.)  Specifically, Prime Healthcare alleges that the Agreement goes beyond a standard neutrality agreement, and is illegal, because it: (1) grants UHW "access rights" to at least 30,000 non-union hospital employees (*id.* ¶¶ 218, 241-42); (2) requires that CHA and other signatories be "positive" about UHW

in communications (*id.* ¶¶ 243-49); (3) prohibits CHA and other signatories from advocating against UHW through litigation (except to enforce the terms of an existing collective bargaining agreement) or adverse action by any branch of government (*id.* ¶ 244); (4) requires that the signatory hospitals give UHW "control of its labor relations" because it allows the Committee to address "other mutually agreed upon issues as permitted by the LMCA" (*id.* ¶¶ 250-52); and (5) requires that CHA and its signatory member hospitals make $80 million in payments to the Joint Advocacy Fund (*id.* ¶¶ 215-16,  228-29). (Dkt. No. 57 at 26.)  Prime Healthcare alleges that in exchange, UHW will: (1) stop disparaging signatory hospitals (FAC ¶¶ 219-20); (2) stop pursuing, sponsoring, or supporting any anti-hospital industry legislation, initiatives, or other efforts (*id.* ¶¶ 219, 221-22); and (3) provide at least $20 million of its own money to the Joint Advocacy Fund (*id.* ¶¶ 214-16, 219, 228-31). (Dkt. No. 57 at 26-27.)

Defendants contend that the Ninth Circuit and other circuits have held that neutrality agreements are lawful under federal labor laws. (Dkt. No. 50-1 at 22-23, 25.) Defendants rely on the Ninth Circuit's decision in *Hotel Emps., Rest. Emps. Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464 (9th Cir. 1992). (Dkt. No. 50-1 at 22; Dkt. No. 58 at 5.)  There the Ninth Circuit held that the a district court had jurisdiction to enforce a neutrality agreement that the employer was "not to express any opinion on whether its employees should choose Local 2 as their exclusive bargaining representative," and that such an agreement was enforceable because "[n]othing in the relevant statutes or NLRB decisions suggests employers may not agree to remain silent during a union's organizational campaign – something an employer is certainly free to do in the absence of such an agreement." *Marriott Corp.*, 961 F.2d at 1469-70. However, as Prime Healthcare correctly notes, *Marriott Corp.* did not expressly consider whether the neutrality agreement violated LMRA § 302. (Dkt. No. 57 at 29 & n.22.)  Therefore, it appears that the Ninth Circuit has not yet addressed whether a

1  neutrality agreement can violate § 302.[9]

2       Defendants also rely on the Fourth Circuit's decision in *Adcock v. Freightliner*

3  *LLC*, 550 F.3d 369 (4th Cir. 2008) and the Third Circuit's decision in *Hotel Emps.,*

4  *Rest. Emps. Union Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206 (3d Cir.

5  2004), which both held that neutrality agreements did not violate LMRA § 302. (Dkt.

6  No. 50-1 at 22-23.)  In *Adcock*, the Fourth Circuit held that a neutrality agreement

7  which required the employer to, among other things, provide the union access to

8  employees and refrain from making negative comments about the union did not violate

9  § 302 because the employer did not deliver a "thing of value" to the union.  *Adcock*,

10  550 F.3d at 374-75.  The Fourth Circuit noted that its interpretation of "thing of value"

11  was consistent with the purposes of § 302 because "the concessions made by [the

12  employer] do not involve bribery or other corrupt practices.  By no stretch of the

13  imagination are the concessions a means of bribing representatives of the Union . . . .

14  Rather, the concessions serve the interests of both [the employer] and the Union, as

15  they eliminate the potential for hostile organizing campaigns in the workplace."  *Id.* at

16  375.

17       Similarly, in *Sage Hospitality*, the Third Circuit held that a neutrality agreement

18  under which union representation would be determined by a card-check procedure did

19  not violate § 302 because the employer did not deliver a "thing of value" to the union.

20  *Sage Hospitality Res.*, 390 F.3d at 210, 219.  The Third Circuit reasoned that: "Not

21  surprisingly, [the employer] is unable to provide any legal support for the remarkable

22  assertion that entering into a valid labor agreement governing recognition of a labor

23  union amounts to illegal labor bribery. . . . The fact that a Neutrality Agreement – like

24  any other labor arbitration agreement – benefits both parties with efficiency and cost

25

26      [9]Defendants also rely on the Ninth Circuit's purported decision in  *Hotel & Rest.*
*Emps. Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 566-67 (2d Cir. 1993).

27  (Dkt. No. 50-1 at 22.)  However, as Prime Healthcare correctly notes, this decision is
actually by the Second Circuit, and is not relevant because it concerns whether a

28  district court had jurisdiction over an arbitration clause in an agreement between an
employer and union.  (Dkt. No. 57 at 29 n.22.)

saving does not transform it into a payment or delivery of some benefit." *Id.* at 219.

Prime Healthcare contends that *Adcock* and *Sage Hospitality* are distinguishable because the CHA-UHW Agreement here makes more extensive demands than those standard neutrality agreements. (Dkt. No. 57 at 29-30 & n.23.)  Prime Healthcare instead relies on the Eleventh Circuit's decision in *Mulhall v. Unite Here Local 355*, 667 F.3d 1211 (11th Cir. 2012). (Dkt. No. 57 at 29.)  In *Mulhall*, the Eleventh Circuit disagreed with the Third and Fourth Circuits, and held that a neutrality agreement which required that the employer provide the union access to employees and remain neutral to unionizing efforts could constitute a "thing of value," if demanded or given as payment, and therefore could violate LMRA § 302.  *Mulhall*, 667 F.3d at 1213, 1215.   The Eleventh Circuit stated that:

> [A] violation of § 302 cannot be ruled out merely because intangible assistance cannot be loaned or delivered.  Section 302 also prohibits payment of a thing of value, and intangible services, privileges, or concessions can be paid or operate as payment.  Whether something qualifies as a payment depends not on whether it is tangible or has monetary value, but on whether its performance fulfills an obligation.  If employers offer organizing assistance with the intention of improperly influencing a union, then the policy concerns in § 302 – curbing bribery and extortion – are implicated.
>
> It is too broad to hold that all neutrality and cooperation agreements are exempt from the prohibitions in § 302.  Employers and unions may set ground rules for an organizing campaign, even if the employer and union benefit from the agreement.  But innocuous ground rules can become illegal payments if used as valuable consideration in a scheme to corrupt a union or to extort a benefit from an employer.

*Id.* at 1215.  The Eleventh Circuit held that the plaintiff stated a claim under § 302 because he alleged that the employer's organizational assistance had monetary value as evidenced by the union spending $100,000 on a ballot initiative favored by the employer as consideration.  *Id.* at 1215-16.

Defendants argue that *Mulhall* does not support Prime Healthcare's LMRA § 302 claim because the Eleventh Circuit still held that neutrality agreements are generally lawful unless they implicate the type of corruption aimed at by § 302. (Dkt. No. 50-1 at 23 n.8; Dkt. No. 58 at 7.)  Defendants also argue that *Mulhall* is distinguishable because the aspect of the neutrality agreement the Eleventh Circuit found potentially

troublesome – that the union allegedly agreed to spend money on a ballot initiative in return for the employer's entry into the neutrality agreement – is not alleged by Prime Healthcare here.  (Dkt. No. 50-1 at 23 n.8.)

The Court need not determine whether a neutrality agreement may ever violate LMRA § 302 because the Court concludes that Prime Healthcare has failed to sufficiently allege that the neutrality provisions in the instant CHA-UHW Agreement are unlawful.   As stated above, Prime Healthcare alleges that Defendants are demanding that it sign the CHA-UHW Agreement, and therefore is demanding Prime Healthcare provide the following "thing[s] of value": (1) grant UHW "access rights" to non-union hospital employees (FAC ¶¶ 218, 241-42); (2) be "positive" about UHW in communications (*id.* ¶¶ 243-49); (3) refrain from advocating against UHW through litigation (except to enforce the terms of an existing collective bargaining agreement) or adverse action by any branch of government (*id.* ¶ 244); (4) give UHW "control of its labor relations" by allowing the Committee to address "other mutually agreed upon issues as permitted by the LMCA" (*id.* ¶¶ 250-52); and (5) make substantial payments to the Joint Advocacy Fund (*id.* ¶¶ 215-16,  228-29). (Dkt. No. 57 at 26.)  In return, UHW will: (1) stop disparaging Prime Healthcare (FAC ¶¶ 219-20); (2) stop pursuing, sponsoring, or supporting any anti-hospital industry legislation, initiatives, or other efforts (*id.* ¶¶ 219, 221-22); and (3) provide its own substantial payments to the Joint Advocacy Fund (*id.* ¶¶ 214-16, 219, 228-31).  (Dkt. No. 57 at 26-27.)

As discussed above, the Court has already concluded that the Joint Advocacy Fund does not violate LMRA § 302.  The other concessions made by CHA and the signatory hospitals, and allegedly demanded by UHW from Prime Healthcare, also do not violate § 302 because they do not plausibly involve bribery or other corrupt practices, which is what Congress sought to prevent by enacting § 302. *See Arroyo*, 359 U.S. at 425-26.   Rather, the concessions serve the interests of both the CHA/hospitals and UHW "as they eliminate the potential for hostile organizing campaigns in the workplace" which is "certainly . . . not inimical to the collective

1  bargaining process." *Adcock*, 550 F.3d at 375.   The fact that the CHA-UHW

2  Agreement, like any other labor agreement, "benefits both parties with efficiency and

3  cost saving does not transform it into a payment or delivery of some benefit." *Sage*

4  *Hospitality Res.*, 390 F.3d at 219.

5      As such, the Court concludes that Prime Healthcare fails to sufficiently allege

6  that the neutrality agreement provisions violate LMRA § 302.

7      **2.     Extortion**

8      The Court next turns to whether Prime Healthcare has sufficiently stated a RICO

9  claim premised on the predicate act of extortion, rather than on an alleged violation of

10  LMRA § 302.[10]  Under RICO, "extortion" requires: (1) "the obtaining of property from

11  another"; and (2) "wrongful use of actual or threatened force, violence, or fear, or under

12  the color of official right."  18 U.S.C. § 1951(b)(2).

13      **a.     Obtaining Property From Another**

14      To meet the first "obtaining of property from another" element, the plaintiff must

15  allege facts showing that the defendant has acquired or is seeking to acquire property

16  from the plaintiff that the defendant (or an allied third party) can "exercise, transfer, or

17  sell." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404-05 (2003).  Mere

18  coercion, interference, or deprivation without acquisition is not sufficient to constitute

19  extortion for a RICO claim. *Id*. at 404-08.  In other words, this element "requires that

20  the victim 'part with' his property, and that the extortionist 'gain possession' of it."

21  *Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013) (citations omitted).

22      In *Scheidler*, the Supreme Court held that the actions of anti-abortion protestors

23  preventing access to clinics, causing property damage, and committing criminal

24  trespass did not constitute "extortion" under RICO because the petitioners did not

25  "obtain" the respondents' property. *Scheidler*, 537 U.S. at 404, 409.  The Supreme

26

27      [10]Defendants appear to assume that any RICO claim predicated on extortion is
barred by claim preclusion.  (Dkt. No. 50-1 at 24-27.)  However, the Court concludes

28  that Prime Healthcare is also alleging extortion under RICO based on Defendants'
more recent conduct.

Court reasoned that "[p]etitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property." *Id.* at 405.

More recently, in *Sekhar*, the Supreme Court held that the petitioner's e-mails threatening to expose an affair of the New York Comptroller's general counsel if he did not recommend investing government money in a fund the petitioner's firm managed did not constitute "extortion" under the Hobbs Act because the petitioner did not "obtain" the general counsel's right to make an investment recommendation. *Sekhar*, 133 S. Ct. at 2723, 2726-27. The Supreme Court reasoned that the petitioner's goal was not to "acquire" the general counsel's right to make a recommendation, but rather to "force" or "coerce" the general counsel to offer advice that accorded with the petitioner's wishes. *Id.* at 2727.

Here, in addition to the provisions in the CHA-UHW Agreement, Prime Healthcare alleges that Defendants seek to obtain a litany of its property, such as: (1) Prime Healthcare's business reputation and goodwill (FAC ¶¶ 5, 7, 9, 13-14, 109, 198, 267, 282, 288, 300, 318); (2) Prime Healthcare's current and potential customers and related revenues (*id.*); (3) Prime Healthcare's money in the form of union dues paid to Defendants by Prime Healthcare on behalf of its employees (*id.* ¶¶ 14, 68, 105, 110, 273), as well as contributions by Prime Healthcare to other funds benefitting Defendants, including but not limited to, certain of Defendants' pension funds (*id.* ¶¶ 14, 108, 110); (4) Prime Healthcare's right to exclude representatives of Defendants from Prime Healthcare's property (*id.* ¶¶ 14, 110); (5) Prime Healthcare's autonomy and control over its business operations (*id.* ¶¶ 71, 110, 112); (6) Prime Healthcare's right guaranteed under Section 8(c) of the NLRA to voice its opinion about, and/or opposition to, attempts to unionize its employees, by forcing Prime to waive such right and remain neutral (*id.* ¶ 122); (7) Prime Healthcare's right to refuse to recognize UHW as bargaining agent of Prime Healthcare's employees on the basis of signed union

authorization cards, by forcing Prime Healthcare to waive such right and to recognize UHW as such bargaining agent on the basis of such cards (*id.* ¶ 70); (8) Prime Healthcare's recognition of Defendants as bargaining agents of Prime Healthcare's non-union employees, at current and future Prime facilities that have not, to date, been organized by any union (*id.* ¶ 110); (9) Prime Healthcare's right to insist on secret ballot elections conducted by the NLRB (*id.*); (10) monies invested in Victor Valley Community Hospital in anticipation of Prime Healthcare's acquisition of that hospital (*id.*); and (11) unwanted, unnecessary, and superfluous labor services (*id.* ¶ 14). (Dkt. No. 57 at 17 n.9.)

To analyze Prime Healthcare's allegations, the Court finds the Florida district court's decision in *Wackenhut* instructive. *See Wackenhut Corp. v. SEIU*, 593 F. Supp. 2d 1289 (S.D. Fla. 2009). In *Wackenhut*, the court dismissed a RICO claim in which the employer alleged that the union was attempting to obtain from it various intangible property rights, including the "right to control the form and nature of the union recognition process," the "right to decline collective bargaining with [the union]," the "right to preserve its employees' statutory right to 'free choice,'" and the "right to conduct business with its customers free from interference, harassment and threats of economic doom." *Id.* at 1296. The court held that these allegations "fall short of satisfying the 'obtaining' prong of the extortion statute" because the employer did not allege that the union "obtained any of [its] rights or property; at most it claims that [the union] improperly coerced or attempted to coerce it to do something to which it was not otherwise inclined or required to do." *Id.* The court reasoned that:

> Even assuming the truth of [the employer's] allegations – that the [union] sought to exert economic pressure on [the employer] to force it to accede to its demand for recognition and in doing so interfered with its right to conduct its business, even to the point of causing it to lose customers – such allegations merely establish that the [union] sought to deprive [the employer] of these property rights, not that it sought to acquire them for itself.

*Id.*

Here, as in *Wackenhut*, Prime Healthcare fails to allege how Defendants would

obtain most of its listed property.  Prime Healthcare's allegations only establish that Defendants seek to deprive Prime Healthcare of these rights or to coerce Prime Healthcare not to exercise these rights, rather than establishing that Defendants seek to acquire these rights.  For example, Prime Healthcare has not established that Defendants seek to acquire Prime Healthcare's recognition of Defendants as bargaining agents of Prime Healthcare's non-union employees. Instead, Defendants seek to coerce Prime Healthcare to recognize Defendants as the bargaining agents.

Prime Healthcare argues that *Wackenhut* is distinguishable because that case only addressed intangible property and here Prime Healthcare also alleges tangible property.[11]   (Dkt. No. 57 at 20 n.13.)   However, Prime Healthcare's allegations regarding tangible property are insufficient to show extortion.  For example, Prime Healthcare alleges that Defendants are attempting to obtain Prime Healthcare's money in the form of union dues paid to Defendants by Prime Healthcare on behalf of its employees (FAC ¶¶ 14, 68, 105, 110, 273), as well as contributions by Prime Healthcare to other funds benefitting Defendants, including but not limited to, certain of Defendants' pension funds (*id.* ¶¶ 14, 108, 110).  But, there is no allegation that Defendants are presently demanding these items.  (Dkt. No. 59 at 4-5 n.3.)

More importantly, as discussed below, even if Prime Healthcare has sufficiently alleged that Defendants are seeking to "obtain" some of their listed property, Prime Healthcare fails to meet the second element required for generic extortion.

**b.    Wrongful Use of Economic Pressure**

The second element of generic extortion requires the wrongful use of force, fear,

---

[11]Prime Healthcare also relies on the district court's decision in *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l*, 633 F. Supp.2d 214 (E.D. Va. 2008). (Dkt. No. 57 at 19.)  In *Smithfield*, the court held that the employer's right to refrain from recognizing unions and right to operate its business free from interference by the defendants were obtainable property rights for extortion under RICO.  *Smithfield*, 633 F. Supp. 2d at 225.  However, this Court does not find the reasoning in *Smithfield* persuasive in light of the Supreme Court's decisions in *Scheidler* and *Sekhar*, and chooses not to follow it here.

or threats.  *See* 18 U.S.C. § 1951(b)(2); *UBC*, 770 F.3d at 843.  Prime Healthcare alleges that Defendants have used economic pressure to demand that it sign onto the CHA-UHW Agreement.  Defendants argue that Prime Healthcare has failed to allege that their use of economic pressure was "wrongful."  (Dkt. No. 50-1 at 20-21.)

"[T]he fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc*., 140 F.3d 494, 523 (3d Cir. 1998).  However, there is a difference "between legitimate use of economic fear – hard bargaining – and wrongful use of such fear – extortion." *UBC*, 770 F.3d at 838 (fear, in the context of the Hobbs Act, can include fear of economic loss).  In *United States v. Enmons*, 410 U.S. 396, 400 (1973), the Supreme Court held that a defendant violates the Hobbs Act only "where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property."  "[F]ollowing *Enmons*, using fear of economic loss to obtain personal payoffs or payments for 'imposed, unwanted, superfluous and fictitious services,' may well be extortionate." *UBC*, 770 F.3d at 838 (quoting *Enmons*, 410 U.S. at 400).

In *UBC*, the Ninth Circuit held that a labor organization's alleged use of economic pressure was not "wrongful" and therefore the complaint failed to state a claim for extortion under RICO.  *Id.* at 841.  A labor union ("Carpenters") had alleged that an umbrella labor organization ("Building Trades") committed extortion under RICO by using a campaign of intense economic pressure to try to force the Carpenters to reaffiliate with the Building Trades and pay monthly dues in exchange for the Building Trades' services that were "unrequested, unwanted, and unnecessary." *Id.* at 836.  Allegations of "economic pressure" included, among other things, organizing a rally, repeated public criticism of the Carpenters on websites and in other publications, and filing frivolous regulatory claims against the Carpenters.  *Id.*

In holding that the Carpenters failed to state a RICO claim, the Ninth Circuit

1   rejected the Carpenters' argument that the Building Trades' economic pressure was
2   extortionate because it was directed towards a wrongful end – coercing the Carpenters
3   to accept "unrequested, unwanted, and unnecessary" services.  *Id.* at 839.  The Ninth
4   Circuit reasoned that the Building Trades' economic pressure was not wrongful simply
5   because it offered "unwanted or subjectively valueless services" in consideration.  *Id*.
6   "Otherwise any plaintiff could bring a civil RICO claim based on a bare allegation that
7   whatever service or good he received in return for his property was of no subjective
8   value."  *Id.*

9        The Ninth Circuit also rejected the Carpenters' argument that the Building
10  Trades' economic pressure was extortionate because it used wrongful means, such as
11  filing frivolous regulatory claims.  *Id.*  Otherwise, "any economic pressure campaign
12  that includes tortious conduct . . . would be a predicate offense to civil RICO,
13  regardless of whether the alleged tortfeasor demanded payment to refrain from harming
14  the victim" *Id.* at 840.  Rather, the key question is "whether the victim had a pre-
15  existing statutory or contractual right to the *consideration* offered by the defendant in
16  return for the victim's property."  *Id.*  "If so, the resulting transaction would have been
17  an illegitimate sham, and potentially a 'wrongful' goal to pursue."  *Id.*  Because the
18  Carpenters did not have a statutory or contractual right to the services the Building
19  Trades offered, it failed to show that the alleged economic pressure was extortion.  *Id.*
20  Moreover, the complaint did not allege extortion merely because the Building Trades
21  might have committed some tort or breached some contract through its economic
22  pressure.  *Id.* at 841.  If the Building Trades committed such a breach, the proper
23  remedy was a claim under state law, not RICO.  *Id.*

24       Here, Prime Healthcare alleges that Defendants are committing extortion by
25  using economic pressure to try to coerce Prime Healthcare to sign onto the "unlawful"
26  CHA-UHW Agreement.  Regarding this economic pressure, Prime Healthcare alleges
27  that Defendants threatened to continue, and then accelerated, their campaign attacks.
28

(FAC ¶¶ 261-62.)   Specifically, Prime Healthcare alleges that Defendants told California elected officials that they should refuse to accept political contributions from Prime Healthcare.  (*Id.* ¶¶ 263-65.)

Prime Healthcare argues that Defendants' economic pressure is wrongful because it is directed towards a wrongful end – coercing Prime Healthcare to sign an agreement that is "illegitimate under labor law." (Dkt. No. 57 at 21.)  However, as discussed above, the Court has already determined that Prime Healthcare failed to sufficiently allege that the CHA-UHW Agreement was unlawful under the LMRA. Prime Healthcare's arguments that the CHA-UHW Agreement "falls outside th[e] statutory framework" in the NLRA because Defendants are "forc[ing] themselves upon employees who never consented to Defendants' representation" is misplaced because the Agreement only establishes ground rules for a union organizing campaign.  (Dkt. No. 57 at 21-22; Dkt. No. 59 at 5-6.)  Prime Healthcare also argues that Defendants' economic pressure is extortionate because it is being used to impose "unwanted, unnecessary, and superfluous labor services" which are of no "subjective" value. (FAC ¶ 14; Dkt. No. 57 at 23).  But, the Ninth Circuit rejected this precise argument in *UBC*. *See* 770 F.3d at 839.  To the extent Prime Healthcare is arguing that Defendants' economic pressure used wrongful means, this argument is unavailing because Prime Healthcare has failed to allege that it has a statutory or contractual right to the consideration Defendants have offered. *See id.* at 840.

As such, the Court concludes that Prime Healthcare fails to sufficiently allege a claim for extortion under RICO.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss Prime Healthcare's RICO and LMRA § 302 claims based on more recent conduct.

## C.   LMRA § 303 Claims

In Count XI, Prime Healthcare alleges that Defendants SEIU and UHW violated § 303 of the LMRA based on their conduct related to Daughters of Charity Health

System ("DCHS").  Specifically, Prime Healthcare alleges that Defendants violated § 303 by protesting at a DCHS hospital, backing an ERISA lawsuit against DCHS, and requesting that the Securities and Exchange Commission ("SEC") investigate DCHS. (FAC ¶¶ 173-76, 178, 339-40.)

LMRA § 303 makes it unlawful for a labor organization to engage in any activity or conduct defined as an unfair labor practice in § 8(b)(4) of the NLRA.  29 U.S.C. § 187(a).  In turn, NLRA § 8(b)(4)(ii)(B) prohibits a labor organization from engaging in secondary boycotts.  29 U.S.C. § 158(b)(4)(ii)(B).  "A § 8(b)(4)(ii)(B) violation has two elements."  *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1212 (9th Cir. 2005).  "First, a labor organization must 'threaten, coerce, or restrain' a person engaged in commerce (such as a customer walking into one of the secondary businesses)."  *Id.* (quoting 29 U.S.C. § 158(b)(4)(ii)).  "Second, the labor organization must do so with 'an object' of 'forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the produces of any other producer, processor, or manufacturer, or to cease doing business with any other person.'"  *Id.* (quoting 29 U.S.C. § 158(b)(4)(ii)(B)).

Defendants argue that Prime Healthcare fails to allege a violation of LMRA § 303 for three reasons: (1) Prime Healthcare has not been injured; (2) DCHS was not a "secondary" or neutral employer; and (3) the alleged conduct was not "coercive." (Dkt. No. 50-1 at 27-32.)

### 1.   Injury

LMRA § 303 confers standing to "[w]hoever shall be injured in his business or property by reason o[f]" an unfair labor practice under NLRA § 8(b)(4).  29 U.S.C. § 187(b).  "[A] court must determine whether Section 303 standing exists by looking to: (1) the nexus between the injury and the statutory violation; and (2) the relationship between the injury alleged and the forms of injury that Congress sought to prevent or remedy by enacting the statute."  *Am. President Lines, Ltd. v. Int'l Longshore &*

*Warehouse Union*, 721 F.3d 1147, 1153 (9th Cir. 2013).

Defendants contend that Prime Healthcare has failed to allege any injuries as a result of SEIU and UHW's allegedly unlawful § 8(b)(4) conduct related to DCHS, and that Prime Healthcare cannot do so because it acknowledges that DCHS approved the sale of six hospitals to Prime Healthcare on October 10, 2014. (Dkt. No. 50-1 at 28 (citing FAC ¶ 171).)  Prime Healthcare counters that it sufficiently alleged injury because it alleged that it incurred costs in responding to Defendants' conduct. (Dkt. No. 57 at 31 (citing FAC ¶¶ 19, 21, 266-69).)  In addition, the sale of the hospitals is not final yet because DCHS's approval was just one step in the process and most of Defendants' conduct occurred after DCHS announced its decision in an effort to force DCHS to abandon the sale while it remains subject to agency approval. (Dkt. No. 57 at 31 (citing FAC ¶¶ 171-78).)  Defendants reply that Prime Healthcare's cited allegations are too vague or irrelevant. (Dkt. No. 58 at 8-9.)

None of the allegations relied on by Prime Healthcare are sufficient to show an injury under LMRA § 303. (Dkt. No. 57 at 31 (citing FAC ¶¶ 19, 21, 266-69).)  Prime Healthcare points to paragraph 19, but that paragraph only vaguely alleges that "Prime has incurred significant costs, including substantial legal fees, in defending against UHW's unlawful conduct in violation of LMRA Section 303." (FAC ¶ 19.)  Prime Healthcare also points to paragraph 21, but that paragraph only conclusorily alleges that it seeks to recover "consequential damages that were directly and proximately caused by UHW's unlawful activities under Section 303(a) of the LMRA." (*Id.* ¶ 21.)  Paragraphs 266 and 267 address injuries allegedly flowing from "extortionate" conduct under RICO, not flowing from secondary conduct under § 303. (*Id.* ¶¶ 266-67.)  Paragraph 268 concerns an employee's False Claims Act suit against Prime Healthcare and is irrelevant. (*Id.* ¶ 268.)  Paragraph 269 is also irrelevant because it concerns the boycott of a DCHS hospital, but does not allege any damages or other injury. (*Id.* ¶ 269.)

1    Therefore, the Court concludes that Prime Healthcare fails to sufficiently allege

2    any injuries stemming from the allegedly unlawful § 8(b)(4) conduct related to DCHS.

3    As Prime Healthcare will have an opportunity to amend its FAC, the Court briefly

4    addresses Defendants' other arguments regarding Prime Healthcare's LMRA § 303

5    claims.

6          **2.    Secondary Conduct**

7    NLRA § 8(b)(4) is not meant to prohibit "primary activity" but rather "secondary

8    boycotts whose 'core concept' is 'union pressure directed at a neutral employer the

9    object of which [is] to induce or coerce him to cease doing business with an employer

10   with whom the union [is] engaged in a labor dispute.'" *Griffith Co. v. NLRB*, 545 F.2d

11   1194 (9th Cir. 1976) (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 622

12   (1967)).

13   Defendants contends that DCHS is not a "secondary" or neutral employer, but

14   rather a "primary" employer, because UHW was the bargaining representative of

15   employees at DCHS.  (Dkt. No. 50-1 at 29.)  Further, the fact that Prime Healthcare

16   may have also been affected by this conduct does not mean that Defendants violated

17   NLRA § 8(b)(4).  (*Id.* at 29-30.) (citing *NLRB v. Local 825, Int'l Union of Operating

18   *Eng'rs, AFL-CIO*, 400 U.S. 297, 303 (1971) ("Section 8(b)(4)(B) . . . reflects a concern

19   with protecting labor organizations' right to exert legitimate pressure aimed at the

20   employer with whom there is a primary dispute.  This primary activity is protected even

21   though it may seriously affect neutral third parties.")).  Prime Healthcare responds that

22   it is irrelevant that UHW was the bargaining representative of employees at DCHS, and

23   the key issue is whether Defendants' conduct directed at DCHS was motivated by its

24   labor dispute with Prime Healthcare.  (Dkt. No. 57 at 31-32.)

25   The Court agrees with Prime Healthcare that UHW's status as the bargaining

26   representative of employees at DCHS does not preclude its conduct toward DCHS as

27   constituting secondary activity.  As Prime Healthcare notes, in *Local 825*, cited by

28

1    Defendants, the union's activities were "aimed directly" at employers with which it had

2    a bargaining relationship, but the Supreme Court still held that the union's actions were

3    "unmistakably and flagrantly secondary" because these neutral employers were not

4    involved in the dispute and the union's goal was to get these neutral employers to apply

5    pressure on another employer, the union's primary target.  *See Local 825, Int'l Union*

6    *of Operating Eng'rs, AFL-CIO*, 400 U.S. at 300, 304.  The Fifth Circuit case cited by

7    Defendants also actually supports Prime Healthcare's argument that a union may have

8    more than one motive, and the key issue is whether it has a prohibited secondary

9    boycott motive. (Dkt. No. 50-1 at 29 n.10; Dkt. No. 57 at 32.)  *See Tex. Distributors,*

10   *Inc. v. Local Union No. 100, United Ass'n of Journeyman*, 598 F.2d 393, 399-400 (5th

11   Cir. 1979) ("The prohibited secondary object need not be the sole object of the union's

12   activity. . . . A determination that the union has [a primary] objective does not . . .

13   foreclose inquiry into whether a prohibited secondary objective or intent exists, as

14   well."), *abrogated on other grounds by Summit Valley Indus., Inc. v. Local 112, United*

15   *Bhd. of Carpenters*, 456 U.S. 717 (1982)).

16        Prime Healthcare alleges that Defendants' conduct regarding DCHS was

17   intended to induce DCHS to cease its sale of hospitals to Prime Healthcare because of

18   Defendants' labor dispute with Prime Healthcare. (FAC ¶¶ 173-76, 339-40.)  As such,

19   Prime Healthcare has sufficiently alleged secondary conduct.

20        **3.    Coercive Conduct**

21        NLRA § 8(b)(4)(ii)(B) requires that the union "threaten, coerce, or restrain" any

22   person to cease doing business with another.  29 U.S.C. § 158(b)(4)(ii).  Prime

23   Healthcare challenges three alleged actions by Defendants regarding DCHS:

24   (a) protesting at a DCHS hospital; (b) backing an ERISA lawsuit against DCHS; and

25   (c) requesting that the SEC investigate DCHS.  (FAC ¶¶ 173-76, 178, 339-40.)

26   Defendants contend that Prime Healthcare has failed to allege that these alleged actions

27   amount to unlawful coercion under NLRA § 8(b)(4)(ii)(B). (Dkt. No. 50-1 at 30-32.)

28

### a.    Protest at DCHS Hospital

The Supreme Court has emphasized that, in light of a union's First Amendment rights, the phrase "threaten, coerce, or restrain" "should be interpreted with caution and not given a broad sweep." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988). For example, a union protest at a neutral employer's premises that creates a physical or symbolic barrier to the neutral employer, promotes physical confrontations with individuals seeking to enter the neutral employer's business, implicitly instructs union members employed by the neutral employer to stop work, or explicitly pickets  the neutral employer is unlawful. *See Overstreet*, 409 F.3d at 1213-16. However, a union protest at a neutral employer's premises that simply informs the public of a labor dispute in a non-threatening and non-coercive manner is lawful. *See id.*

Defendants argue that Prime Healthcare failed to allege any details regarding Defendants' protest at a DCHS hospital. (Dkt. No. 50-1 at 31.) Prime Healthcare responds that Defendants' protests "contain an element of conduct which differ from pure speech" and that its allegations are not conclusory. (Dkt. No. 57 at 33 & n.27.)

Regarding the protest, Prime Healthcare only vaguely alleges that "on August 15, 2014, dozens of SEIU members, at the direction of Defendants, joined [healthcare 'watchdog' coalition] Our SALUD members outside St. Vincent's Medical Center, one of the hospitals owned by DCHS, for the purpose of interfering with Prime's attempted acquisition of this hospital system by coercing neutral DCHS not to sell to Prime." (FAC ¶ 269.) There is no indication what type of conduct Defendants were engaged in outside the hospital.

As such, the Court agrees with Defendants that Prime Healthcare has failed to allege sufficient details regarding this protest to show that Defendants' conduct rises to the level of a threat, coercion or restraint under NLRA § 8(b)(4)(ii)(B).

///

### b.   ERISA Lawsuit

Defendants contend that UHW's alleged support of an ERISA lawsuit against DCHS is protected by the First Amendment right to access the courts and does not amount to coercive conduct under § 8(b)(4)(ii)(B) because Prime Healthcare fails to allege that the lawsuit was filed for an improper purpose and is objectively baseless, and because it is implausible that such a lawsuit would coerce DCHS to back out of its hospital sales to Prime Healthcare.  (Dkt. No. 50-1 at 31; Dkt. No. 58 at 9-10.) Defendants also argue that the ERISA lawsuit is well-founded, ask this Court to take judicial notice of the ERISA complaint, and cite to a separate district court ERISA case concerning different parties.  (Dkt. No. 50-1 at 31.)  Prime Healthcare counters that a lawsuit with a secondary objective constitutes coercion under the statute, and it is inappropriate at this stage for the Court to evaluate the merits of the ERISA lawsuit. (Dkt. No. 57 at 33.)

The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.  The right to petition the government extends to the courts and, thus, includes the right to file certain lawsuits. *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002).  In the NLRA context, the Supreme Court held in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 744 (1983) that an employer's prosecution of a retaliatory suit against picketing employees constitutes an unfair labor practice under § 8(a)(1) if the suit: (1) is filed with an improper motive; and (2) lacks a reasonable basis in law.   The Ninth Circuit has applied this "improper motivation/reasonable basis" test to determine whether a union committed an unfair labor practice under § 8(b)(4). *Int'l Longshoremen's & Warehousemen's Union, Local 32 v. Pac. Maritime Ass'n*, 773 F.2d 1012, 1015 (9th Cir. 1985).

Regarding the ERISA lawsuit, Prime Healthcare alleges:

> On October 21, 2014, a few weeks after DCHS announced its intent to sell to Prime, UHW filed a class action lawsuit against DCHS and other

1   related defendants. The lawsuit alleges that DCHS improperly evaded
2   federal pension law requirements under ERISA, allowing DCHS to underfund its pension plan by an estimated $229 million.

3   The suit was filed to threaten, coerce, and restrain DCHS, and those in control of DCHS, from moving forward with the sale of the DCHS
4   hospitals to Prime. UHW's declared impetus for the suit: the acquisition by Prime increased the risks to the pension plan.

5   Also, the ERISA lawsuit targets not only DCHS – requesting that DCHS bring the retirement plan into compliance with ERISA and funding
6   the plan – it also targets those in charge of the decision to do business with Prime (i.e., sell the hospitals to Prime): DCHS executives and
7   corporate entities that DCHS is subordinate to or affiliated with. Specifically, the lawsuit requests that the DCHS executives who are plan
8   fiduciaries make the plan whole for any losses, disgorge any profits accumulated as a result of their breaches of fiduciary duty, and pay all
9   applicable civil monetary penalties. With regard to the other corporate entities, the lawsuit alleges that they are jointly and severally liable for the
10   failure to meet ERISA's minimum funding standards and must therefore fully fund the retirement plan.

11   Although UHW is not a named plaintiff, it has publicly acknowledged that it is backing the lawsuit. DCHS has characterized
12   UHW's suit as "nothing more than an unfortunate scare tactic by a union waging a corporate campaign against Prime Healthcare."

13   (FAC ¶¶ 173-76.)

14   The Court finds that Prime Healthcare has alleged that the ERISA lawsuit was

15   filed for an improper motive because Prime Healthcare alleged that the lawsuit "was

16   filed to threaten, coerce, and restrain DCHS, and those in control of DCHS, from

17   moving forward with the sale of the DCHS hospitals to Prime" and was filed "in the

18   context of UHW's dispute with Prime." (FAC ¶¶ 174, 339.) However, the Court finds

19   that Prime Healthcare has failed to allege that the ERISA lawsuit lacks a reasonable

20   basis in law. There are no allegations regarding the merit of the ERISA lawsuit.

21   As such, the Court concludes that Prime Healthcare has failed to sufficiently

22   allege that the ERISA lawsuit amounts to a threat, coercion or restraint under NLRA

23   § 8(b)(4)(ii)(B).

24   **c.   SEC Investigation**

25   Defendants contend that government lobbying, such as requesting that the SEC

26   investigate DCHS, does not amount to coercion under NLRA § 8(b)(4)(ii)(B). (Dkt.

27   No. 50-1 at 32.) (citing *Brown & Root, Inc. v. La. State AFL-CIO*, 10 F.3d 316, 326-27

28

(5th Cir. 1994) ("[T]o hold that lobbying activities constitute coercion within the meaning of section 8(b)(4)(ii)(B) would pose potentially serious First Amendment problems . . . We cannot discern in the language of section 8(b)(4)(ii)(B) any clear indication that governmental lobbying alone 'coerces' secondary employers. Neither do we find any clear indication in the legislative history that Congress intended to proscribe such lobbying.").

Prime Healthcare counters that UHW's request that the SEC investigate DCHS is not protected lobbying activity because it is not a genuine effort to influence governmental action but rather an unlawful attempt to interfere with Prime Healthcare's relationship with DCHS.  (Dkt. No. 57 at 24-25, 33.) (citing *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1251, 1253 (9th Cir. 1982) ("If the purported effort to influence or obtain government action is in reality only an attempt to interfere with the business relationships of" another the activity does not enjoy immunity under the *Noerr-Pennington* doctrine, and "[w]hether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact.").  *See also Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009) (discussing *Noerr-Pennington* doctrine).

Prime Healthcare alleges that:

> UHW sent a letter to the SEC demanding an investigation of and agency action against the neutral DCHS.  Specifically, UHW alleged that DCHS had violated the Securities Exchange Act because its CEO had misled investors.  In reality, the DCHS CEO was asked about a dispute between the California Nurses Association and UHW and what percentage of the staff was represented by UHW.  He responded that he did not know the specific number, that it was a significant percentage, and that "we have had a great labor-management partnership for years, working together. So it is a significant number but I can't tell you percentage."  The basis for the SEC investigation demand: UHW disagreed with the description of the labor-management partnership as "great."

(FAC ¶ 178.)  Prime Healthcare further alleges that this request was "in the context of UHW's dispute with Prime" and that by "requesting that the SEC initiate an investigation of DCHS . . . UHW sought to pressure DCHS to not sell its hospitals to

Prime." (*Id.* ¶ 339.)

At this early stage of the proceedings, assuming that truth of all factual allegations and construing all inferences from them in the light most favorable to Prime Healthcare, the Court concludes that Prime Healthcare has sufficiently alleged that UHW's request that the SEC investigate DCHS amounts to coercion under NLRA § 8(b)(4)(ii)(B). Prime Healthcare alleged that UHW's request to the SEC was not well-founded (FAC ¶ 178) and was "sought to pressure DCHS to not sell its hospitals to Prime" "in the context of UHW's dispute with Prime" (*id.* ¶ 339). Therefore, it is plausible that UHW's request to the SEC was not genuine government lobbying, but rather a sham to coerce DCHS because of UHW's labor dispute with Prime Healthcare.

In sum, the Court has concluded for its LMRA § 303 claims related to DCHS, Prime Healthcare has failed to sufficiently allege that it was injured, and has failed to sufficiently allege that the protest at a DCHS hospital and the ERISA lawsuit amount to unlawful conduct under NLRA § 8(b)(4)(ii)(B). Accordingly, the Court **GRANTS** Defendants' motion to dismiss Prime Healthcare's LMRA § 303 claim in Count XI.[12]

## CONCLUSION AND ORDER

For the foregoing reasons, the Court hereby **ORDERS**:

1. Defendants' Motion to Dismiss the FAC is **GRANTED IN PART AND**

---

[12]Prime Healthcare correctly points out that Defendants failed to address Count X, which alleges that SEIU and UHW violated LMRA § 303 by attempting to force Prime Healthcare to join a de facto multi-employer bargaining group. (Dkt. No. 57 at 12; FAC ¶¶ 252-53, 331-32.) Defendants acknowledge that they overlooked Count X, but ask this Court to use its discretion to consider this issue raised for the first time in their reply brief, and argue that the claim is specious because it is predicated on the legal assertion that by giving the Committee the authority to make expenditures as permitted by the LMCA, the CHA-UHW Agreement thereby gives the Committee the right to control all labor relations issues at the signatory hospitals. (Dkt. No. 58 at 10-11.) The Court declines to address this issue because it is raised for the first time in Defendants' reply brief, and Prime Healthcare has not had the opportunity to respond. *See Hupp v. San Diego County*, 2014 WL 347472, at *4 (S.D. Cal. Jan. 30, 2014) (district courts have broad discretion to consider arguments raised in a reply brief, but generally should do so only for good cause, if the issue is raised in the opponent's brief, or if failure to raise the issue properly did not prejudice the opposing party).

1      **DENIED IN PART** (Dkt. No. 50);

2      2.      the Court **DISMISSES WITHOUT PREJUDICE** Prime Healthcare's

3              entire FAC, except for Count X.  If Prime Healthcare wishes, it **SHALL**

4              **FILE** a second amended complaint to correct the deficiencies identified

5              herein within thirty (30) days of the date this Order is electronically

6              docketed;

7      3.      Plaintiff's Ex Parte Motion for Leave to File Supplemental Memorandum

8              is **GRANTED** (Dkt. No. 68).

9      **IT IS SO ORDERED.**

10

11     DATED:  April 1, 2015

12

13                                     HON. GONZALO P. CURIEL
                                       United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28