1   GLENN ROTHNER (CSB No. 67353)
    HANNAH WEINSTEIN (CSB No. 301666)
2   ROTHNER, SEGALL & GREENSTONE
    510 South Marengo Avenue
3   Pasadena, California 91101
    Telephone:  (626) 796-7555
4   Facsimile:  (626) 577-0124
    E-mail:  grothner@rsglabor.com
5
6   Attorney for Defendants SEIU and Mary Kay Henry

7   BRUCE A. HARLAND (CSB No. 230477)
    JANNAH V. MANANSALA (CSB No.
8   249376)                                    LEON DAYAN (CSB No. 153162)
    MINSU D. LONGIARU (CSB No. 298599) ANDREW D. ROTH (*pro hac vice*)
9   WEINBERG ROGER & ROSENFELD       BREDHOFF & KAISER, PLLC
    1001 Marina Village Parkway, Suite 200   805 Fifteenth St., N.W. Tenth Floor
10  Alameda, California 94501-1091           Washington, D.C. 20005
    Telephone:  (510) 337-1001               Telephone:  (202) 842-2600
11  Facsimile:  (510) 337-1023               Facsimile:  (202) 842-1888
    E-mail:  bharland@unioncounsel.net       E-mail:  ldayan@bredhoff.com
12          jmanansala@unioncounsel.net              aroth@bredhpff.com
            mlongiaru@unioncounsel.net
13                                           Attorney for Defendants Change to
    Attorneys for Defendants SEIU-United     Win, CtW Investment Group and
14  Healthcare Workers West and Dave Regan   Tom Woodruff

15

16                 UNITED STATES DISTRICT COURT

17              SOUTHERN DISTRICT OF CALIFORNIA

18
    PRIME HEALTHCARE SERVICES,          CASE  NO. 14-CV-2553-GPC-RBB
19  INC.,
                                        **MEMORANDUM OF POINTS
20             Plaintiff,               AND AUTHORITIES IN
                                        SUPPORT OF DEFENDANTS'
21       v.                             MOTION TO DISMISS SECOND
                                        AMENDED COMPLAINT**
22  SERVICE EMPLOYEES
    INTERNATIONAL UNION; SERVICE        **DATE:**      August 28, 2015
23  EMPLOYEES INTERNATIONAL             **TIME:**      1:30 p.m.
    UNION – UNITED HEALTHCARE           **CTRM:**      2D
24  WORKERS WEST; CHANGE TO WIN;        **JUDGE:**     Hon. Gonzalo P. Curiel
    CTW INVESTMENT GROUP; MARY
25  KAY HENRY; DAVE REGAN; and
    TOM WOODRUFF,
26
               Defendants.
27

28

                                                              14cv2553

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

I.   THE CLAIM PRECLUSION DEFECT IN PRIME'S
     FAC CANNOT BE CURED. ........................................................1

II.  THE SAC FAILS TO CURE THE DEFICIENCIES IN
     PRIME'S LMRA § 302 AND RICO "EXTORTION"
     CLAIMS BASED ON THE CHA-UHW AGREEMENT;
     THUS, BOTH THE FREE-STANDING LMRA § 302
     CLAIM ASSERTED IN COUNT IX OF THE SAC
     BASED ON THE CHA-UHW AGREEMENT, AND
     THE VARIOUS RICO CLAIMS ASSERTED IN
     COUNTS I-VIII OF THE SAC BASED ON THE
     CHA-UHW AGREEMENT, FAIL TO STATE A
     CLAIM AND SHOULD BE DISMISSED ........................................2

     A.   Prime's LMRA § 302 Claim. ...............................................2

          1.   The Joint Advocacy Fund Provisions ...........................2

          2.   The Neutrality Agreement Provisions............................7

     B.   Prime's RICO "Extortion" Claim.........................................9

III. THE SAC FAILS TO CURE THE DEFICIENCIES IN
     COUNTS X AND XI DEFICIENCIES............................................10

     A.   Count X Fails Because The Allegation That The
          "Unlawful Agreements" Created A Multi-Employer
          Bargaining Group Are Legally Insufficient, And
          Prime Lacks Standing Under § 303(a) Of The
          LMRA.) ................................................................................10

          1.   Prime's allegations that the "Unlawful
               Agreements" create a multi-employer
               bargaining group are legally insufficient.. ....................11

               a.   Express Scope ......................................................11

               b.   Catch-All Provision ...........................................12

               c.   Decision-Making and Expenditures....................13

          2.   To survive dismissal of Count X, Prime must
               plead sufficient facts to show both injury and
               coercion; It fails sufficiently to allege either. ..............14

     B.   Count XI Fails Because Prime Does Not
          Sufficiently Plead Injury Or Coercive Conduct. ....................15

i

14cv2553

**TABLE OF CONTENTS**
**(cont'd)**

Page

      1.    Prime fails sufficiently to allege injury under LMRA § 303. ............................................... 15

      2.    Prime fails sufficiently to allege that Defendants' conduct constitutes a threat or coercion under NLRA § 8(b)(4)(ii)(B) ........................ 18

IV.    THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE..................................................................21

    A.    Prime Has Repeatedly Failed to Cure the Deficiencies in its Complaints....................................21

    B.    Prime's Effort to Hold The SEIU and CtW Defendants Legally Responsible For UHW's "New Conduct" Fails *Twombly's* Plausibility Standard ................................................................23

CONCLUSION...........................................................................

14cv2553

# TABLE OF AUTHORITIES

Page

**Cases**

*Abreen Corp. v. Laborers' Int'l Union,*
709 F.2d (1st Cir. 1983) ................................................................ 14

*Adcock v. Freightliner,*
550 F.3d 369 (4th Cir. 2008) ........................................................... 8

*Am. President Lines, Ltd. v. ILWU,*
721 F.3d 1147 (9th Cir. 2013) ........................................................ 14

*Arroyo v. United States,*
359 U.S. 419 (1959) ......................................................................... 7

*BE & K Const. Co. v. United Bhd. of Carpenters & Joiners,*
90 F.3d 1318 (8th Cir. 1996) ......................................................... 15

*Boone v. Redevelopment Agency of City of San Jose,*
841 F.2d (9th Cir. 1988) ................................................................. 15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988) .................................................................. 18, 19

*Eminence Capital, LLC v. Aspeon, Inc.,*
316 F.3d 1048 (9th Cir. 2003) ....................................................... 22

*Empress LLC v. City and County of San Francisco,*
419 F.3d (9th Cir. 2005) ................................................................. 20

*Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters,*
623 F.2d 1354 (9th Cir. 2006) ....................................................... 11

*Foman v. Davis,*
371 U.S. 178 (1962) ....................................................................... 22

*Hotel Emps. & Rest. Emps. Union Local 57 v. Sage Hospitality Res., LLC,*
390 F.3d 206 (3d Cir. 2004) .......................................................... 8, 9

*In re United Bhd. of Carpenters & Joiners of America, Local Union 1506,*
355 NLRB No. 159 (2010) .............................................................. 19

*Local 144 Nursing Home Pension Fund v. Demisay,*
508 U.S. 581 (1993) ..................................................................... 6, 7

*NLRB v. Servette,*
377 U.S. 57 (1964) ......................................................................... 15

*Overstreet v. United Broth. of Carpenters and Joiners of America, Local Union No. 1506,*
409 F.3d (9th Cir. 2005) ............................................................ 18, 19

*Salessi v. Commonwealth Land Title Ins. Co.*,
   No. SA CV 08-01274-DOC (JPRx), 2013 WL 5676209
   (C.D. Cal. Oct. 16, 2013) ...................................................................................2

*Sosa v. DIRECTV, Inc.*,
   437 F.3d (9th Cir. 2006) ...................................................................................20

*Summit Valley Indus. v. Local 112, United Bhd. of Carpenters*,
   456 U.S. 717 (1982) ................................................................................14, 18

*United Bhd. of Carpenters & Joiners v. Bldg. & Const. Trades Dep't*,
   770 F.3d 834 (9th Cir. 2014).........................................................10, 23, 24, 25

**Statutes**

29 U.S.C.
   § 158(b)(4)(ii) ...................................................................................18
   § 158(b)(4)(ii)(A) ......................................................................10, 14
   § 158(b)(4)(ii)(B) ...........................................................................18
   § 186 ...................................................................................*passim*
   § 186(b)(1)............................................................................................2
   § 186(c)...............................................................................................7
   § 186(c)(5)..........................................................................................6
   § 186(c)(9)...............................................................................4, 7, 12
   § 187 ..................................................................................*passim*
   § 187(a).......................................................................10, 14, 19

**Rules**

Federal Rules of Civil Procedure
   Rule 15(a)(1)(B) ...................................................................................21

**INTRODUCTION**

On April 1, 2015, the Court granted in part and denied in part the defendants' joint motion to dismiss Prime's First Amended Complaint ("FAC"), granting Prime leave to amend "to correct the deficiencies [the Court] identified" in its order of partial dismissal ("Order") [Docket No. 70], if possible.  Order at 41. As we show in this motion, Prime's Second Amended Complaint ("SAC") [Docket No. 73] neither corrects the identified deficiencies nor states a viable claim in any other respect and should, therefore, be dismissed, this time *with prejudice*.

**I.    THE CLAIM PRECLUSION DEFECT IN PRIME'S FAC CANNOT BE CURED.**

This Court granted Defendants' motion to dismiss Prime's claims premised on conduct previously alleged in Prime's anti-trust action against SEIU, UHW, and others ("*Prime I*").  Order at 15.  Noting that Prime filed the operative complaint in *Prime I* on September 21, 2012, the Court held that the doctrine of claim preclusion – which "prohibits lawsuits on any claims that were raised or *could have been raised* in a prior action" – barred Prime's RICO claims to the extent they rested on allegations of conduct occurring prior to September 21, 2012.  *Id.*, at 7, 8, 15 (emphasis by Court) (internal quotations and citations omitted).

Nonetheless, Prime's SAC continues to allege pre-September 21, 2012 conduct, and even includes further allegations from this time-frame that were not included in the First Amended Complaint.  *See*, *e.g.*, SAC ¶ 161 (including, for the first time, allegations concerning a May 2012 California Watch report entitled "Prime Hospital's Stent Placements Violated State Regulations").  But because this Court held in its Order that claim preclusion bars consideration of pre-September 21, 2012 conduct, Prime cannot rely on such pre-September 21, 2012 conduct in the SAC.  Once it is clear that claim preclusion bars allegations (and legal claims resting on such allegations) that were *or could have been* raised in a prior action between the parties – and here, the Court has explicitly held this to be so –

reiteration or embellishment of those allegations in a subsequent complaint "cannot cure" the claim preclusion "defect." *Salessi v. Commonwealth Land Title Ins. Co.*, No. SA CV 08-01274-DOC (JPRx), 2013 WL 5676209, at *12 (C.D. Cal. Oct. 16, 2013).

## II. THE SAC FAILS TO CURE THE DEFICIENCIES IN PRIME'S LMRA § 302 AND RICO "EXTORTION" CLAIMS BASED ON THE CHA-UHW AGREEMENT; THUS, BOTH THE FREE-STANDING LMRA § 302 CLAIM ASSERTED IN COUNT IX OF THE SAC BASED ON THE CHA-UHW AGREEMENT, AND THE VARIOUS RICO CLAIMS ASSERTED IN COUNTS I-VIII OF THE SAC BASED ON THE CHA-UHW AGREEMENT, FAIL TO STATE A CLAIM AND SHOULD BE DISMISSED.

### A. Prime's LMRA § 302 Claim

Prime continues to maintain in its SAC that the May of 2014 CHA-UHW Agreement is "unlawful" on its face under § 302 of the LMRA, 29 U.S.C. § 186, and that UHW's alleged demand that Prime sign onto that "unlawful" agreement is thus itself "unlawful" under § 302(b)(1) of the LMRA. *See* SAC ¶¶ 372-80. And, Prime continues to maintain that this "unlawfulness" infects *both* the Joint Advocacy Fund provisions *and* the neutrality agreement provisions of the CHA-UHW Agreement. *Id.* We address Prime's attack on these two components of the CHA-UHW Agreement in turn, as this Court did in its Order rejecting and dismissing without prejudice the § 302 claim asserted by Prime in its FAC. *See* Order at 17-25.[1]

### 1. The Joint Advocacy Fund Provisions

In its FAC, Prime's main line of attack on the Joint Advocacy Fund provisions of the CHA-UHW Agreement was that the employer payments into the Fund provided for by the Agreement "constitute[ ] . . . illegal direct payment[s] to UHW." Order at 17 (citing FAC ¶¶ 228-40, 251-56).

The Court found two deficiencies in Prime's position. First, "§ 302 explicitly

---

[1] As the Court noted, *see* Order at 16, § 302 violations are RICO predicate acts. Thus, Prime's claim that Defendants violated § 302 is both a free-standing claim, *see* SAC Count IX, and an asserted basis for various RICO claims, *see* Counts I-VIII.

1  excepts payments by employers through an industrywide labor management

2  committee established under the Labor Management Cooperation Act of 1978

3  ('LMCA')," yet Prime's "own allegations show that the CHA-UHW Agreement

4  limits the money [to be paid by employers into the Joint Advocacy Fund] to

5  purposes allowed under the LMCA." *Id.* at 17-18.  Second, Prime "acknowledges

6  that the money [in the Fund] may not be spent without the equal approval of both

7  the employer and UHW representative." *Id.* at 18.  The Court thus concluded that

8  Prime's assertion that "UHW will improperly use the money [in the Fund] for its

9  own ends" in violation of § 302 amounts to "speculation" that "does not pass the

10  plausibility standard" outlined at pages 5-6 of the Court's Order. *Id.*[2]

11       In its SAC, Prime persists in this previously-rejected line of attack on the

12  Joint Advocacy Fund provisions of the CHA-UHW Agreement, while attempting

13  to address—through new allegations—the two deficiencies identified by the Court.

14  As we demonstrate below, Prime's attempt fails.

15       As to the first deficiency, Prime trumpets that under the terms of the CHA-

16  UHW agreement, employer contributions to the Joint Advocacy Fund will be used

17  to accomplish Medi-Cal reform through "educational, legislative, regulatory,

18  initiative or other strategies" aimed at increasing Medi-Cal reimbursements to

19  California hospitals by $6 Billion and bringing about other improvements to

20  California's healthcare delivery system "that [cannot] be obtained through direct

21  negotiation between employers and labor unions."  SAC ¶¶ 249-53; *see also id.*

22  ¶¶ 271, 278, 284.[3]  As Prime would have it, this alleged joint expenditure of money

23

24  [2] The Court also considered and rejected two other lines of attack on the Joint
   Advocacy Fund provisions of the CHA-UHW Agreement as allegedly creating an
25  illegitimate industrywide labor management committee under the LMCA. *See*
   Order at 18-20.  In the SAC, Prime makes no serious effort to prop up these other
26  previously-rejected lines of attack, and any such effort would be futile given how
   far afield and "illogical," *id.* at 20, both lines of attack are.

27

28  [3] It is common knowledge, of which this Court may take judicial notice, *see* Order
   at 5 n.1, that Medi-Cal is the California Medicaid welfare program serving indigent
   persons in the State.

by CHA/hospitals and UHW to accomplish Medi-Cal reform is a joint expenditure that falls outside "the limited purposes permitted under the LMCA," and thus violates § 302. *See id.* ¶ 271. But that simply is not so.

The LMCA, by its express terms, permits joint expenditure of money by a joint labor-management committee "established for one or more" of seven statutorily-enumerated "purposes," the third and fourth of which are as follows:

> (3) to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

> (4) to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the plant, area or industry

*See* 29 U.S.C. §§ 186(c)(9), 175a Note. Prime's rhetoric notwithstanding, joint expenditure of money by CHA/hospitals and UHW to accomplish Medi-Cal reform falls squarely within *both* of these statutory purposes.

Plainly, the well-publicized problems with the current Medi-Cal system are problems "of mutual concern" to CHA/hospitals and health care workers, inasmuch as the relatively low level of reimbursements provided to California hospitals under that system for the treatment they provide to indigent patients directly disadvantages the hospitals and indirectly disadvantages health care workers by, among other things, limiting the wages and benefits that the hospitals can afford to pay them as well as their future employment opportunities and prospects. And, these problems "of mutual concern" are "not susceptible to resolution within the collective bargaining process," inasmuch as an increase in hospital reimbursement rates and other reforms to the Medi-Cal system can be achieved only through governmental action. Thus, joint expenditure of money by the CHA/hospitals and UHW aimed at accomplishing such reforms through "educational, legislative, regulatory, initiative or other strategies" falls squarely within statutory purpose Number 3 above.

Likewise, if the parties are successful in their joint Medi-Cal reform efforts,

that success unquestionably will enhance "the competitiveness and . . . the economic development of the [healthcare] industry" in California.  Thus, the joint expenditure of money by the CHA/hospitals and UHW aimed at accomplishing such reforms also falls squarely within statutory purpose Number 4 above.

In sum, the new allegations in Prime's SAC pertaining to the use of money in the Joint Advocacy Fund to accomplish Medi-Cal reform do nothing to cure the first deficiency in the FAC identified by the Court.

As to the second deficiency, Prime continues to acknowledge, as it must, this Court's point that under the CHA-UHW Agreement the money in the Joint Advocacy Fund may not be spent without the equal approval of both the employer and UHW representative.  *See* SAC ¶ 255.  But in the SAC Prime now asserts that this 50/50 split exists only on paper, and that in reality UHW exercises "absolute control" over the Fund because the employer representative, CHA's CEO/President Daune Dauner, has "already demonstrated" by his actions "that he is under UHW's control."  *Id.*; *see also id.* ¶¶ 247, 274-75, 282.  This assertion is specious.

According to Prime, Dauner "willingly exceeded his authority as CEO/President of CHA" and "also violated CHA's By-Laws" by entering into the CHA-UHW Agreement, and it is these alleged *ultra vires* actions by Dauner which "already demonstrate[ ]" that Dauner "is under UHW's control."  *See id.* ¶¶ 247, 255.  But this is a *non sequitur*.  Assuming for argument purposes that Dauner did in fact exceed his authority and violate CHA's By-Laws by entering into the CHA-UHW Agreement—although Prime pleads no facts at all in the SAC to back up that claim—Dauner's *ultra vires* actions in this regard do not suggest in any way that Dauner "is under UHW's control."  Rather, if they indicate anything, it is over-zealousness on Dauner's part in securing for CHA member hospitals the substantial benefits that Prime itself trumpets will flow to those hospitals under the CHA-UHW Agreement, including UHW cooperation toward Medi-Cal reform

aimed at increasing by $6 Billion hospital reimbursements for treatment of indigent patients.  Thus, the SAC's new allegations pertaining to UHW's asserted "control" over Dauner do not cure the FAC's second deficiency identified by the Court.

The upshot of the foregoing is this:  Because the SAC does nothing to cure *either* of the pleading deficiencies identified by the Court in its Order, the SAC does nothing to upset this Court's prior conclusion that Prime's § 302 claim based on the Joint Advocacy Fund provisions of the CHA-UHW Agreement fails as a matter of law on the ground that Prime's assertion that "UHW will improperly use the money [in the Fund] for its own ends" in violation of § 302 amounts to "speculation" that "does not pass the [applicable] plausibility standard."  Order at 18.

*                    *                    *                    *

Although these deficiencies are dispositive of Prime's § 302 claim based on the Joint Advocacy Fund provisions of the CHA-UHW Agreement, we would be remiss if we failed to show that under the Supreme Court's decision in *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993), Prime would have no § 302 claim even if its speculation that money in the Fund "will be" used for purposes not "in accordance with the LMCA" at some future time, *see* SAC ¶ 375, should come to pass.  In *Demisay*, the Supreme Court held that when a joint labor-management fund has been lawfully "established" under § 302(c)(5) of the LMRA for one or more of the enumerated purposes in that statutory exception to § 302's bar on employer payments to union representatives, but monies contributed by employers into the fund are subsequently misused by the fund's administrators for impermissible purposes not within the scope of the § 302(c)(5) exception, that misuse is *not* itself a "violation of § 302," but rather, at most, "a breach of [the administrators'] contractual or fiduciary obligations [that] may subject them to suit for such breach."  *See* 508 U.S. at 587-89.

As we have shown, the Joint Advocacy Fund in the CHA-UHW Agreement

was lawfully "established" under § 302(c)(9) of the LMRA for one or more of the purposes enumerated in that statutory exception to § 302's bar on employer payments to union representatives.[4]  Thus, under the Supreme Court's decision in *Demisay*, if monies contributed by employers into the Fund are subsequently misused by the Fund's administrators for impermissible purposes not within the scope of the § 302(c)(9) exception, that misuse would *not* itself be a "violation of § 302," but rather, at most, "a breach of [the administrators'] contractual or fiduciary obligations [that] may subject them to suit for such breach."

Applying this point here, Prime alleges in the SAC that the Joint Advocacy Fund has spent more than $3 Million on political contributions.  SAC ¶¶ 286-87.  Adding these allegations to the other allegations in the SAC pertaining to the joint CHA/UHW objective of accomplishing Medi-Cal reform, it is reasonable to assume that these expenditures were made to support legislators and organizations committed to Medi-Cal reform, and thus were expenditures in support of a permissible statutory purpose for which the Fund was "established."  But even if that were not the case, and the expenditures were in fact for impermissible purposes other than those for which the Fund was "established," there would be, under *Demisay*, no actionable "violation of § 302."

## 2.    The Neutrality Agreement Provisions

In its FAC, Prime also attacked the legality under § 302 of certain provisions in the CHA-UHW Agreement bearing "the hallmarks" of an employer-union "neutrality agreement," including, specifically, provisions granting UHW access rights to 30,000 non-union signatory hospital employees, and provisions restraining CHA and signatory hospitals from engaging in anti-union communications and activities.  *See* Order at 20-21 (citing FAC ¶¶ 218, 241-49).

---

[4] Insofar as is relevant here, the § 302(c)(9) exception is indistinguishable from the § 302(c)(5) exception considered by the Supreme Court in *Demisay*, in that both exceptions apply by their express terms if, but only if, the fund at issue has been "established" for one or more of the "purposes" specifically enumerated in the applicable exception.  *See* 29 U.S.C. § 186(c).

In its Order, the Court canvassed the relevant case law and concluded that the dispositive question was whether these neutrality-agreement-like concessions by the CHA/hospitals "plausibly involve bribery or other corrupt practices, which is what Congress sought to prevent by enacting § 302." *Id.* at 24 (citing *Arroyo v. U.S.*, 359 U.S. 419, 425-26 (1959)). Relying on *Adcock v. Freightliner*, 550 F.3d 369 (4th Cir. 2008) and *Hotel Emps. & Rest. Emps. Union*, *Local 57 v. Sage Hospitality Res.*, *LLC*, 390 F.3d 206 (3d Cir. 2004), the Court found that the answer to this dispositive question was "no."

> Rather, the concessions serve the interests of both the CHA/hospitals and UHW "as they eliminate the potential for hostile organizing campaigns in the workplace" which is "certainly . . . not inimical to the collective bargaining process." *Adcock*, 550 F.3d at 375. The fact that the CHA-UHW Agreement, like any other labor agreement, "benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit [in violation of § 302]." *Sage Hospitality Res.*, 390 F.3d 219.

Order at 24-25. Thus, the Court concluded that Prime "fails to sufficiently allege that the neutrality agreement provisions [of the CHA-UHW Agreement] violate LMRA § 302." *Id.* at 25.

In continuing this approach in the SAC, Prime does not make a single new *factual* allegation pertaining to the neutrality agreement provisions of the CHA-UHW Agreement. Rather, it rehashes the *legal* argument—fully taken note of and squarely rejected by the Court in its Order at pages 20-25—that the neutrality-agreement-like concessions made by the CHA/hospitals must be deemed unlawful "thing[s] of value" for § 302 purposes because they were given "[i]n exchange, *quid pro quo*," for various concessions made by UHW in favor of the CHA/hospitals. *See* SAC ¶¶ 257, 298.

Nothing in Prime's SAC warrants a different outcome for this motion. As the Court noted in its prior decision, any employer-union agreement amicably resolving a dispute between the parties—whether it be a collective bargaining agreement, a neutrality agreement, or another type of agreement containing one or

more of the "hallmarks" of a neutrality agreement—invariably entails reciprocal concessions that benefit both contracting parties to some degree. *See* Order at 25 ("The fact that the CHA-UHW Agreement, *like any other labor agreement*, 'benefits both parties . . . .'") (emphasis added). That being so, acceptance of Prime's theory that any employer concessions that benefit the union are unlawful "thing[s] of value" for § 302 purposes when given "[i]n exchange, *quid pro quo*," for union concessions benefitting the employer, would—as the Third Circuit aptly noted in *Sage Hospitality*, *supra*, 390 F.3d at 219—"wreak havoc on the carefully balanced structure of the laws governing recognition of and bargaining with unions."

To avoid wreaking such havoc, *every* court to consider the matter of employer-union neutrality agreements, including this Court in its prior Order, has found that the key inquiry in evaluating the legality of such an agreement under § 302 is whether the concessions made by the employer "plausibly involve bribery or other corrupt practices, which is what Congress sought to prevent by enacting § 302." Order at 24; *see also id.* at 22-24 (surveying the appellate decisions in this area). Because Prime's SAC, like its FAC, contains no such plausible allegations of bribery or other corrupt practices, the SAC does nothing to upset the Court's prior conclusion that Prime "fails to sufficiently allege that the neutrality agreement provisions [of the CHA-UHW Agreement] violate LMRA § 302."

## B. Prime's RICO "Extortion" Claim

In its FAC, Prime also urged, as an alternate basis for its RICO claims, that Defendants' alleged use of economic pressure to induce Prime to sign the CHA-UHW Agreement amounted to "extortion," a RICO predicate act. *See* Order at 28-29. In rejecting the RICO "extortion" claim, the Court concluded that "even if Prime Healthcare has sufficiently alleged that Defendants are seeking to 'obtain' some of their listed property," Prime "fails to meet the second ['wrongful use'] element required for generic extortion." Order at 28. The Court squarely rested its

conclusion on the Ninth Circuit's controlling decision in *United Bhd. of Carpenters & Joiners v. Bldg. & Const. Trades Dep't*, 770 F.3d 834 (9th Cir. 2014) ("*UBC*").  The Court explained that under that Ninth Circuit decision, Prime's burden was to make out a colorable claim that the CHA-UHW Agreement was indeed "unlawful" as alleged by Prime, and that Prime had failed to meet this burden.  *See* Order at 29-31.  The Court concluded, in sum:

> Prime Healthcare argues that Defendants' economic pressure is wrongful because it is directed towards a wrongful end – coercing Prime Healthcare to sign an agreement that is "illegitimate under labor law." . . . *However, as discussed above, the Court has already determined that Prime Healthcare failed to sufficiently allege that the CHA-UHW Agreement was unlawful under the LMRA.*

*Id.* at 31 (emphasis added) (internal citation omitted).

As shown above, *supra* at pages 2-9, in its SAC Prime again has "failed to sufficiently allege that the CHA-UHW Agreement was unlawful under the LMRA."  Thus, for the reasons stated by the Court at pages 28-31 of its Order, Prime's SAC fails to state a RICO claim based on the theory that Defendants' alleged use of economic pressure to induce Prime to sign onto the CHA-UHW Agreement amounts to the RICO predicate act of "extortion."

For the foregoing reasons, both the free-standing LMRA § 302 claim asserted in Count IX of the SAC based on the CHA-UHW Agreement, and the various RICO claims asserted in Counts I-VIII of the SAC based on the CHA-UHW Agreement, fail to state a claim and should be dismissed with prejudice.

## III. THE SAC FAILS TO CURE THE COUNT X AND XI DEFICIENCIES.

### A. Count X Fails Because The Allegation That The "Unlawful Agreements" Created A Multi-Employer Bargaining Group Are Legally Insufficient, And Prime Lacks Standing Under § 303(a) Of The LMRA.

In Count X, Prime asserts that SEIU and UHW engaged in unlawful coercive conduct under NLRA § 8(b)(4)(ii)(A), , 29 U.S.C. § 158(b)(4)(ii)(A), by

attempting to force Prime to join a "*de facto* multi-employer bargaining group."[5]

SAC ¶¶ 381-87.  Prime alleges that the "Unlawful Agreements" created this *de facto* multi-employer bargaining group" by assigning "all rights over labor-related issues at signatory hospitals" to a "Committee controlled by CHA and UHW."

SAC ¶¶ 385.  Prime's argument fails for two independent reasons.  First, Prime fails to allege sufficient facts to show that the joint-labor management committee created by the "Unlawful Agreements" was a multi-employer bargaining group.

Second, Prime lacks standing under § 303(a) of the LMRA.  As a result, Count X should be dismissed.

> **1.    Prime's allegations that the "Unlawful Agreements" create a multi-employer bargaining group are legally insufficient.**

Prime alleges three reasons to support its theory that the "Unlawful Agreements" create a multi-employer bargaining group: (1) the Agreements' express scope (SAC ¶ 300); (2) the Agreements' "catch-all" term (SAC ¶ 301); and (3) the Agreements' decision-making provisions on expenditures (SAC ¶¶ 255, 302, 304).  To form a multi-employer bargaining group, individual employers need to "express an *unequivocal intention* to be bound in collective bargaining by group rather than individual action."  *Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd.of Teamsters*, 623 F.2d 1354, 1358 (9th Cir. 2006) (emphasis added).  None of Prime's arguments shows "unequivocal intent."  Instead, they rest on the specious assertion that Defendants created a multi-employer bargaining group by giving the joint-labor management committee authority permitted under the LMCA.

> **a.    Express Scope**

Prime lists five issues in the Agreements' express scope that cover "core labor relations issues."  SAC ¶ 300.  As the Court's Order observed, the first, third,

---

[5] We raised our argument respecting Count X's legal insufficiency in our Motion to Dismiss the FAC in its entirety.  As the Court's Order noted at p. 40, n. 12, because we raised the Count X argument in our reply brief and thus Prime "[did] not ha[ve] the opportunity to respond," the court declined to address it.  We now promptly raise this argument in our opening brief in support of our motion to dismiss the SAC in its entirety.  Prime has a full and fair opportunity to respond.

fourth, and fifth issues Prime cites in Paragraph 300 mirror the first, second, fifth, and sixth purposes the LMCA expressly permits.  Order at 18; *see also* 29 U.S.C. §§ 186(c)(9), 175a Note.  If these issues created a multi-employer bargaining group, then virtually every labor-management committee would be one.

Recognizing this problem, Prime adds a fifth issue: "[s]upporting 'the principle that compensation should include consideration of a pay for performance model . . . .'"  SAC ¶ 300.  Despite Prime's latching onto a single word, "compensation," this issue falls well within the third and fourth statutory purposes permitted under the LMCA – namely, (3) ". . . solving problems of mutual concern not susceptible to resolution within the collective bargaining process;" and (4) "explor[ing] ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the … industry."  *See* 29 U.S.C. §§ 186(c)(9),175a Note.  A "pay for performance" model refers not to wage scales susceptible to collective bargaining, but rather to sweeping reform of the health care system.  It references switching from the dominant "fee for service" model, which bills based on the number of medical procedures performed, to an "outcome-centered" model, which bases revenues on patient health and other factors.[6]  Only action on the part of government, the insurance industry, and the health care delivery system can achieve this transformation.  To suggest, as Prime does, that "pay for performance" is compensation for healthcare workers to be bargained between a multi-employer group and a Union is disingenuous.

### b.    Catch-All Provision

Prime also claims that the following "catch-all" provision in the Agreements converts the labor-management committee into a multi-employer bargaining group:  "The Committee may also address other mutually agreed upon issues as permitted by the LMCA."  SAC ¶ 301.  Prime declares, "There is not a single labor

---

[6] Cody Vitello, *Transforming the Way We Pay Doctors,* 19 ANNALS HEALTH L. ADVANCE DIRECTIVE 34, 38-40 (2009).

1    relations, organizing, or bargaining issue that could not easily fit within this

2    language expanding the scope of the Committee." *Id.*  This Court previously

3    rejected this claim in its Order.  Noting that the catch-all provision is limited to

4    "issues *as permitted by the LMCA,*" the Court held that Prime's allegation that

5    Defendants would act improperly, despite these limitations, amounted to

6    "speculation" that "does not pass the plausibility standard."  Order at 18.  While

7    the Court addressed this claim in the context of Prime's allegations regarding

8    Defendants' purported improper expenditures, the logic remains the same.  Prime's

9    suggestion that the labor-management committee will exceed the scope of the

10   Agreements and exercise control over labor relations amounts to mere speculation

11   that does not pass the plausibility standard.

12              **c.     Decision-Making and Expenditures**

13             Finally, Prime alleges that by giving the joint labor-management committee

14   the authority to make LMCA-permitted expenditures, the Agreements somehow

15   grant the committee control over all labor relations at the signatory hospitals and

16   create a "*de facto* multi-employer bargaining group."  Prime asserts old and new

17   allegations in support of this argument.  With respect to the old allegations, as the

18   Court noted, a 50-50 split in decision-making does not mean that Defendants

19   exercise control over the group.  See SAC ¶ 255; Order at 18.  Nor must

20   Defendants represent employees of all of the committee's members to be a

21   legitimate labor-management committee.  SAC ¶ 288; Order at 18-19.  New to the

22   SAC are allegations regarding CHA's CEO/President and the committee's role in

23   solving the Medi-Cal problem.  Prime alleges Dauner is under Defendants' control

24   (SAC ¶¶ 246-47) — an assertion unsupported by the facts Prime alleges, as we

25   showed earlier in this brief.  *See supra* pp. 5-6.  Prime's new claim that

26   Defendants' authority to spend Fund monies to pursue fixes to Medi-Cal and other

27   ends converts the committee into a multi-employer bargaining group is a *non-*

28   *sequitur.*  SAC ¶ 302.  Prime fails to allege any facts or offer a plausible theory

1  why, even if this were true, it would constitute multi-employer bargaining over

2  terms and conditions of employment.

3         **2.      To survive dismissal of Count X, Prime must plead**
              **sufficient facts to show both injury and coercion; It fails**
4             **sufficiently to allege either.**

5         An independent basis for dismissal is Prime's lack of standing under LMRA

6  § 303(a).  To have standing, Prime must sufficiently plead both injury and

7  coercion.  Order at 32 (citing *Am. President Lines, Ltd. v. ILWU*, 721 F.3d 1147,

8  1153 (9th Cir. 2013) and 29 U.S.C. § 187(a) and 29 U.S.C. § 158(b)(4)(ii)(A).

9         Prime's Count X alleges injury at in Paragraphs 316-317, and 386 of the

10  SAC.  Prime's only non-conclusory allegations in these paragraphs with "who,

11  what, and when" details are those regarding its attorneys' fees.  Prime argues it

12  spent "tens of thousands of dollars" engaging its "legal counsel to review, evaluate,

13  provide legal advice regarding, attempt to negotiate . . . and, ultimately, reject the

14  Unlawful Agreements."  SAC § 317.  Attorneys' fees are not an injury that

15  Congress sought to prevent or remedy by enacting LMRA § 303.  *Summit Valley*

16  *Inds. v. Local 112, United Bhd. of Carpenters*, 456 U.S. 717, 727 (1982) (holding

17  that reasonable attorneys' fees incurred in stopping illegal secondary activity are

18  not recoverable under § 303); *see also Abreen Corp. v. Laborers' Int'l Union*, 709

19  F.2d 748, 760 (1st Cir. 1983) (declining to award attorneys' fees even where those

20  fees did not arise from NLRB litigation because the fees were to stop unlawful

21  secondary activity); *Grayhawk, LLC v. Indiana/Kentucky Reg'l Council of*

22  *Carpenters, Local Union No. 64*, Civil Action No. 3:07-CV-272-S, 2009 WL

23  5169821, at *3 (W.D. Ky. Dec. 29, 2009) (denying attorneys' fees incurred to

24  eliminate alleged secondary conduct where "there [was] no allegation that the

25  [employer's] attorneys have done any work external to the [employer's] dispute

26  with the [Union]").  Nor does Prime state how these fees flowed from Defendants'

27  allegedly coercive conduct.

28

With respect to coercion, Prime alleges that in connection with pressuring it into signing the "Unlawful Agreements," Defendants threatened a campaign to urge elected officials to reject Prime's political contributions based on Defendants' purportedly false allegations of patient care.  Both allegations—as to campaign contributions and as to purported misrepresentations to public officials acting in the political sphere—fall squarely within the First Amendment's and *Noerr-Pennington*'s protections.  *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 894-95 (9th Cir. 1988).  Essentially, Prime argues that Defendants threatened it with First Amendment protected activity.  As a matter of law, a threat of protected activity is not coercion.  *BE & K Const. Co. v. United Bhd. of Carpenters & Joiners*, 90 F.3d 1318, 1330-31 (8th Cir. 1996) (citing *NLRB v. Servette*, 377 U.S. 46, 54 (1964)).  As such, Count X should be dismissed.

### B.   Count XI Fails Because Prime Does Not Sufficiently Plead Injury or Coercive Conduct.

Count XI alleges that Defendants violated LMRA § 303 by engaging in unlawful secondary pressure against a neutral employer, DCHS, in the context of UHW's labor dispute with Prime.  Specifically, Prime alleges that Defendants violated § 303 by protesting at DCHS hospitals (SAC ¶ 193), backing an ERISA lawsuit against DCHS (SAC ¶¶ 194-201), and requesting the SEC to investigate DCHS (SAC ¶¶ 203-204).

### 1.   Prime fails sufficiently to allege injury under LMRA § 303.

Prime alleges Defendants engaged in a multi-faceted campaign to block the DCHS sale.  SAC ¶ 182.  Prime alleges the campaign consisted of: (1) acts of secondary pressure to convince DCHS not to sell its hospitals to Prime; and (2) acts of political pressure to persuade the Attorney General to block the sale.  Alleged acts of secondary pressure included: (1) protest activities outside DCHS hospitals; (2) Defendants' support for an ERISA lawsuit against DCHS and its executives; and (3) efforts to initiate an SEC investigation of DCHS.

As a threshold matter, only two of Count XI's three allegations even arguably constitute unlawful acts of secondary pressure – the support of the ERISA lawsuit and the initiation of the SEC complaint – but both fail because Prime does not allege *any* injury flowing therefrom.  According to Prime's own allegations, Defendants' ultimate success in having the California Attorney General approve the sale with onerous conditions, thereby injuring Prime, was due to the political pressure Defendants placed on the Attorney General, and nothing more.  As Prime alleges, the Attorney General's decision amounted to an "effective denial."  SAC ¶ 191.  Prime fails to allege that the decision had anything to do with the two arguably unlawful acts of "secondary" pressure applied by Defendants against DCHS.  Thus, on the face of the SAC, Prime's alleged injury – its lost opportunity to buy DCHS – was caused by the Attorney General, not by the two arguably unlawful acts of "secondary" pressure.

Tacitly recognizing this reality, Prime's SAC asserts, in conclusory terms lacking any relevant factual details, that it was injured in other ways by Defendants' two arguably unlawful acts.  Specifically, Prime argues these two acts injured Prime by: (1) causing delays in the "internal DCHS process" for deciding whether DCHS should approve the sale to Prime, and (2) requiring Prime to expend "time, money, and resources in managing and responding to" these acts.  SAC ¶¶ 205-206.  But Prime's own timeline of events belies these assertions.  As Prime alleges, DCHS decided to sell to Prime on or before *October 10, 2014.*  SAC ¶ 189.  The ERISA lawsuit against DCHS was filed "[o]n *October 21, 2014,* a few weeks *after* DCHS announced its intent to sell Prime."  SAC ¶ 194 (emphasis added).  Similarly, Defendants' "demand" that the SEC investigate DCHS was made on *October 29, 2014.*  SAC ¶ 203.  Thus, based on Prime's own timeline, these two acts could not, and did not, delay "the internal DCHS process" or require Prime expenditures of "time, money, and resources" to convince DCHS to approve the sale.  By the time these acts occurred, DCHS had already approved the sale.

Against this backdrop, it is telling that the *only* expenditure of "time, money, and resources" that Prime identifies with the necessary factual details of "who, what, and when" is the "sending of dozens of personnel, including executives and doctors, to attend the January 5, 7, and 8, 2015 [Attorney General] hearings over the sale of the hospitals." SAC ¶ 208. But Prime made these expenditures not to fend off secondary activity, but to fend off Defendants' First Amendment protected acts of political pressure on the Attorney General. Since there is no causal link to the unlawful secondary activity, these allegations of injury also fail.

Finally, while the hospital protests were peaceful, protected activity, even if the Court concluded they were coercive, Prime still fails to show that it suffered an "injury." Prime's allegations in Paragraphs 182, 191, and 208 are insufficient because Prime's injuries flow from the Attorney General's conditional approval of the sale, Prime's decision to walk away from that approval, and from Defendants' First Amendment protected activity.[7] Similarly, at Paragraph 207 Prime fails to allege any relevant facts regarding what its staff was diverted from doing. Without these basic factual allegations, a causal analysis is impossible, and the allegation is

---

[7] Prime attempts to rewrite history by laying blame on Defendants for the failure of the sale, despite the Attorney General's conditional approval of the transaction. The public record, however, indicates that the real reason the sale was never consummated is because Prime chose to walk away from it. We request that the Court take judicial notice of **Exhibit "A" and "B"** to the Request for Judicial Notice (RJN). **Exhibit "A" to the RJN**: Araceli Oliva, *Prime Healthcare Services Decides Not to Purchase Daughters of Charity Health System*, DAUGHTERS OF CHARITY HEALTH SYSTEM (Mar. 10, 2015) http://dochs.org/2015/03/prime-healthcare-services-decides-not-to-purchase-daughters-of-charity-health-system/ (last visited May 14, 2015) (noting that DCHS was "disappointed that Prime Healthcare has decided not to go forward with the purchase of our hospitals. We strongly disagree with Prime's position on the Attorney General conditions. We are confident that Prime could successfully turn around the DCHS hospitals."); **Exhibit "B" to the RJN**: *Attorney General Kamala D. Harris Issues Statement on Prime Healthcare Decision*, STATE OF CALIFORNIA DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY GENERAL (Mar. 10, 2015) https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-issues-statement-prime-healthcare-decision (last visited May 14, 2015) (noting that "Prime is choosing to walk away from this transaction after publicly stating that it had no issue with the ten-year conditions and intended not to close any of the hospitals or end essential services. By walking away, Prime is confirming many of the concerns heard at multiple community meetings that the continuity of vital healthcare services in these communities is not its priority.")

insufficient on its face.  Lastly, Prime alleges injuries suffered in the form of attorneys' fees for "work to get the secondary targeting of DCHS stopped."  SAC ¶ 207.  Again, the Supreme Court held in *Summit Valley*, 456 U.S. at 727, that attorneys' fees to stop secondary targeting are not an available remedy under § 303.

## 2. Prime fails sufficiently to allege that Defendants' conduct constitutes a threat or coercion under NLRA § 8(b)(4)(ii)(B).

To establish a § 303 claim under NLRA §8(b)(4)(ii)(B), Prime must allege that Defendants engaged in conduct "to threaten, coerce, or restrain" any person to cease doing business with another.  29 U.S.C. § 158(b)(4)(ii).  Prime alleges three instances of secondary pressure on DCHS: (1) protest activities outside the hospital; (2) Defendants' support for the ERISA lawsuit against DCHS; and (3) Defendants' efforts to initiate an SEC investigation of DCHS.

With respect to the protest activities, the Court rejected the FAC's assertion that these protests were illegal secondary pressure because Prime failed to show sufficient coercion under NLRA § 8(b)(4)(ii)(B).  Order at 35-36.  Although the SAC attempts to address these deficiencies, the peaceful protest activities it lists at Paragraph 193 only reinforce the conclusion that the alleged protests were First Amendment- and federal labor law-protected secondary activity.  As the Court's Order pointed out, in light of a union's First Amendment rights, the phrase "threaten, coerce or restrain" "should be interpreted with caution and not given a broad sweep."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988).  The law distinguishes between "acts of mere persuasion" which are protected free speech activity, and unprotected acts of coercion which are more similar to "intimidation by a line of picketers."  *Overstreet v. United Bhd. of Carpenters & Joiners, Local Union No. 1506*, 409 F.3d 1199, 1211 (9th Cir. 2005).

Prime alleges that four protests took place on: (1) July 24, 2014; (2) August 12, 2014; (3) August 15, 2014; and (4) January 5-8, 2015. SAC ¶ 193. For the July 24 protest, Prime alleges that UHW representatives and workers "*stood outside the hospital, chanting and carrying signs with messages.*" SAC ¶ 193 (emphasis added). This type of stationary picket is an example of traditionally protected activity. *Overstreet*, 409 F.3d at 1214 (citing *DeBartolo*, 485 U.S. at 587).

For the August 12 protest, Prime does not even allege that Defendants participated; it merely states that "*healthcare workers*" picketed. SAC ¶ 193 (emphasis added). This sort of vague, insufficient allegation was rejected by the Court. Order at 36.

For August 15, Prime alleges that "dozens of UHW representatives . . . protested outside St. Vincent's Medical Center" and that "multiple individuals spoke out against the sale . . . and carried large signs." SAC ¶ 193. Prime alleges no facts to indicate this is anything other than a traditionally protected, stationary picket. *Overstreet*, 409 F.3d at 1214. The fact that protesters were carrying "large signs" does not render their conduct coercive. *Id.* (finding no coercion where multiple participants upheld four foot by fifteen foot banners); *see also In re United Bhd. of Carpenters & Joiners of America, Local Union 1506,* 355 NLRB No. 159, at *7 (2010) ("The core conduct that renders picketing coercive . . . is not simply the holding of signs but the combination of carrying signs and persistent patrolling . . . back and forth in front of the entrance to a work site. . . ."). Nor do multiple individuals speaking out about the sale make for coercion. *Overstreet*, 409 F.3d at 1211 ("'[P]eaceful and truthful discussion' designed to convince others not to engage in behavior regarded as detrimental to one's own interest, or to the public interest, is fully protected speech.").

Finally, the January 5-8 protests are protected First Amendment activity immunized under *Noerr-Pennington*. "Noerr-Pennington is a label for a form of

First Amendment protection; to say that one does not have Noerr-Pennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment." Empress LLC v. City and County of San Francisco, 419 F.3d 1052, 1056 (9th Cir. 2005).  Held on the same day and location as the Attorney General's hearings, these protests were First Amendment-protected petitioning and political activity directed at the Attorney General.[8]  While Prime attempts to constrain Defendants' petitioning rights by framing these protests as NLRA violations, courts must not "lightly impute to Congress an intent to invade . . . freedoms" protected by the Petition Clause and must give adequate "breathing space" to the right to petition.  Sosa v. DIRECTV, Inc., 437 F.3d 923, 931-32 (9th Cir. 2006).  Nor do these protests fall under Noerr-Pennington's sham exception.  Prime does not allege that Defendants used the process of the Attorney General hearings, as opposed to the outcome of that process, to injure Prime.  Empress LLC, 419 F.3d at 1057.  The Attorney General's approval of the sale with conditions evidences this.

---

[8] We request judicial notice of **Exhibit "C"** to the RJN, *Non-Profit Hospital Transactional Notices*, STATE OF CALIFORNIA DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/charities/nonprofithosp (last visited May 14, 2015).  These notices indicate that the January protests were held on the same day and location as the Attorney General hearings regarding the proposed sale.

We also request judicial notice of the following press releases.  For the **January 5th Protest**: (1) **Exhibit "D"** to RJN, *Nurses Rally & Testify to Oppose Sale to Prime*, UNITED NURSES ASSOCIATION OF CALIFORNIA (Jan. 2, 2015) http://www.unacuhcp.org/press-release-nurses-rally-testify-to-oppose-sale-of-st-francis-to-prime/ (last visited May 14, 2015) and (2) **Exhibit "E"** to RJN, *First Attorney General Hearings on Fate of Daughters of Charity Hospitals Begin in LA on Monday*, NATIONAL NURSES UNITED (Jan. 4, 2015), http://www.nationalnursesunited.org/press/entry/first-attorney-general-hearings-on-fate-of-daughters-of-charity-hospitals/ (last visited May 14, 2015).  **For the January 7th Protest:  Exhibit "F"** to RJN, *Attorney General to Hold Daughters of Charity Hearings Jan 5-9 in LA and Bay Area*, NATIONAL NURSES UNITED (Dec. 30, 2014), http://www.nationalnursesunited.org/press/entry/attorney-general-to-hold-daughters-of-charity-hearings-jan-5-9-in-la-and-ba/ (last visited May 14, 2015).  **For the January 8th Protest:  Exhibit "G"** to RJN, *Public Hearings on Future of Four Bay Area Daughters of Charity Hospitals Start Wednesday,* NATIONAL NURSES UNITED (Jan. 6, 2015), http://www.nationalnursesunited.org/press/entry/public-hearings-on-future-of-four-bay-area-doc-hospitals-start-wed/ (last visited May 14, 2015).  Labor groups representing both sides of the debate rallied and held press conferences in connection with the Attorney General's hearings.

The only other allegations are: (1) Defendants' support for the ERISA lawsuit, and (2) UHW's efforts to initiate an SEC investigation of DCHS.  As the Court's Order highlights, to show that the ERISA lawsuit is unprotected by the First Amendment, Prime must allege that the ERISA lawsuit lacks a reasonable basis in law.  Order at 37.  Prime's new allegations in Paragraphs 196, 197, 198, and 200 do not address the objective baselessness of the suit but rather Defendants' motivations in bringing or settling it.  Only in Paragraph 199 does Prime allege the suit is objectively baseless because Defendants failed to advance it.  Yet, the district court's docket shows that the reason the case was stayed was because of a Ninth Circuit ruling on a potentially dispositive issue.[9]  In the alternative, the prospect that an allegedly improperly motivated and objectively baseless ERISA lawsuit or SEC investigation demand would coerce DCHS to back off its publicly announced sale to Prime is too remote and implausible to state a claim of "unlawful coercion" under the statute.  This point is driven home by the fact that DCHS agreed to sell its hospitals to Prime, and that the filing of the ERISA lawsuit and SEC complaint occurred *after* DCHS had already approved the sale.

In sum, insufficient allegations of either injury or coercion would justify dismissal of Prime's Count XI claim.  Here, Prime has insufficiently alleged both.  Thus, Count XI should be dismissed.

## IV. THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE

### A. Prime Has Repeatedly Failed to Cure the Deficiencies in its Complaints.

Prime has now twice amended its complaint in this action – once, as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), following the defendants' filing of their motion to dismiss the original complaint, *see* Docket No. 47, and once after this Court granted it leave to amend, *see* Docket No. 73 – resulting in a

---

[9] We request judicial notice of the Ninth Circuit's pending decision in *Rollins v. Dignity Health,* U.S. District Court, Northern District of California (4:13 CV-01450).  We also request judicial notice of the March 13, 2015 Order issued in the ERISA matter, attached as **Exhibit "H"** to RJN.

total of three complaints alleging various RICO and LMRA claims against Defendants thus far.  Moreover, much of the conduct alleged in these three iterations of the complaint was previously asserted in Prime's earlier anti-trust case against Defendants SEIU and UHW, *Prime I.  See* Docket No. 50-2 (comparing allegations from *Prime I*'s First Amended Complaint to Prime's allegations in its First Amended Complaint in the instant action).  In *Prime I*, Prime filed an initial complaint and then a first amended complaint after the court granted one defendant's motion to dismiss with leave to amend.  *See* Complaint for Violation of the Sherman Act and Demand for Jury Trial, *Prime Healthcare Services, Inc. v. SEIU et al.*, No. 11CV2652L (RBB) (S.D. Cal. Nov. 15, 2011); First Amended Complaint for Violation of the Sherman Act and Demand for Jury Trial, *Prime Healthcare Services, Inc. v. SEIU et al.*, No. 11CV2652L (RBB) (S.D. Cal. Sept. 21, 2012).  In sum, Prime has had the opportunity to adequately plead the factual allegations and legal theories at least three times in the instant action, and up to five times when accounting for the significant overlap between the allegations in the instant action and in *Prime I*.

Because Prime has had so many opportunities to adequately plead its case, but has failed at each turn to do so, this Court should dismiss this Second Amended Complaint with prejudice.  Although generally the Ninth Circuit advises district courts to grant leave to amend liberally, this Court nonetheless has the discretion to deny leave to amend when the plaintiff has repeatedly failed to cure deficiencies by amendments previously allowed or when further amendment would be futile. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Both of these circumstances exist here, and should be afforded great weight.  Although Prime has now twice amended its complaint in the instant action, it continues to fail adequately to plead any RICO or LMRA violations based on the conduct alleged.  *See supra* pp. 2-21. And in *Prime I*, Prime failed adequately to allege any anti-trust violations based on

1  much of the same conduct, further adding to the number of times Prime has failed

2  to cure deficiencies.

3  In addition, it is quite clear that any further amendments would be futile.

4  Claim preclusion bars any additional or more detailed allegations concerning pre-

5  September 21, 2012 conduct.  *See supra* pp. 1-2.  And the legal deficiencies in

6  Prime's LMRA and RICO claims based on UHW's "new conduct" are so basic and

7  run so deep that Prime could not possibly cure those deficiencies through yet

8  another amended complaint.  For these reasons, the Court should dismiss the

9  Second Amended Complaint with prejudice.

10  **B.      Prime's Effort to Hold the SEIU and CtW Defendants Responsible For UHW's "New Conduct" Fails *Twombly's* Plausibility Standard.**

11

12  Finally, although the discussion *supra* shows that the UHW "new conduct"

13  that forms the basis of Prime's non-claim-precluded LMRA and RICO claims in

14  this case is *not* "unlawful" conduct in *any* respect, and that those LMRA and RICO

15  claims should therefore be dismissed *with prejudice* as to *all* Defendants, Prime's

16  attempt to hold the SEIU Defendants (the SEIU and its President Mary Kay Henry)

17  and the CtW Defendants (Change to Win, the CtW Investment Group, and Thomas

18  Woodruff) legally responsible for UHW's alleged "new conduct" fails under the

19  *Twombly* plausibility standard.  The Ninth Circuit's recent opinion in *United*

20  *Brotherhood of Carpenters and Joiners of America v. Building and Construction*

21  *Trades Dep't*, 770 F.3d 834 (9th Cir. 2014) ("*UBC*"), lucidly articulates the

22  standard by explaining that "[e]ven in a complaint, formulaic recitations and

23  conclusory statements will not suffice to allege [the violation] plausibly" and that

24  "*[b]are assertions of agreement, or identifications of particular persons as co-*

25  *conspirators, will not suffice*."  *Id.* at 842 (internal quotations and citations

26  omitted) (emphasis added).

27  In *UBC*, the Ninth Circuit held that allegations in the complaint stating

28  generally that certain actors agreed to and did act on behalf of the Defendants were

1   simply "rote recitations [that did] not render plausible that the [actors] conspired

2   with the [Defendants]." *Id.* (internal quotations omitted).  The plaintiffs' claims

3   against these actors commonly rested on labeling the actors "Defendants' agents,"

4   but the Court held that such a label, without more, does not plausibly allege

5   agency.  *Id.* at 842-43.  Rather, "[a] complaint must answer the basic questions:

6   who, did what, to whom (or with whom), where, and when?"  *Id.* at 842 (internal

7   quotations and citations omitted).

8        As to the LMRA § 302 and RICO claims against the SEIU and CtW

9   Defendants based on the May 2014 CHA-UHW Agreement, Prime articulates

10   either no factual allegations against those Defendants or the generalized "bare

11   assertions of agreement" that the Ninth Circuit held do not meet plausibility

12   requirements in *UBC*.  In the paragraphs alleging that all Defendants violated

13   § 302 and RICO by pressuring Prime economically to sign the CHA-UHW

14   Agreement, Prime alleges no specific facts against the SEIU and CtW Defendants.

15   SAC, ¶¶ 264-317.  Although Prime initially pays lip service to all Defendants'

16   involvement in this alleged unlawful conduct (*e.g.*, "UHW, at the direction and on

17   behalf of the other Defendants, began meetings for a new agreement," SAC, ¶ 242,

18   and "UHW, at the direction of and on behalf of Defendants, again used the threat

19   of two ballot initiatives to pressure CHA," SAC, ¶ 243),  Prime does so in the

20   generalized manner that the Ninth Circuit held did not meet *Twombly*'s plausibility

21   standard for stating a claim against a particular actor.  *See UBC*, 770 F.3d at 842-

22   43.  In sum, although Prime attempts to implicate the SEIU and CtW Defendants

23   as actors in the "new conduct" by alleging that they put economic pressure on

24   Prime to enter into the CHA-UHW Agreement, Prime does not articulate exactly

25   "what" these Defendants did "with" UHW, or "when" or "where" Defendants

26   acted, so as to "direct" the alleged UHW conduct.  *See id.* at 842.

27        Prime's LMRA § 303 claims against SEIU (in an uncharacteristic bow to

28   reality, Prime does not even name SEIU President Henry or any of the CtW parties

                                              24                              14cv2553

1  as defendants on these § 303 claims) suffer from this same pleading deficiency.

2  Prime has again only made "rote recitations" that SEIU, in agreement with UHW,

3  violated LMRA § 303 by coercing or restraining DCHS, a neutral employer, to

4  cease doing business with Prime.  *See* SAC ¶¶ 192-208.  For example, although

5  Prime claims that it is "Defendants' campaign" to coerce DCHS to cease doing

6  business with Prime, SAC ¶ 192, and states that a protest outside of St. Vincent's

7  Medical Center took place "at the direction of Defendants," SAC ¶ 193, Prime

8  once more articulates no specific factual allegations against SEIU beyond the mere

9  identification of SEIU as a co-conspirator.  And the same is true of Prime's

10 generalized, boilerplate allegation that "Defendants" threatened and coerced Prime

11 to join an employer organization in violation of LMRA § 303.  SAC, ¶¶ 242-263.

12      In sum, seeking to hold the SEIU and CtW Defendants responsible under the

13 LMRA and RICO for certain of UHW's "new conduct," Prime never specifically

14 articulates how these Defendants were involved in that conduct or only does so by

15 generalized accusations that these Defendants worked in concert with UHW or

16 "directed" UHW's actions.  The Ninth Circuit has held unequivocally that such

17 rote accusations against a particular actor are subject to dismissal because they do

18 not meet the *Twombly* standard for plausibility.  *See UBC*, 770 F.3d at 842-43.

19 DATED:  May 15, 2015         s/Glenn Rothner
20                              Attorneys for Defendants SEIU and
                                Mary Kay Henry
21                              E-mail: grothner@rsglabor.com

22 DATED:  May 15, 2015         s/ Bruce A. Harland
                                Attorneys for Defendants SEIU-United
23                              Healthcare Workers West and Dave Regan
                                E-mail:  bharland@unioncounsel.net

24 DATED:  May 15, 2015         s/Andrew D. Roth
25                              Attorneys for Defendants Change to Win,
                                CtW Investment Group and Tom Woodruff
26                              E-mail: aroth@bredhoff.com

27      I certify that the content of this document is acceptable to all persons signing
   the document and have authorization for the electronic signatures of all parties on
28 the document.
                                s/Glenn Rothner