1  GLENN ROTHNER (CSB No. 67353)
   HANNAH WEINSTEIN (CSB No. 301666)
2  ROTHNER, SEGALL & GREENSTONE
   510 South Marengo Avenue
3  Pasadena, California 91101
   Telephone:  (626) 796-7555
4  Facsimile:  (626) 577-0124
   E-mail:  grothner@rsglabor.com
5          hweinstein@rsglabor.com

6  Attorney for Defendants SEIU and Mary Kay Henry

7  BRUCE A. HARLAND (CSB No. 230477)
   JANNAH V. MANANSALA
8  (CSB No. 249376)                        LEON DAYAN (CSB No. 153162)
   MINSU D. LONGIARU (CSB No. 298599)      ANDREW D. ROTH (*pro hac vice*)
9  WEINBERG ROGER & ROSENFELD             BREDHOFF & KAISER, PLLC
   1001 Marina Village Parkway, Suite 200  805 Fifteenth St., N.W. Tenth Floor
10 Alameda, California 94501-1091          Washington, D.C. 20005
   Telephone:  (510) 337-1001              Telephone:  (202) 842-2600
11 Facsimile:  (510) 337-1023              Facsimile:  (202) 842-1888
   E-mail:  bharland@unioncounsel.net      E-mail:  ldayan@bredhoff.com
12         jmanansala@unioncounsel.net              aroth@bredhoff.com
           mlongiaru@unioncounsel.net
13                                         Attorneys for Defendants Change to
   Attorneys for Defendants SEIU-United    Win, CtW Investment Group and
14 Healthcare Workers West and Dave Regan  Tom Woodruff

15

16                    UNITED STATES DISTRICT COURT

17                 SOUTHERN DISTRICT OF CALIFORNIA

18

19 PRIME HEALTHCARE SERVICES,          CASE NO. 14-CV-2553-GPC-RBB
   INC.,
20                                      **REPLY MEMORANDUM IN
            Plaintiff,                  SUPPORT OF DEFENDANTS'
21                                      MOTION TO DISMISS SECOND
        v.                              AMENDED COMPLAINT**
22
   SERVICE EMPLOYEES                    **DATE:**     August 28, 2015
23 INTERNATIONAL UNION; SERVICE         **TIME:**     1:30 p.m.
   EMPLOYEES INTERNATIONAL              **CTRM:**     2D
24 UNION – UNITED HEALTHCARE            **JUDGE:**    Hon. Gonzalo P. Curiel
   WORKERS WEST; CHANGE TO WIN;
25 CTW INVESTMENT GROUP; MARY
   KAY HENRY; DAVE REGAN; and
26 TOM WOODRUFF,

27          Defendants.

28

                                                              14cv2553

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

I.    The LMRA § 302 and RICO Extortion Claims Based on Post-September 2012 Conduct Remain Legally Deficient. ...........................1

II.   Count X of the SAC, Under LMRA § 303(a) for Violation of NLRA § 8(b)(4)(ii)(A), Is Legally Deficient and Should Be Dismissed...........................................................................4

III.  Count XI's LMRA § 303(a) Claim for Violating NLRA § 8(b)(4)(ii)(B) Is Legally Deficient and Should Be Dismissed Once Again. ............................................6

      A.    Lack of Injury.........................................................7

      B.    Lack of Coercion.....................................................8

IV.   Prime's Defense of its Claims as to the SEIU and CtW Defendants Fails. ......................................................9

Conclusion ........................................................................10

1

**TABLE OF AUTHORITIES**

2

Page(s)

3 **Cases**

4 *Fontalvo v. Sikorsky Aircraft Corp.*,
       No. 13cv0331-GPC-KSC, 2014 WL 2809861
5       (S.D. Cal. June 20, 2014) ..................................................................3, 9, 10

6 *Jones v. Sprinkler Fitters Local Union 669*,
       No. CV13-3015-GHK (JPRx), 2013 WL 5539291
7       (C.D. Cal. July 24, 2013) .............................................................................8

8 *Kendall v. U.S.A., Inc.*,
       518 F.3d 1042 (9th Cir. 2008)....................................................................10
9

*Moss v. U.S. Secret Service*,
10       572 F.3d 962 (9th Cir. 2009)........................................................................3

11 *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*,
       611 F.3d 483 (9th Cir. 2010)........................................................................8
12

*United Bhd. of Carpenters & Joiners v. Bldg. Constr. Trades Dep't*,
13       770 F.3d 834 (9th Cir. 2014)............................................................2, 4, 9, 10

14 **Statutes**

15       29 U.S.C. § 158(b)(4)(ii)(A) ...................................................................4, 6
       29 U.S.C. § 158(b)(4)(ii)(B).......................................................................6
16       29 U.S.C. § 175a ..........................................................................................5
       29 U.S.C. § 186 ....................................................................................1, 2, 4
17       29 U.S.C. § 187 ....................................................................................4, 6, 8
       29 U.S.C. § 187(a)................................................................................4, 6

18

19

20

21

22

23

24

25

26

27

28

**I.      The LMRA § 302 and RICO Extortion Claims Based on Post-September 2012 Conduct Remain Legally Deficient.[1]**

Prime's Opposition Brief ("Opp. Br.") thoroughly confuses the legal question fairly presented by Defendants' motion to dismiss the LMRA § 302 and RICO extortion claims based on post-September 2012 conduct reasserted by Prime in its SAC.  We therefore begin by setting the record straight on this score.

According to Prime, our motion to dismiss these reasserted LMRA § 302 and RICO extortion claims is "limited" by its terms to post-September 2012 conduct "involving" the CHA-UHW Agreement, thereby embodying a tacit "concession" that Prime has stated a claim under RICO based on "other" post-September 2012 conduct purportedly not "involving" the CHA-UHW Agreement.  Opp. Br. at 1-2.  But that ignores Prime's own description of its theory of the case.

In fact, *all* post-September 2012 conduct Prime pleads to support its LMRA § 302 and RICO extortion claims "involves" the CHA-UHW Agreement.  In suggesting otherwise, Prime drops a footnote alluding to acts of economic pressure allegedly imposed on Prime by Defendants after September 2012, including Defendants' alleged efforts to block Prime's acquisition of hospitals in several states, and alleged "false publications" critical of Prime's business practices.  Opp. Br. at 1 n.2.  But in Prime's LMRA § 302 and RICO extortion theory of the case, these acts of economic pressure impose statutory liability on Defendants precisely and only because they allegedly were undertaken *to support a demand that Prime sign the CHA-UHW Agreement*.  To suggest these acts of economic pressure did not "involve" the CHA-UHW Agreement defies reality and is disingenuous.

Indeed, in its prior Order dismissing these claims, this Court described Prime's LMRA § 302 and RICO theory of the case in precisely these terms:

> Prime Healthcare alleges that Defendants are violating both RICO and § 302 of the LMRA by demanding that Prime Healthcare sign onto an

---

[1]  Prime's Opposition does nothing to overcome our showing, at pages 1-2 of our Opening Brief, that Prime's SAC does not and cannot cure the legal deficiencies in the reasserted RICO claims based on pre-September 2012 conduct.

"unlawful" 2014 agreement . . . [*i.e.*, the CHA-UHW Agreement], *and by putting economic pressure on Prime Healthcare to do so*.

Order (Dkt. #70), at 15-16; *see also id.* at 30 ("Here, Prime Healthcare alleges that Defendants are committing [RICO] extortion *by using economic pressure to try to coerce Prime Healthcare to sign onto the 'unlawful' CHA-UHW Agreement*.") (emphasis supplied).

In its Order, this Court began by addressing Prime's LMRA § 302 claim, and after canvassing applicable § 302 law, held the claim legally deficient because Prime had failed to allege facts plausibly showing that the CHA-UHW Agreement is "unlawful."  Dkt. #70 at 17-25.  Then turning to the RICO claim, and addressing the Ninth Circuit's recent decision in *United Bhd. of Carpenters & Joiners v. Bldg. Constr. Trades Dep't*, 770 F.3d 834 (9th Cir. 2014) ("*UBC*"), the Court held that Prime's failure to allege facts plausibly showing that the CHA-UHW Agreement is "unlawful" doomed the RICO extortion claim as well.  *See* Dkt. #70 at 28-31.

The Court gave Prime the opportunity to "correct the [foregoing] deficiencies" in these claims, *id.* at 41; which, in context, meant that the Court gave Prime the opportunity, *not* to reargue its LMRA § 302 and RICO extortion theory of the case, but to plead, if it could, *new facts* plausibly showing that the CHA-UHW Agreement is "unlawful."  Against this background, the dispositive legal question fairly presented by Defendants' motion to dismiss the reasserted LMRA § 302 and RICO extortion claims is whether Prime has pled new facts plausibly showing that the CHA-UHW Agreement is "unlawful."

We showed at pages 2-6 of our Opening Brief that the answer to this question is "no," and Prime's Opposition does nothing to overcome that showing.

One new fact Prime's SAC pleads (which is not really a "fact" but we accept as such for present purposes) is that CHA President Dauner exceeded his authority and violated CHA's By-Laws by entering into the CHA-UHW Agreement.  Prime argues this new fact shows that Dauner "is under UHW's control" and that UHW

1   thus "controls" money paid into the Agreement's Joint Advocacy Fund.  Opp. Br.

2   at 5-6.  But as our Opening Brief showed, that new allegation does not support

3   Prime's argument.  Prime merely refers the Court to its SAC's conclusory legal

4   assertion that UHW "has control over the monies paid into the Joint Advocacy

5   Fund."  Opp. Br. at 9.  But as this Court's prior Order ruled, such a bald assertion

6   of UHW "control" gets Prime nowhere.  Dkt. #70 at 6 (to avoid dismissal, "the

7   *non*-conclusory *'factual content'* [of the plaintiff's complaint], and reasonable

8   inferences *from that content*, must be plausibly suggestive of a claim entitling the

9   plaintiff to relief") (quoting *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th

10  Cir. 2009)) (emphasis supplied).[2]

11        Prime's other new fact is that Medi-Cal reform is a purpose behind

12  establishing the Joint Advocacy Fund.  Prime maintains this shows that the Fund

13  was not established for a purpose the Labor-Management Cooperation Act

14  ("LMCA") permits.  Opp. Br. at 3-5.  But, as our Opening Brief showed, this fact

15  does not support the legal conclusion Prime advances.  *Id.*  Rather than confront

16

17  _____
    [2]  At the outset of its Opposition, Prime cites this Court's decision in *Fontalvo v.*
18  *Sikorsky Aircraft Corp.*, No. 13cv0331-GPC-KSC, 2014 WL 2809861, at *2 (S.D.
    Cal. June 20, 2014), for the general propositions that (1) the Court must accept as
19  true all facts alleged in the complaint and draw all reasonable inferences in the
    plaintiff's favor, and (2) dismissal is not warranted if the complaint alleges enough
20  facts to state a plausible claim on its face.  Fair enough.  But immediately
    following the passages Prime cites is a passage that speaks with particular
21  relevance and force here:

22        However, a plaintiff's obligation to provide the grounds of his
          entitle[ment] to relief requires more than labels and conclusions, and a
23        formulaic recitation of the elements of a cause of action will not do.
          A court need not accept legal conclusions as true.  In spite of the
24        deference the court is bound to pay to the plaintiff's allegations, it is
          not proper for the court to assume that the [plaintiff] can prove facts
25        that [he or she] has not alleged or that defendants have violated the . . .
          laws in ways that have not been alleged.  Where a complaint pleads
26        facts that are merely consistent with a defendant's liability, it stops
          short of the line between possibility and plausibility of entitlement to
27        relief.

28  *Id*. (internal citations and quotation marks omitted).  Prime's defense of its
    conclusory, formulaic allegations thus misses this Court's clearly articulated mark.

1   Defendants' showing, Prime mischaracterizes the argument as being, "that no

2   matter how illegally they behave, their conduct is beyond the reach of this Court

3   merely because they have referenced the LMCA in their agreement."  Opp. Br. at

4   13.  Such mischaracterizations lead Prime nowhere.

5          In the end, Prime abandons any pretense that it has pled new facts plausibly

6   showing that the CHA-UHW Agreement is "unlawful."  Rather, without candidly

7   acknowledging that it is doing so, Prime adopts the altogether different tack of

8   rearguing the key legal issues previously ruled upon by the Court in its prior Order

9   dismissing Prime's LMRA § 302 and RICO extortion claims without prejudice.

10  *See, e.g.,* Opp. Br. at 7 (arguing that, contrary to the Court's *UBC*-based ruling,

11  Dkt. #70 at 28-31, the legal sufficiency of Prime's RICO extortion claim does not

12  turn on whether Prime has alleged facts plausibly showing that the CHA-UHW

13  Agreement is "unlawful"); *id.* at 11-12 (arguing that, contrary to the Court's § 302

14  case law-based ruling, Dkt. #70 at 20-25, the CHA-UHW Agreement is "unlawful"

15  under § 302 because each side to that Agreement receives some form of benefit or

16  "consideration" from the other).

17         As previously noted, this Court did *not* grant leave to amend to afford Prime

18  the opportunity to reargue its LMRA § 302 and RICO theory of the case; it granted

19  leave to amend to afford Prime the opportunity, if it could, to allege *new facts*

20  plausibly showing that the CHA-UHW Agreement is "unlawful."  Because Prime

21  has failed to allege such new facts, its reasserted LMRA § 302 and RICO extortion

22  claims remain legally deficient and should be dismissed once again.

**II.     Count X of the SAC, Under LMRA § 303(a) for Violation of NLRA § 8(b)(4)(ii)(A). Is Legally Deficient and Should Be Dismissed.**

Our Opening Brief showed, at pages 11-14, that Count X is implausible,

chiefly because Prime's allegation that the CHA-UHW Agreement creates a "*de*

*facto* multi-employer bargaining group," under which all signatory hospitals must

bargain collectively over the terms and conditions of UHW-represented workers'

1    employment, is incorrect.  Prime's response as to why the CHA-UHW Agreement

2    creates a "*de facto* multi-employer bargaining group," is unpersuasive.

3           Prime's first argument – that "[o]n its *[sic]* face, the [CHA-UHW]

4    Agreements relate to terms and conditions of employment," Opp. Br. at 15, fails at

5    every turn.  Although not a model of clarity, Prime's position appears to be that the

6    CHA-UHW Agreement "relates" to collective bargaining over terms and

7    conditions of employment because of its Joint Labor-Management Committee,

8    Scope, and Ground Rules provisions.  Not so at all.

9           Prime's reliance on the creation of a Joint Labor-Management Committee

10   ("LMC") to pursue Medi-Cal Reform, *see* SAC ¶¶ 17, 128, 255, 262-263, and 273,

11   is misplaced.  As our Opening Brief shows at pages 3-5 and 12, employing an

12   LMC for such a purpose has nothing to do with collective bargaining for UHW-

13   represented workers.  Rather, it addresses reform of the legislative and regulatory

14   system by which hospitals are reimbursed for their services.  *Id*.  Such systemic

15   reform involving the government, insurance, and health care providers is the type

16   of mutual concern to Labor and Management that "is *not* susceptible to resolution

17   within the collective bargaining process."  *See* Section 6(b) of the Labor-

18   Management Cooperation Act of 1978 ("LMCA"), 29 U.S.C. § 175a (emphasis

19   supplied).  Prime's assertion that the establishment of an LMC to pursue such

20   reform "relates" to collective bargaining stands reality on its head.

21          Prime's reliance on the Scope provisions, cited at SAC ¶¶ 300, 301, and 303,

22   to argue that the CHA-UHW Agreement "relates" to collective bargaining is also

23   misplaced.  Simply put, nothing in the Scope provisions authorizes the LMC to

24   engage in collective bargaining negotiations with UHW on *any* basis, much less on

25   a *group* basis.  And Prime's reliance on the Agreement's Ground Rules'

26   provisions, *see* SAC ¶¶ 17, 289, and 292, is equally far afield.  As the Court noted

27   on page 3 of its prior Order, "the Agreement only establishes ground rules for an

28   organizing campaign."  Thus, on their face the provisions dealing with Ground

                                        5                          14cv2553

1    Rules have nothing to do with establishing multi-employer bargaining, which, by

2    definition, can only come into existence *after* an organizing campaign has

3    concluded and a labor organization has been certified or recognized as the

4    exclusive bargaining representative.[3]

5         Prime's second argument – that "multiple employers are signatories to the

6    CHA-UHW agreements," Opp. Br. at 15 – is a *non sequitur*.  The mere fact that

7    multiple employers have signed the CHA-UHW Agreement does not speak to the

8    issue – or much less establish – whether the Agreement creates a "*de facto* multi-

9    employer bargaining group."  Whether the Agreement does so depends on its

10   content, not the number of employers who have signed it.  And, as we have shown,

11   Prime alleges *no facts* pertaining to the content of the CHA-UHW Agreement that

12   lends any "plausibility" to its allegation that the Agreement creates a "*de facto*

13   multi-employer bargaining group."

14        In sum, because there is no "plausibility" to Prime's allegation that the

15   CHA-UHW Agreement creates a "*de facto* multi-employer bargaining group," its

16   claim that Defendants are attempting to coerce Prime into joining such a group in

17   violation of NLRA § 8(b)(4)(ii)(A) and LMRA § 303 fails as a matter of law, and

18   Count X of the SAC should be dismissed on that ground.

19   **III.   Count XI's LMRA § 303(a) Claim for Violating NLRA § 8(b)(4)(ii)(B)**
         **Is Legally Deficient and Should Be Dismissed Once Again.**
20
          At pages 31-40 of its prior Order, the Court dismissed Prime's LMRA § 303
21
     claims because Prime failed adequately to plead injury.  But because it allowed
22
     leave to amend, the Court also addressed coercion, holding that the allegations of
23
     coercion were sufficient to state a claim only with regard to the SEC investigation.
24
     Dkt. #70 at 40.  As we showed in our Opening brief, at 18-21, Prime has not cured
25

26   _____

27   [3]    Prime's remaining citations are either conclusory (SAC ¶¶ 299, 303, and
     385) or inapposite (SAC ¶ 141).  If the CHA-UHW Agreement does not create a
28   "*de facto* multi-employer bargaining group," then as a matter of law the conduct
     alleged at SAC ¶ 141 could not have coerced Prime to join such an entity.

1  the coercion deficiencies with respect to the ERISA lawsuit or the DCHS protests,

2  and on closer inspection has not alleged coercion with respect to the SEC

3  investigation.  But, as we show below, the Court need not reach coercion, as Prime

4  failed to cure the lack of injury revealed by the timeline alleged in its own SAC.

5        **A.    Lack of Injury.**

6        As we showed in our Opening Brief at pages 16-17, based on the SAC's

7  timeline, by the time the ERISA action was filed and the SEC investigation was

8  initiated, DCHS had already approved the sale to Prime.  In other words, Prime

9  suffered no injury from these two activities because the activities did not delay "the

10  internal DCHS process" or require Prime to expend "time, money, and resources"

11  to convince DCHS to approve the sale.[4]

12        For injury, Prime's Opposition Brief, at page 23, cites to SAC ¶¶ 205-07,

13  whose generic recitals of "direct and proximate damages" and "money, resources,

14  and time" spent dealing with undefined "secondary conduct," are the kind of vague

15  and conclusory allegations the Court's prior Order rejected.  Dkt. #70 at 32-33.

16        Prime also cites SAC ¶ 208, which does refer specifically to its perceived

17  need to send its staff to the Attorney General hearings.  With only the January

18  protests surrounding the Attorney General hearings left to stand on, Prime invites

19  the Court to inquire into Defendants' "mixed motives" for protesting, and suggests

20  such a factual inquiry is improperly resolved on a motion to dismiss.  But this is a

21  diversion.  The question of motive is irrelevant if Prime fails to allege injury

22  flowing from Defendants' conduct.  Taking Prime's own allegations as true, *see*

23  SAC ¶ 208, all of the "injuries" Prime suffered during the January protests had to

24

25  _____

[4] Prime adverts to the possibility that DCHS could have backed out of the sale at any time, Opp. Br. at 23 n.25, but fails then to allege that it suffered damages that might stem from any efforts it undertook to avoid such a scenario.  For example, nowhere does Prime's SAC allege what Prime did, or how it was injured, or whether even as a result of Defendants' conduct it needed to do anything "extra," to convince DCHS to move forward with the sale to which it had already agreed.  In the absence of any such allegations of injury, Prime's argument fails.

do with "sending dozens of personnel . . . to attend the January [Attorney General] hearings over the sale of the hospitals." Thus, the "injuries" Prime alleges are due to Defendants' secondary activities result instead from Prime's own participation in the hearings. Again, because Prime has not alleged facts showing that Defendants' conduct caused it injury, Count XI should be dismissed.

### B.  Lack of Coercion.

In any event, with regard to pleading coercion vis-à-vis the ERISA lawsuit, Prime has effectively ignored the Court's invitation to allege any new facts to establish that the ERISA lawsuit lacks a "reasonable basis in law," as the Court required for purposes of pleading coercion. Dkt. #70 at 38. Ceding that opportunity, Prime pivots, Opp. Br. at 22, to the argument that no such showing is required, because the ERISA lawsuit was filed with an illegal objective and thus falls within an exception to the heightened standard rule.[5] Prime's assertion simply ignores this Court's prior holding that the lack of a reasonable basis in law is a necessary element of coercion. Dkt. #70 at 38.

Having disposed of all claims related to Defendants' ERISA or SEC complaints, Prime's only remaining § 303 claims relate to Defendants' protests outside the DCHS Hospitals. As shown in our Opening Brief at pages 19-20, the additional facts Prime alleges at SAC ¶ 193 regarding Defendants' July-August protests do nothing to establish coercion. In fact, they establish the opposite. The facts alleged by Prime confirm that the July and August protests are classic examples of non-coercive stationary picketing and bannering.[6] Prime also fails to

---

[5]  The case Prime cites for this proposition, *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 491-94 (9th Cir. 2010), rested on unusual facts in which the illegal objective "could be established as a matter of law under settled authorities"; *Small* has been distinguished on these grounds. *See Jones v. Sprinkler Fitters Local Union 669*, No. CV13-3015-GHK (JPRx), 2013 WL 5539291, at *3 (C.D. Cal. July 24, 2013).

[6]  Prime does not even allege that the SEIU and CtW defendants participated in the various protests, or that *any* Defendant participated in the August 12 protest. *See* SAC ¶ 193.

1    plausibly allege any injury arising from these protests.  Prime's conclusory

2    allegations of injury at SAC ¶¶ 205-207 arising from unspecified "secondary

3    conduct" (none of which even specifically mentions the July or August protests)

4    fail for the reasons described above.

5    **IV.     Prime's Defense of its Claims as to the SEIU and CtW Defendants Fails.**

6             As we noted at page 3, footnote 2 above, this Court's *Fontalvo* decision

7    strongly rejects mere formulaic recitations, labels, and conclusions in lieu of

8    specific allegations supporting plausible entitlement to relief.  That analysis also

9    applies to the SEIU and CtW defendants' alleged liability, as co-conspirators and

10   agents, particularly after the Ninth Circuit's recent decision in *UBC* [*see* Dkt.

11   #74-1, Opening Brief, pp. 23-25].

12            Prime's defense of its SAC in this regard falls well short of the *UBC* mark.

13   It proffers only its generalized, disconnected background allegations that:  in 1988

14   SEIU published, and in 2005 republished, a Contract Campaign Manual, SAC

15   ¶¶ 75, 88, and 90; the Defendants have governing documents that describe their

16   relationship, and they exchange revenues and reimbursements and sometimes share

17   personnel, SAC ¶¶ 26, 101-111; and the Defendants entered into an "agreement,"

18   "directed" each other, "conspired," shared an extortionate "goal," and

19   "coordinated" and approved an "extortionate" campaign, SAC ¶¶ 5-6, 8, 10-11, 15,

20   17, 27-29, and 33-36.

21            Not only do these background "facts" fail to answer "the basic questions

22   framed by the claims involving new [non-claim precluded] conduct:  who, did

23   what, to whom (or with whom), where, and when?"  *UBC*, 770 F.3d at 842, but the

24   allegations purporting to describe the participation of SEIU and CtW in that new

25   conduct are just as formulaic and conclusory in that they merely rely on Prime's

26   earlier vague portrayal of the relationship among UHW, SEIU, and CtW to

27   implicate the SEIU and CtW defendants in any alleged misconduct.  *See* SAC

28   ¶¶ 140-142, 162, 174, 177-208, 230-37, 242-250, 253-316.  In short, Prime's

1   allegations regarding the SEIU and CtW defendants "stop[] short of the line

2   between possibility and plausibility of entitlement to relief." *Fontalvo, supra.*

3          Finally, contrary to Prime's assertion, *UBC* cannot be distinguished on the

4   ground that the alleged co-conspirators there were third parties. *UBC* cites with

5   approval *Kendall v. U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), in which, as here,

6   the alleged co-conspirators were named as defendants. *See UBC* at 842; *Kendall* at

7   1048 & 1050. No formulaic pleading exception exists for conspiracy or agency.

8                        **Conclusion**

9          For these reasons, and those stated in our Opening Brief, Prime's SAC

10  should be dismissed in its entirety, *with prejudice*. In this regard, we note that

11  Prime has neither requested leave to file a third amended complaint in the event

12  that its SAC is dismissed, nor made any effort to rebut the showing at pages 21-23

13  of our Opening Brief that affording Prime such an opportunity is unwarranted here.

14

15  DATED: August 7, 2015          ROTHNER, SEGALL & GREENSTONE

16                                        s/ Glenn Rothner
                                          Attorneys for Defendants SEIU and

17                                        Mary Kay Henry
                                          E-mail: grothner@rsglabor.com

18

19  DATED: August 7, 2015          WEINBERG ROGER & ROSENFELD

20                                          s/ Bruce A. Harland
                                          Attorneys for Defendants SEIU-United

21                                        Healthcare Workers West and Dave Regan
                                            E-mail: bharland@unioncounsel.net

22

23  DATED: August 7, 2015          BREDHOFF & KAISER

24                                          s/ Andrew D. Roth
                                          Attorneys for Defendants Change to Win,

25                                        CtW Investment Group and Tom Woodruff
                                          E-mail: aroth@bredhoff.com

26

27         I certify that the content of this document is acceptable to all persons signing the document and have authorization for the electronic signatures of all parties on the document.

28                                        s/ Glenn Rothner