UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PRIME HEALTHCARE SERVICES, INC.,

                    Plaintiff,

v.

SERVICES EMPLOYEES INTERNATIONAL UNION, ET AL.,

                    Defendants.

Case No.: 14-cv-2553-GPC (RBB)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

[ECF Nos. 74, 81]

## INTRODUCTION

Plaintiff Prime Healthcare Services, Inc. ("Prime Healthcare" or "Plaintiff") brings this civil action against Defendants Service Employees International Union ("SEIU"), Service Employees International Union – United Healthcare Workers West ("UHW"), Change to Win, CTW Investment Group, Mary Kay Henry, Dave Regan, and Tom Woodruff (collectively, "Defendants") for alleged violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") and the Labor Management and

1

Relations Act ("LMRA"). (ECF No. 74.) Prime Healthcare alleges that these various union-related entities and individuals are engaged in strong-armed, extortionate tactics and other illegal conduct to enrich themselves through the acquisition of Prime Healthcare's property. (SAC ¶ 6, ECF No. 73.) Presently before the Court are Defendants' motion to dismiss Plaintiff's Second Amended Complaint ("SAC") (ECF No. 74), and Plaintiff's motion for leave to file a Third Amended Complaint ("TAC") (ECF No. 81). The Parties have fully briefed both motions. (ECF Nos. 77-79, 82-84.) The Court heard oral argument on the motion to dismiss on August 28, 2015. (*See* ECF No. 80.) For the reasons set forth below, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's SAC and **DENIES** Plaintiff's motion for leave to file a TAC.

## FACTUAL BACKGROUND

### A.   The Parties

Plaintiff Prime Healthcare is a hospital management company which, along with an affiliated foundation, operates thirty-four acute care hospitals in eleven states, including fifteen hospitals in California. (*Id.* ¶¶ 1, 22-23.) Prime Healthcare describes itself as "largely non-union." (*Id.* ¶ 3.)

Defendant SEIU is an unincorporated labor association that represents units of workers and negotiates terms and conditions of employment for the workers it represents. (*Id.* ¶ 24.) Defendant UHW is a local union affiliate of SEIU located in California. (*Id.* ¶ 25.) UHW represents individuals working in California's hospitals and clinics, including nurses, aids, case managers, clerks, maintenance workers, and housekeeping staff, and negotiates terms and conditions of employment for the healthcare workers it represents. (*Id.*)

Defendant Change to Win ("CtW") is a union federation made up of three member unions: SEIU, the International Brotherhood of Teamsters, and the United Farm Workers of America. (*Id.* ¶ 30.) Defendant CtW Investment Group is the investment arm of CtW.

(*Id.* ¶ 35.)  Prime Healthcare alleges that CtW approves of SEIU's tactics, and supports them through CtW Investment Group.  (*Id.* ¶¶ 31-35.)

The remaining Defendants are individual executives of the above entities. Defendant Mary Kay Henry is the President of SEIU and Secretary-Treasurer of CtW.  (*Id.* ¶ 27.)  Defendant Dave Regan is President of UHW, Vice President of SEIU, and Vice President of the SEIU Leadership Council.  (*Id.* ¶ 28.)  Defendant Tom Woodruff is the Executive Director of CtW's Strategic Organizing Center, and also previously served as an SEIU International Executive Vice President for more than a decade.  (*Id.* ¶ 36.)

**B.    Alleged Unlawful Conduct**

Prime Healthcare alleges that Defendants have unlawfully conspired to force Prime Healthcare to unionize its hospitals through a "corporate campaign" that employs extortion. (*Id.* ¶¶ 5, 8, 47.)  According to the SAC, Defendants have allegedly:

- Attempted to thwart Prime Healthcare's acquisition of additional hospitals;
- Produced false and misleading reports and studies for the sole purpose of damaging Prime Healthcare's business goodwill;
- Worked with complicit media outlets to publicize sham and baseless allegations;
- Initiated certain sham and baseless complaints causing regulatory and administrative investigations, sham and baseless litigation, and inquiries by accreditation agencies;
- Coerced, harassed, and threatened patients who use Prime Healthcare's services;
- Persuaded writers, government agencies, and politicians to raise specious allegations about Prime Healthcare's conduct;
- Targeted the California Hospital Association ("CHA") with sham ballot initiatives to obtain property of CHA member hospitals (including Prime Healthcare); and
- Violated federal labor laws.

(*Id.* ¶¶ 9, 115.)

The vast majority of these allegations are based upon conduct between 2010 and

3

September 21, 2012. In its earlier order, the Court ruled that allegations based upon activities before September 21, 2012 are barred under the doctrine of res judicta. To avoid this ruling, Plaintiff has advanced a theory of admissibility which will be addressed herein at section A.

Prime Healthcare alleges that through their extortionate activities, Defendants have acquired and are attempting to acquire substantial money and property, including tens of millions of dollars, Prime Healthcare's business goodwill, Prime Healthcare's rights to grow its business through hospital acquisitions and oppose unionization of its employees, Prime Healthcare's rights to make autonomous business decisions, access to Prime Healthcare's private property, and Prime Healthcare's customers and related revenues. (*Id.* ¶¶ 14, 113.)

## C. Prior Prime Healthcare Litigation

On November 15, 2011, Prime Healthcare previously brought an antitrust action alleging that SEIU, UHW, and several Kaiser-related entities had conspired to eliminate Prime Healthcare from the healthcare services market and increase healthcare workers' wages. *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-CV-2652-GPC-RBB (S.D. Cal.) ("*Prime Healthcare I*"). On September 21, 2012, Prime Healthcare filed a first amended complaint. (*Id.* at ECF No. 46.) On July 25, 2013, this Court dismissed Prime Healthcare's first amended complaint under Federal Rule of Civil Procedure 12(b)(6), but granted leave to amend. *See Prime Healthcare I*, 2013 WL 3873074 (S.D. Cal. July 25, 2013). After Prime Healthcare did not file a second amended complaint, this Court granted the defendants' motion to dismiss with prejudice for lack of prosecution under Federal Rule of Civil Procedure 41(b). *See id.* Prime Healthcare's appeal of this Court's dismissal orders is still pending. *See Prime Healthcare I*, No. 13-57185 (9th Cir.).

///

## PROCEDURAL HISTORY

On August 25, 2014, Prime Healthcare filed the instant action in the Northern District of California ("*Prime Healthcare II*"). (ECF No. 1.) On October 24, 2014, the Northern District of California ordered the case transferred to the Southern District of California. (ECF No. 38.) On November 14, 2014, the case was reassigned to the undersigned judge. (ECF No. 45.)

On November 17, 2014, Prime Healthcare filed its First Amended Complaint ("FAC"), which superseded its original complaint. (ECF Nos. 47, 52.) On December 16, 2014, Defendants filed a motion to dismiss the FAC. (ECF No. 50.) On April 1, 2015, the Court granted in part and denied in part Defendants' motion to dismiss Prime Healthcare's FAC, granting Prime Healthcare leave to amend "to correct the deficiencies [the Court] identified" if possible. (Order at 41, ECF No. 70.)

On May 1, 2015, Prime Healthcare filed the operative SAC, which superseded its FAC. (ECF Nos. 73, 47.) Prime Healthcare alleges eight RICO claims, 18 U.S.C. §§ 1961 *et seq*. (counts I-VIII), and three LMRA claims, 29 U.S.C. §§ 186 *et seq*. (counts IX-XI). (ECF No. 73 ¶¶ 323-94.)

On May 15, 2015, Defendants filed a motion to dismiss the SAC.[1] (ECF No. 74.)

---

[1] Defendants also filed a supporting request for judicial notice. (ECF No. 74-2.) Defendants seek judicial notice of exhibits to the Declaration of Bruce Harland in Support of Defendants' Motion to Dismiss (ECF No. 74-3): (1) a March 10, 2015 press release entitled "Prime Healthcare Services Decides Not to Purchase Daughters of Charity Health System" (ECF No. 74-5); (2) a March 10, 2015 press release entitled "Attorney General Kamala D. Harris Issues Statement on Prime Healthcare Decision"; (3) a Notice from the State of California Department of Justice Office of the Attorney General entitled "Non-Profit Hospital Transactional Notices" (ECF No. 74-6); (4) a January 2, 2015 press release entitled "Nurses Rally & Testify to Oppose Sale to Prime" (ECF No. 74-7); (5) a January 4, 2015 press release entitled "First Attorney General Hearings on Fate of Daughters of Charity Hospitals Begin in LA on Monday" (ECF No. 74-8); (6) a December 30, 2014 press release entitled "Prime Healthcare Services Decides Not to Purchase Daughters of Charity Health System" (ECF No. 74-9); (7) a January 6, 2015 press release entitled "Public Hearings on Future of Four Bay Area Daughters of Charity Hospitals Start Wednesday" (ECF No. 74-

Prime Healthcare filed its opposition on July 24, 2015. (ECF No. 78.) Defendants filed their reply on August 7, 2015. (ECF No. 78.) The Court held a motion hearing on August 28, 2015. (*See* ECF No. 80.)

On September 14, 2015, while the motion to dismiss was still pending, Plaintiff filed a motion for leave to file a TAC. (Mot. Leave TAC, ECF No. 81.) Defendants filed a response on October 23, 2015 (ECF No. 83) and Plaintiff filed a reply on November 6, 2015 (ECF No. 84).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under

---

10); and (8) a March 13, 2015 order by U.S. District Judge Vince Chhabria in *Lynn Morris, et al. v. Daughters of Charity Health System, et al.*, Case No. 14-cv-04861-VC (N.D. Cal.) (ECF No. 74-11).

Under Federal Rule of Evidence 201, a court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The Court finds that Defendants' requests for judicial notice are properly noticeable, and therefore takes judicial notice of the documents. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" (citation omitted)); *In re Tourism Assessment Fee Litig.*, No. 08-CV-1796-MMA, 2009 WL 10185458, at *4-5 (S.D. Cal. Feb. 19, 2009) (taking judicial notice of press release on website); *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008) (taking judicial notice of records and reports of administrative bodies). To the extent that facts contained in the judicially noticed documents are disputed, the Court only takes judicial notice of the existence of those documents, and not for the truth of the matter asserted therein. *Lee v. Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

that theory. *Robertson*, 749 F.2d at 534. While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee*, 250 F.3d at 688-89.

//

//

//

# DISCUSSION

## A. Res Judicata

This Court previously granted Defendants' motion to dismiss Prime Healthcare's claims premised on conduct previously alleged in Prime Healthcare's antitrust action against SEIU, UHW and others (*Prime Healthcare I*). (Order at 15, ECF No. 70.) The Court held that the doctrine of res judicata—which prohibits lawsuits on claims that were raised or could have been raised in a prior action—barred Prime Healthcare's claims to the extent they rested on allegations of conduct occurring prior to September 21, 2012, the date on which Prime Healthcare filed its operative complaint in *Prime Healthcare I*. (*Id*.)

Defendants assert that the SAC continues to allege pre-September 21, 2012 conduct that was or could have been raised in *Prime Healthcare I*. (*See, e.g.,* ECF No. 74 at ¶¶ 137-39, 143-161.) Prime Healthcare responds that, although it is "precluded from recovering damages based on barred conduct, it may rely on [pre-September 2012 predicate acts] from an evidentiary standpoint . . . to support its RICO claims." (Plf.'s Opp'n to Mot. Dismiss SAC ("Opp'n") at 12, ECF No. 78.)

Plaintiff relies on *Los Angeles NAACP v. Los Angeles Unified Sch. Dist.*, for the proposition that evidence of claim-precluded acts alleged in a prior action could be admitted as relevant to prove a later claim based on new conduct. *Los Angeles NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d 731, 740-41 (9th Cir. 1984) (hereinafter *NAACP*). Simply stated, *NAACP* does not stand for the proposition that conduct barred under res judicata can be relied upon to support a subsequent RICO claim. Instead, *NAACP* merely concluded that a state court judgment alleging de facto segregation was entitled to preclusive effect in a federal court action alleging de jure segregation, but only as to segregative acts occurring prior to the close of trial in the state court action. *Id*.

In addition, Plaintiff also relies on *Molus v. Swan*, Case No. 15-cv-0452, 2007 WL 2326132 (S.D. Cal. 2007) to support its use of pre-September 2012 conduct to support its

RICO claims.  However, *Molus* did not address whether conduct precluded by res judicata can be used to establish a pattern of racketeering activity.  Instead, it asked whether conduct that occurred prior to the statute of limitations period could be used to establish a pattern of racketeering activity.  *Id* at *7.  The court held that this evidence was admissible but limited recovery on the RICO causes of action to damages that occurred within the limitations period.  *Id.*  Given the markedly different policy considerations that underlie res judicata and the statute of limitations, *Molus* is inapposite.

For the reasons set forth in detail in the Court's April 1, 2015 Order (ECF No. 70), Prime Healthcare's RICO claims resting on allegations that were asserted or could have been asserted in its prior antitrust action (*Prime Healthcare I*), are barred by the doctrine of res judicata and will be disregarded in the Court's review of the SAC.  The Court now turns to Plaintiff's additional allegations of post-September 2012 conduct that are not barred by claim preclusion.

**B.    RICO Claims in SAC**

In the SAC, as in the FAC, Prime Healthcare alleges that Defendants have engaged in racketeering activity by engaging in extortionate activities and violating 18 U.S.C. § 1951 *et seq,* 18 U.S.C. § 1952, 29 U.S.C. § 186.  The essence of the claims is that Defendants are demanding that Prime Healthcare sign onto an "unlawful" May 2014 agreement between the California Hospital Association ("CHA"), various signatory CHA-member hospitals, and UHW ("CHA-UHW Agreement"), and making such demands by placing economic pressure on Prime Healthcare to do so.  (SAC ¶¶ 247-317; 323-80, ECF No. 73.)  To allege a civil RICO claim, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property."  *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO ("UBC")*, 770 F.3d 834, 838 (9th Cir. 2014) (citation and internal quotation marks omitted).  "'[R]acketeering activity' includes . . .

9

'any act which is indictable' under the Hobbs Act, 18 U.S.C. § 1951, or 'any act or threat involving . . . extortion . . . which is chargeable under State law.'" *Id.* (quoting 18 U.S.C. §§ 1961(1)(A), (B)). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). "Racketeering activity" also includes violations of § 302 of the LMRA. 18 U.S.C. § 1961(1)(C).

LMRA § 302(a)(2) makes it unlawful for an employer to pay, lend, or deliver, "any money or other thing of value" to a union, and § 302(b)(1) makes it unlawful for a union to demand or accept the same. 29 U.S.C. §§ 186(a)(2), (b)(1). Congress enacted LMRA § 302 to attack practices that were "inimical to the integrity of the collective bargaining process," including bribery by employers during collective bargaining, extortion by employee representatives, and abuse of power by union officers who have sole control over welfare funds. *Arroyo v. United States*, 359 U.S. 419, 425-26 (1959); *see also Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219, 1227 (9th Cir. 1979) ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers.").

The Court considers whether Prime Healthcare's SAC sufficiently addresses the deficiencies the Court identified in its Order dismissing Plaintiff's FAC, first, with respect to Plaintiff's freestanding claim under § 302 of the LMRA (Count IX), second, with respect to its RICO claim (Counts I-XIII) and, third, with respect to its LMRA § 303 claims (Counts X & XI).

### 1. LMRA § 302

In its FAC, Plaintiff alleged that the CHA-UHW Agreement is unlawful under LMRA § 302 for two reasons. First, Plaintiff challenged the lawfulness of the CHA-UHW Agreement's creation of a "Joint Advocacy Fund." Second, Plaintiff challenged other

"neutrality agreement" provisions setting ground rules for union organizing. The Court held that Plaintiff failed to sufficiently allege that the Joint Advocacy Fund is not covered by the LMCA exception and violates LMRA § 302 and that the neutrality agreement provisions violates LMRA § 302. (Order at 17-25, ECF No. 70.) The Court provided Plaintiff the opportunity to correct the foregoing deficiencies. (*Id.* at 41.) The Court now considers whether Plaintiff's SAC pleads new facts plausibly showing that the CHA-UHW Agreement is unlawful under § 302 of the LMRA.

### a) The Joint Advocacy Fund Provision

In its FAC, Plaintiff alleged that that CHA-UHW Agreement violates LMRA § 302 because it creates a Joint Advocacy Fund administered by a Labor Management Cooperation Committee ("Committee") funded in part by $80 million from CHA and its signatory hospitals, which constitutes an illegal direct payment to UHW. (FAC ¶¶ 228-40, 251-56, ECF No. 47.) The Court found Plaintiff's allegations insufficient for two reasons. First, § 302 explicitly excepts payments by employers through an industry-wide labor management committee established under the Labor Management Cooperation Act of 1978 ("LMCA"), and Plaintiff acknowledges that the CHA-UHW Agreement limits spending to purposes allowed under the LMCA. (Order at 18, ECF No. 70.) Second, Plaintiff acknowledges that the money in the Joint Advocacy Fund may not be spent without the equal approval of both the employer and UHW representative. (*Id.*) As such, the Court held that Prime Healthcare's speculation that despite these limitations UHW will improperly use the money for its own ends did not pass the plausibility standard.

In its SAC, Prime Healthcare maintains that the Committee created under the CHA-UHW Agreement that exclusively controls the Joint Advocacy Fund was not established for the limited purposes permitted under the LMCA. (Opp'n at 12, ECF No. 78 (citing SAC ¶¶ 270-72, 288-89, 301-02, ECF. No 73).) In support of its allegations, Prime Healthcare pleads that under the CHA-UHW Agreement, UHW will use the employer

contributions to the Joint Advocacy Fund to fund its campaign for Medi-Cal Reform in California; become "one of the largest political action committees" in California; obtain political power and influence; "further its extortionate conduct against Prime and other non-union hospitals"; and "advance whatever agenda it chooses" without regard to the limited purposes permitted by the LMCA. (SAC ¶ 284, ECF No. 73; *see also id.* ¶¶ 249-53, 255, 257, 265, 271-72, 277-78, 284, 302.) According to Prime Healthcare, such expenditures fall outside the limited purposes permitted under the LMCA, and thus the CHA-UHW Agreement violates § 302 of the LMRA. (*See id.* ¶¶ 271, 284.)

Plaintiff alleges that UHW will use its political influence and employer contributions to the Joint Advocacy Fund to finance its campaign for Medi-Cal reform "through educational, legislative, regulatory, initiative or other strategies" aimed at increasing Medi-Cal reimbursement to California hospitals and bringing about other improvements to California's delivery system "that [cannot] be obtained through direct negotiation between employers and labor unions." (*Id.* ¶ 250; *see also* ¶¶ 249-53.) Plaintiff maintains that these expenditures expressly violate LMRA § 302 and 303. (*Id.* ¶ 249.)

Defendants respond that the LMCA, by its express terms, permits joint expenditure of money by a joint labor-management committee "established for one or more" of seven statutorily-enumerated "purposes," the third and fourth of which are as follows: (3) to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process; (4) to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the plant, area or industry. *See* 29 U.S.C. § 186(c)(9). Defendants contend that joint expenditure by CHA/hospitals and UHW to accomplish Medi-Cal reform "falls squarely within both of these statutory purposes." (Mot. Dismiss at 9, ECF No. 74.)

The Court finds that Joint Advocacy Fund expenditures in furtherance of Medi-Cal reform are "joint labor-management committee" expenditures excepted under the LMCA.

*See* 29 U.S.C. § 186(c)(9). Problems with the existing Medi-Cal system are of mutual concern to both hospital systems and workers that are "not susceptible to resolution within the collective bargaining process" insofar as Medi-Cal reform requires government action. Further, Medi-Cal reform is related to the competitiveness and the economic development of the healthcare industry in California. As such, the Court finds that Plaintiff's new allegations regarding Medi-Cal reform do not sufficiency plead that the purpose of the Joint Advocacy Fund falls outside the scope of the LMCA exceptions.

In support of its allegation that UHW will use money from the Joint Advocacy Fund to gain political power and influence to become the "largest political action committee in California" (SAC ¶ 285, ECF No. 73), Plaintiff alleges that UHW has created a new campaign finance entity "Caring for Californians," a "general purpose committee" (i.e., a political action committee) which has spent "more than $3 Million from the Joint Advocacy Fund" on political contributions. (*Id.* ¶ 286.) Plaintiff avers that Caring for Californians has contributed $1 million to the California Democratic Party, $500,000 to the California Republican Party, $605,000 to the Californians Allied for Patient Protection Independent Expenditure Account, $45,000 to Californians for Fiscal Accountability and Responsibility, $500,000 to the FAIRPAC Independent Expenditure Committee sponsored by the Civil Justice Association of California, $400,000 to the Orange County Dignity PAC, and to Assemblymen Pan's—"UHW's close ally['s]"—State Senate campaign. (*Id.* ¶¶ 286-87.) Plaintiff maintains that these expenditures fall outside the exceptions permitted by the LMCA. (Opp'n at 12-13, ECF. No. 78; SAC ¶¶ 283-87, ECF No. 73.)

In fact, Prime Healthcare acknowledges that the money in the Joint Advocacy Fund may not be spent without approval of both CHA's CEO/President Dauner and UHW's President Regan. (*Id.* ¶ 255.) Prime Healthcare posits that this agreement is only on paper that "[n]ot a single penny can be spent without Regan's approval," since "Dauner had already demonstrated that he is under UHW's control." (*Id.*) As an example of the control

exercised by UHW over Dauner, Prime Healthcare presents the circular allegation that Dauner "willingly exceeded his authority as CEO/President of CHA" and "violated CHA's By-Laws" by entering into the CHA-UHW Agreement. (*Id.* ¶ 247.) Plaintiff contends that this shows that UHW has control over the monies paid into the Joint Advocacy Fund. (Opp'n at 9, ECF No. 78 (citing SAC ¶¶ 17, 240-41, 246-47, 255, 269-75, 282, 302, ECF No. 73).)

Plaintiff further alleges that the Joint Advocacy Fund's focus is Medi-Cal reform. (*See, e.g., id.* ¶ 251 (Per the MOU, "[T]he joint advocacy committee . . . shall focus during the first two years of the MOU on . . . Medi-Cal Reform . . . ."); *see also id.* ¶¶ 249, 252-53, 258, 271, 277, 284.) In light of Plaintiff's own allegations, it is reasonable to infer that the alleged political contributions were made for the purposes of advancing the Committee's Medi-Cal reform agenda, and thus for an excepted purpose under the LMCA ("to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process"). *See* 29 U.S.C. § 186(c)(9). That Assemblyman Pan is a "close ally" of UHW or "has played an active role in Defendants' campaign against Prime" (SAC ¶ 287, ECF No. 73) does not render the Committee's expenditures unlawful. Plaintiff does not proffer any facts supporting an inference that these expenditures violate LMRA § 302.

Plaintiff maintains that its allegations and all inferences drawn therefrom must be taken as true for purposes of this motion. However, as the Court noted in its previous Order, it is the "non-conclusory 'factual content,' and reasonable inferences from that content . . . [that] must be plausibly suggestive of a claim entitling plaintiff to relief." *Moss* 572 F.3d at 969. The assertion that Dauner willingly exceeded his authority as CEO and violated CHA's By-Laws by entering the CHA-UHW is conclusory and unsupported by any factual content. Even if Dauner willingly exceeded his authority as CEO/President of CHA by entering into the CHA-UHW Agreement, this does not support the conclusion that

UHW has ongoing control over the Joint Advocacy Fund. Plaintiff has not pleaded facts suggesting that the Joint Advocacy Fund is "administered entirely by union leadership" and "might serve as a 'war chest[]' to support union programs or political factions, or might become [a] vehicle[] through which 'racketeers' accept[] bribes or extort[] money from employers." *United Mine Workers of Am. Health & Ret. Funds v. Robinson*, 455 U.S. 562, 572 (1982). The Court concludes that Prime Healthcare has again failed to sufficiently allege that the Joint Advocacy Fund is not covered by the LMCA exception and violates § 302 of the LMRA.[2]

### b) Neutrality Agreement Provisions

In its FAC, Plaintiff attacked the legality of certain provisions in the CHA-UHW Agreement bearing "the hallmarks" of an employer-union "neutrality agreement" but having a much more "pervasive" reach. (FAC ¶ 217, ECF No. 47.) Plaintiff alleged that Defendants are demanding that it sign the CHA-UHW Agreement, and therefore is demanding that the following "thing[s] of value" in violation of LMRA § 302: that Plaintiff (1) grant UHW "access rights" to non-union hospital employees (*id.* ¶¶ 218, 241-42); (2) be "positive" about UHW in communications (*id.* ¶¶ 243-49); (3) refrain from advocating against UHW through litigation (except to enforce the terms of an existing collective bargaining agreement) or adverse action by any branch of government (*id.* ¶ 244); (4) give UHW "control of its labor relations" by allowing the Committee to address "other mutually agreed upon issues as permitted by the LMCA" (*id.* ¶¶ 250-52); and (5) make substantial payments to the Joint Advocacy Fund (*id.* ¶¶ 215-16, 228-29). (ECF No. 57 at 26.) In

---

[2] Defendants argue, in the alternative, that Prime Healthcare would not have a § 302 claim even if its speculation and money in the Joint Advocacy Fund "will be" used for purposes "not in accordance with the LMCA" at some future time. (Opp'n at 6, ECF No. 78 (citing *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993).) Having determined that Prime Healthcare fails to sufficiently allege that the Joint Advocacy Fund is not covered by the LMCA exception and violates § 302 of the LMRA, the Court need not address Defendants' argument in the alternative.

15

return, UHW would: (1) stop disparaging Prime Healthcare (FAC ¶¶ 219-20, ECF No. 47); (2) stop pursuing, sponsoring, or supporting any anti-hospital industry legislation, initiatives, or other efforts (*id.* ¶¶ 219, 221-22); and (3) provide its own substantial payments to the Joint Advocacy Fund (*id.* ¶¶ 214-16, 219, 228-31). (ECF No. 57 at 26-27.)

The Court previously concluded that the Joint Advocacy Fund does not violate LMRA § 302, and that the other concessions made by CHA and the signatory hospitals, and allegedly demanded by UHW from Prime Healthcare do not violate § 302 because they do not plausibly involve bribery or other corrupt practices, which is what Congress sought to prevent by enacting § 302. *See Arroyo*, 359 U.S. at 425-26. Rather, the concessions serve the interests of both the CHA/hospitals and UHW "as they eliminate the potential for hostile organizing campaigns in the workplace" which is "certainly . . . not inimical to the collective bargaining process." *Adcock v. Freightliner LLC*, 550 F.3d 369, 375 (4th Cir. 2008). The fact that the CHA-UHW Agreement, like any other labor agreement, "benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit." *Hotel Emps., Rest. Emps. Union Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 219 (3d Cir. 2004). As such, the Court concluded that Plaintiff failed to sufficiently allege that the neutrality agreement provisions violated LMRA § 302. (Order at 25, ECF No. 70.)

In its SAC, Plaintiff continues to allege that, by attempting to coerce Plaintiff to enter into the CHA-UHW Agreement, Defendants have demanded the Plaintiff provide previously enumerated money and "things of value" to UHW. (*See, e.g.,* SAC ¶¶ 256, 259-60, 290-301, ECF No. 73.) Additionally, Prime Healthcare alleges that the neutrality agreement-like concessions made by CHA and signatory hospitals must be deemed unlawful "things of value" under LMRA § 302 because they were given "[i]n exchange, *quid pro quo*," for various concessions made by UHW in favor of CHA and signatory

16

hospitals. (*See id.* ¶¶ 257, 287.) Plaintiff specifically notes the following allegedly unlawful "things of value" under § 302: (1) UHW's agreement to use its political influence and money from CHA to "accomplish reform of the Medi-Cal system that would substantially increase payments to California hospitals" (*id.* ¶¶ 249-54, 257-58); (2) CHA's commitment to publicly support UHW's "Let's Get Healthy California" initiative (*id.* ¶¶ 256, 263); and (3) significant political influence to UHW (*id.* ¶¶ 276-79, 285-87).

The Court has already concluded that that the Joint Advocacy Fund does not violate LMRA § 302. That a "key goal" of the Joint Advocacy Fund agenda is "Medi-Cal Reform and funding for Medi-Cal payments to hospitals for services rendered to Medi-Cal beneficiaries" (*id.* SAC ¶¶ 250-51), or the additional facts proffered by Plaintiff regarding alleged *quid pro quo* concessions by CHA in support thereof, do not render the CHA-UHW Agreement unlawful.[3] As with the other allegedly unlawful concessions the Court has addressed, these alleged concessions made by CHA and the signatory hospitals, and allegedly demanded by UHW from Prime Healthcare, also do not violate § 302 because they do not plausibly involve bribery or other corrupt practices which Congress sought to prevent by enacting § 302. *See Arroyo*, 359 U.S. at 425-26.[4]

The Court concludes that Prime Healthcare fails to sufficiently allege that the neutrality agreement provisions violate the LMRA § 302.

_____

[3] On September 14, 2015, Plaintiff filed a Motion for Leave to File TAC. (ECF No. 81.) The TAC seeks to add three paragraphs relating to the neutrality agreement, the existence of a multi-employer bargaining group, and a quid pro quo arrangement between the CHA and UHW. (*Id.* at ¶¶ 246a, 258, 303a.) The TAC alleges that CHA by an unidentified speaker described a quid pro quo relationship relating to contingent access to employees if the Medi-Cal funding goal was reached. (*Id.* at ¶ 258a.) The Court finds that the additional allegation fails to cure the deficiencies identified.

[4] In the proposed TAC, Plaintiff quotes an unidentified CHA representative who allegedly made a statement on June 1, 2015 that the Unlawful Agreement "was [sic] not a neutrality agreement, it [sic] is not [a neutrality agreement]." (ECF 81-2 ¶ 246a.) Given the lack of identifying information as to the speaker and the ambiguity of this quote, the Court finds that these additional allegations do not plausibly prove the existence of any unlawful agreement.

### 2. RICO Claim Based on Extortion

Having found that that Plaintiff has not adequately alleged a claim under LMRA § 302, the Court next turns to whether Prime Healthcare's SAC sufficiently states a RICO claim premised on the predicate act of extortion under state law, the Hobbs Act or the Travel Act.[5] Under RICO, "extortion" requires: (1) "the obtaining of property from another"; and (2) "wrongful use of actual or threatened force, violence, or fear, or under the color of official right." 18 U.S.C. § 1951(b)(2).[6] Plaintiff urges, as alternate basis for its RICO claims, that Defendants' alleged use of economic pressure to induce Prime Healthcare to sign the CHA-UHW Agreement amounts to extortion. (*See* SAC ¶¶ 212-36, ECF No. 73.)

### a) The Obtaining of Property of Another

To meet the first "obtaining of property from another" element, the plaintiff must

_____

[5] The Travel Act, in relevant part, prohibits the use of "any facility in interstate commerce" to "carry on, or facilitate . . . any unlawful activity," which is defined to include certain specified crimes, including "extortion." 18 U.S.C. § 1952. The "unlawful activity" on which Plaintiff's Travel Act claims are premised are the alleged Hobbs Act extortion violations, and the viability of the Travel Act claim necessarily hinges on the viability of the Hobbs Act claims.

[6] Plaintiff alleges that the "actions and events" described in the SAC constitute acts and threats that are "separately chargeable as extortion under the laws of California, Kansas, New Jersey, and the District of Columbia." (SAC ¶ 112, ECF No. 73.) The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). Like the Hobbs Act, state extortion laws require the *wrongful* use of force or fear. *See* Cal. Penal Code § 518 ("Extortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear."); K.S.A. 21-6501 (Extortion is "intentionally and wrongfully demanding, soliciting or receiving anything of value from the owner . . . by means of either a threat . . . or a promise . . . ."); N.J. Stat. Ann. § 2C:20-5 ("A person extorts if he purposely threatens to (a) Inflict bodily injury on or physically confine or restrain anyone or commit any other criminal offense."); D.C. Code § 22-3251 (A person commits extortion if "(1) that person obtains or attempts to obtain the property of another with the other's consent which was induced by wrongful use of actual or threatened force or violence or by *wrongful* threat of economic injury.").

allege facts showing that the defendant has acquired or is seeking to acquire property from the plaintiff that the defendant (or an allied third party) can "exercise, transfer, or sell." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404-05 (2003). The Supreme Court has held that obtaining a property right is the defining characteristic of extortion, without which a defendant is only alleged to have committed coercion. *Id.* at 407-08. Mere coercion, interference, or deprivation without acquisition is not sufficient to constitute extortion for a RICO claim. *Id.* at 404-08. In other words, this element "requires that the victim 'part with' his property, and that the extortionist 'gain possession' of it." *Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013) (citations omitted). Because coercion is not a predicate offense under RICO, the distinction between coercion and extortion is critical. *Scheidler*, 537 U.S. at 408.

In its FAC, Prime Healthcare alleged that in addition to the CHA-UHW Agreement, Defendants seek to obtain a litany of its tangible and intangible property. The Court determined that Plaintiff failed to allege how Defendants would obtain most of its listed property. Plaintiff's allegations only established that Defendants sought to deprive Plaintiff of these rights or to coerce Plaintiff to exercise these rights, rather than that Defendants sought to acquire these rights. (Order at 28, ECF No. 70.)

In its SAC, Prime Healthcare makes almost identical allegations as in its FAC with respect to the property Defendants allegedly seek to obtain: (1) Prime Healthcare's business reputation and goodwill (SAC ¶¶ 5, 7, 9, 13-14, 68, 232, 319, 329, 335, 341, 347, 353, 359, 365, 371, ECF No. 73); (2) Prime Healthcare's current and potential customers and related revenues (*id.*); (3) Prime Healthcare's money in the form of payments to UHW under the Unlawful Agreements and Prime Healthcare's agreement to cede control over how that money is spent (*id.* ¶ 113) and union dues paid to Defendants by Prime Healthcare on behalf of its employees (*id.* ¶¶ 14, 68, 108, 113, 115, 326), as well as contributions by Prime Healthcare to other funds benefitting Defendants, including but not limited to,

certain of Defendants' pension funds (*id.* ¶¶ 14, 108, 115); (4) Prime Healthcare's autonomy and control over its business operations (*id.* ¶¶ 15, 71, 113); (5) Prime Healthcare's right guaranteed under Section 8(c) of the NLRA to voice its opinion about, and/or opposition to, attempts to unionize its employees, by forcing Prime to waive such right and remain neutral (*id.* ¶ 139); (6) Prime Healthcare's right to refuse to recognize UHW as bargaining agent of Prime Healthcare's employees on the basis of signed union authorization cards, by forcing Prime Healthcare to waive such right and to recognize UHW as such bargaining agent on the basis of such cards (*id.* ¶ 70); (7) Prime Healthcare's right to engage in and grow its business through hospital acquisitions (*id.* ¶ 113); (8) access to Prime Healthcare's property to handle union affairs or to compel or intimidate non-union employees into joining the unions (*id.* 113); and (9) Prime Healthcare's control over communications with its own employees and third parties (*id.* ¶ 113). The new allegations in the SAC regarding property Defendants allegedly seek to obtain include: Prime Healthcare's money in the form of payments to UHW under the Unlawful Agreements and Prime Healthcare's agreement to cede control over how that money is spent (*id.* ¶ 14); Prime's confidential business information (e.g., names and contact information for non-unionized employees) (*id.*); Prime's right to hire subcontractors (*id.*); political power and influence (*id.* ¶ 17); and commitment from Prime to support UHW's Let's Get Healthy Initiative (*id.* ¶ 17). Plaintiff's position is that each type of property Defendants are allegedly seeking—tangible property, access to private property, control over business assets, business goodwill, and communication rights—constitutes something of value that than can be used, exercised, transferred or sold under the law. (Opp'n at 4, ECF No. 78 (citing SAC ¶¶ 114-22, ECF No. 73).)

In regards to Prime Healthcare's intangible property, Prime Healthcare alleges that "the LMRA mandates an automatic transfer of this property to Defendants immediately upon unionization." (Opp'n at 3, ECF No. 78 (citing SAC ¶ 106, ECF No. 73).) Prime

Healthcare also avers that Defendants are "presently demanding even more property, prior to unionization, as a condition to ceasing their campaign," including "access rights to Prime's real property, further control over Prime's ability to run its own business, further control over Prime's communication rights . . . and millions of dollars of Prime's money and control over how to spend it if Prime cedes to UHW's demands to enter into the Unlawful Agreements." (*Id.* (citing SAC ¶¶ 107, 123, 133, ECF No. 73).)

Under the Hobbs Act, the property extorted must be "*transferable*—that is, capable of passing from one person to another." *Sekhar*, 133 S. Ct at 2725 (finding that petitioner's threats in an attempt to compel a general counsel to recommend that his employer approve an investment was not "transferable" because petitioner's goal was to force the general counsel to give the advice that accorded with petitioner's wishes, "not to acquire the general counsel's 'intangible property right to give disinterested legal advice.'") For the reasons set forth in its Order dismissing the FAC, the Court holds that Plaintiff's allegations with respect to intangible property "fall short of satisfying the 'obtaining' prong of the extortion statute" because Plaintiff does not allege that Defendants "obtained any of [Plaintiff's] property rights or property; at most it claims that [Defendants] improperly coerced or attempted to coerce it to do something to which it was not otherwise inclined or required to do." *Wackenhut Corp. v. SEIU*, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009). The Court is also not persuaded by Defendants' citation to a Virginia district court case holding otherwise. *Cf. Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 585 F. Supp. 2d 789, 802 (E.D. Va. 2008) (allowing extortion claim to survive as a RICO predicate where defendant sought not to obtain property but to force employer into a contracting relationship) *with Wackenhut Corp.*, 593 F. Supp. 2d at 1295 (requiring both deprivation and acquisition of property for extortion). That Defendants are presently demanding intangible property does not affect the foregoing analysis.

With respect to tangible property, Prime Healthcare alleges that "Defendants are

attempting to obtain through extortion substantial sums of money from Prime directly," which will be transferred to Defendants in the form of "union dues, increased wages for represented worked, contribution to pension funds, payment of health plan fees and other coverage costs and training funds," or "paid to and controlled by UHW under the Unlawful Agreements." (SAC ¶ 115, ECF No. 73.) Prime Healthcare avers that "if [Defendants'] demands are met, UHW [would] become[] the union representative of Prime's employees," the tangible property identified above would "automatically transfer[]" to Defendants. (Opp'n at 3, ECF No. 78 (citing SAC ¶¶ 105-11, ECF No. 73).)

First, the money that Prime Healthcare alleges Defendants are attempting to obtain is made up of money that would be paid under the alleged unlawful agreements or paid if Prime Healthcare's employees chose UHW to represent them as their union. As to the first scenario, the money would not be paid to the UHW directly; instead it would be paid to a joint labor organization. As to the latter, the condition precedent depends on powers outside of UHW's control. The allegations regarding this tangible property are insufficient to show extortion. Assuming that these allegations are sufficient to show Defendants are seeking to "obtain" their tangible property, Prime Healthcare nonetheless must also meet the second element required for generic extortion.

### b) Wrongful Use of Economic Pressure

The second element of generic extortion requires the wrongful use of force, fear or threats.[7] *See* 18 U.S.C. § 1951(b)(2), *UBC,* 770 F.3d at 843. "Wrongful" under the Hobbs

---

[7] In order for a state offense to qualify as a predicate act in a RICO suit it must be "capable of being generally classified as extortionate . . . [which is] defined as 'obtaining something of value from another with his consent induced by wrongful use of force, fear or threats.'" *Scheidler*, 537 U.S. at 409. Even if defendants' conduct is chargeable under state law and punishable by imprisonment for more than one year, 18 U.S.C. § 1961(1)(A), "it cannot qualify as a predicate offense for a RICO suit unless it is 'capable of bring generally classified as extortionate.'" *Id.* at 409-10; *accord*, *United States v. Nardello*, 393 U.S. 296 (1969). Thus, in order to allege a predicate act under either the Hobbs Act or a state extortion statute, Defendants' alleged conduct must involve a "wrongful" use of force, fear or threats.

Act limits the statute's coverage to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property. *Enmons*, 410 U.S. at 400. A violator's action must be "wrongful" with respect to both the means and ends. *See id.* (holding that the Hobbs Act does not apply to the use of even wrongful force to obtain "legitimate" labor ends).

In its Order dismissing Plaintiff's FAC, the Court held that Plaintiff failed to meet the second "wrongful use" element to establish extortion. (Order at 31, ECF No. 70.) In its SAC, Prime Healthcare continues to allege that Defendants are committing extortion by using economic pressure to coerce Prime Healthcare to sign onto the "unlawful" CHA-UHW Agreement. As in the FAC, Prime Healthcare alleges that Defendants threatened to continue and then accelerated their campaign attacks by urging electing officials not to accept political contributions from Prime Healthcare (SAC ¶¶ 311-15, ECF No. 73); threatening to publish "dirt" on Prime Healthcare (*id.* ¶ 137); put Prime Healthcare's executives in jail (*id.* ¶ 138); publish legislation designed to hamstring Prime Healthcare's business (*id.* ¶ 139); and work to ensure that Prime Healthcare would not get approval for the sale of DCHS hospitals from the California Attorney General (*id.* ¶ 142).[8]

While Plaintiff claims that Defendants have threatened harm, "there is nothing inherently wrongful about the use of economic fear to obtain property." *United States v. Sturm,* 870 F.2d 769, 773 (1st Cir.1989). "[T]he fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *Brokerage Concepts, Inc.,* 140 F.3d at 523. Courts must therefore differentiate between legitimate use of economic fear—hard bargaining—and wrongful use of such fear—extortion. *See, e.g., George Lussier Enters., Inc. v. Subaru of New England, Inc.,* 393 F.3d

---

[8] As noted above in the Discussion, *supra* Section A, the majority of these claims are based upon pre-September 21, 2012 conduct, are inadmissible, and are not properly before the Court.

36, 50 (1st Cir.2004). A violator's action must be "wrongful" with respect to both the means and ends to meet the requirement for general extortion. *Enmons*, 410 U.S. at 400.

As discussed *supra*, the Court has already determined that Prime Healthcare failed to sufficiently allege that the CHA-UHW Agreement was wrongful (i.e., unlawful) under the LMRA. As such, the ends of the Defendants' actions are not wrongful. Moreover, Defendants' alleged use of economic pressure to coerce Prime Healthcare to sign onto the CHA-UHW Agreement constitutes the type of fear of economic loss that is legitimate as a means of hard bargaining versus a wrongful use of such fear. The actions allegedly threatened, since September 21, 2012, are ones that Defendants are entitled to take, e.g. attempting to block the sale of hospitals. *Cf. McKay v. Retail Auto. Salesmen's Local Union No. 1067,* 16 Cal.2d 311, 321 (1940) ("General rule" that "what you may do in a certain event you may threaten to do, that is, give warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences."). The Court concludes that neither the means nor the ends of the Defendants' actions are plausibly "wrongful."

The Court finds that Plaintiff has failed to plausibly allege a RICO predicate act of "extortion." Accordingly, the Court GRANTS Defendants' motion to dismiss Prime Healthcare's LMRA § 302 and RICO claims.

**C.    LMRA § 303**

LMRA § 303 makes it unlawful for a labor organization to engage in any activity or conduct defined as an unfair labor practice in § 8(b)(4) of the NLRA. 29 U.S.C. § 187(a). NLRA § 8(b)(4) makes it an unfair labor practice for a labor organization to "threaten, coerce, or restrain any person engaged in commerce" with the object of "forcing or requiring any employer . . . to join any labor or employer organization . . . ." 29 U.S.C. § 158(b)(4)(ii)(A). The Court addresses whether Plaintiff has alleged a claim under LMRA § 303, first in Count XI and second in Count X of its SAC.

### 1. Count XI

In Count XI of the FAC, Prime Healthcare alleged that Defendants SEIU and UHW violated § 303 of the LMRA based on their conduct related to Daughters of Charity Health System ("DCHS"). Specifically, Prime Healthcare alleged that Defendants violated § 303 by protesting at a DCHS hospital, backing an ERISA lawsuit against DCHS, and requesting that the Securities and Exchange Commission ("SEC") investigate DCHS. (FAC ¶¶ 173-76, 178, 339-40, ECF No. 47.) Defendants argued that Prime Healthcare failed to allege a violation of LMRA § 303 for three reasons: (1) Prime Healthcare has not been injured; (2) DCHS was not a "secondary" or neutral employer; and (3) the alleged conduct was not "coercive." (ECF No. 50-1 at 27-32.)

The Court concluded that: (1) Prime Healthcare failed to sufficiently allege any injuries stemming from the allegedly unlawful § 8(b)(4) conduct related to DCHS; (2) Prime Healthcare sufficiently alleged secondary conduct; and (3) Prime Healthcare failed to sufficiently allege that the protest at a DCHS hospital and ERISA lawsuit amounts to unlawful conduct under the NLRA § 8(b)(4)(ii)(B), but sufficiently alleged that it is plausible that UHW's request to the SEC was not genuine government lobbying. (Order at 31-40, ECF No. 70.)

In Count XI of the SAC, Prime Healthcare asserts the same allegations as in its FAC. (SAC ¶¶ 388-92, 394, ECF No 73.) Additionally, it alleges that Defendants' conduct with respect to DCHS was designed to and has directly caused damage to Plaintiff, including through legal fees, public relations expenses, and the costs in time, person-hours, and other administrative out-of pocket expenses incurred as a result of Defendants' conduct with respect to DCHS. (*Id.* ¶¶ 19, 393.) Defendants contend that Plaintiff fails to sufficiently allege injury under LMRA § 303 or that Defendants' conduct constitutes a threat or coercion under NLRA § 8(b)(4)(ii)(B).

//

a) **Standing**

LMRA § 303 confers standing to "[w]hoever shall be injured in his business or property by reason o[f]" an unfair labor practice under NLRA § 8(b)(4). 29 U.S.C. § 187(b). "[A] court must determine whether Section 303 standing exists by looking to: (1) the nexus between the injury and the statutory violation; and (2) the relationship between the injury alleged and the forms of injury that Congress sought to prevent or remedy by enacting the statute." *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 721 F.3d 1147, 1153 (9th Cir. 2013).

Prime Healthcare alleges that it was the primary target of UHW's actions against a neutral "secondary" employer and that it was damaged by such conduct. (SAC ¶¶ 18, 182, 193-208, 392-94, ECF No. 73.) Prime Healthcare avers that Defendants' campaign to block the DCHS sale consisted of political pressure on the Attorney General to block the sale and secondary pressure on DCHS to convince it not to sell its hospitals to Prime Healthcare. Defendants' acts of secondary pressure allegedly included: "orchestrat[ing] protests with picketing at each of the DCHS hospitals, both before and after the formal announcement of the sale to Prime" (SAC ¶ 193, ECF No. 73); instigating a "baseless" class action lawsuit against DCHS alleging ERISA violations (*id.* ¶¶ 194-201); and efforts to initiate an SEC investigation of DCHS (*id.* ¶¶ 203-04).

Defendants contend that Prime Healthcare has failed to allege any injury—and therefore establish standing—as a result of Defendants' allegedly unlawful § 8(b)(4) conduct related to DCHS. Defendants argue that only the support of the ERISA lawsuit and the initiation of the SEC complaint even arguably constitute unlawful acts of secondary pressure, but both fail because Plaintiff does not allege any injury flowing therefrom. (Mot. Dismiss at 16, ECF No. 74.) Defendants cite to the SAC, in which Plaintiff alleges that on February 20, 2015 Attorney General Harris approved the sale of the DCHS hospital to Prime but it was "an effective denial" because she imposed such "unprecedented and

untenable conditions" on the sale that were "so onerous that Prime was forced to abandon the deal." (SAC ¶ 191, ECF No. 73.) Defendants contend that on the face of Plaintiff's SAC, Plaintiff's alleged injury—its lost opportunity to buy DCHS—was caused by the Attorney General and not by the two acts of secondary pressure (ERISA lawsuit and SEC investigation). (Mot. Dismiss at 16, ECF No. 74.)

Plaintiff alleges that Defendants' acts of instigating the ERISA lawsuit and the SEC investigation caused delays in the "internal DCHS process" for deciding whether to sell to Prime Healthcare and required Plaintiff to expend "time money and resources" in responding to these acts. (SAC ¶¶ 205-06, ECF No. 73.) The Court agrees with Defendants that Plaintiff fails to sufficiently allege injury with respect to these secondary acts. DCHS had approved the sale of six of its hospitals to Prime on or before October 10, 2014. (*Id.* ¶ 189.) The ERISA lawsuit against DCHS was filed on October 21, 2014 and Defendants "demanded" that the SEC investigate the DCHS on October 29, 2014. (*Id.* ¶¶ 193, 204.) As such, these two acts could not have caused the delay in DCHS's internal process to approve the sale to Prime Healthcare nor Prime Healthcare's expenditure of "time, money, and resources" to defend against Defendants' secondary acts in order to convince DCHS to approve the sale, including by engaging legal counsel. (*Id.* ¶¶ 206-07.) By the time of these acts of alleged secondary conduct, DCHS had already approved the sale.

Prime Healthcare also alleges that, in response to the picketing efforts by UHW to stop DCHS from selling to Prime, Prime Healthcare also incurred "costs associated with sending dozens of personnel . . . to attend the January 5, 7, and 8, 2015 [Attorney General] hearings over the sale of the hospitals," including "preparation time, gas, mileage on cars, food, time away from work, and extra staffing to fill mixed shifts." (*Id.* ¶ 208, ECF No. 73.) However, Plaintiff does not adequately allege a nexus between Defendants' alleged wrongful secondary activity and Plaintiff's injury. None of the other allegations relied on by Plaintiff are sufficient to show an injury under the LMRA § 303. (*See* Order at 33, ECF

No. 70.)  As such, the Court finds that Plaintiff lacks standing to proceed on the LMRA § 303 claim contained in Count XI.

Having found that Plaintiff has not adequately alleged injury under LMRA § 303—and therefore has not met the threshold of standing—the Court need not address whether Plaintiff adequately alleges that Defendants' conduct amounts to unlawful coercion under NLRA § 8(b)(4), and concludes that Plaintiff lacks standing under LMRA § 303(a). Accordingly, the Court GRANTS Defendants' motion to dismiss Prime Healthcare's LMRA claim in Count XI.

### 2. Count X

In Count X, Prime Healthcare alleges that SEIU and UHW engaged in unlawful coercive conduct under NLRA § 8(b)(4)(ii)(A), 29 U.S.C. § 158(b)(4)(ii)(A).  Section 8(b)(4) of the NLRA states in pertinent part that:

> "[i]t shall be  an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any employer or self-employed person to join any labor or employer organization . . . ."

29 U.S.C. § 158(b)(4)(ii)(A).

Prime Healthcare claims that Defendants tried to force it to join a "*de facto* multi-employer bargaining group, with all rights over labor-related issues at signatory hospitals assigned to the Committee controlled by CHA and UHW." (SAC ¶¶ 383-85, ECF No. 73.) Defendants contend that Prime Healthcare's argument fails for two independent reasons. First, Prime Healthcare fails to allege sufficient facts to show that the joint labor management committee created by the "Unlawful Agreements" was a multi-employer bargaining group.  (Mot. Dismiss at 11-13, ECF No. 74.)  Second, Prime Healthcare does not sufficiently plead injury and coercion. (*Id.* at 14-15.)  The Court addresses these arguments in turn.

### a) **"Multi-Employer Bargaining Group"**

Prime Healthcare contends that the "Unlawful Agreements" require that any signatory hospitals concede control of its labor relations to UHW." (SAC ¶ 299, ECF No. 73.) Plaintiff alleges several reasons to support its theory that the "Unlawful Agreements" create a multi-employer bargaining group: the Code of Conduct establishing the scope of the Committee (*id.* ¶ 300); that the Agreements relating to terms and conditions of employment and Prime Healthcare specifically allege that multiple employers are signatories to the CHA-UHW Agreements (*id.* ¶¶ 17, 128, 141, 262-63, 273, 289, 299, 385); the Agreements' "catch-all" term (*id.* ¶ 301); and the Agreements' decision-making provisions regarding expenditures (*id.* ¶¶ 255, 302, 304).

Multi-employer bargaining is "collective-bargaining in which more than one employer or an association of employers participate in common negotiations with a group of group of unions as distinct from single-employer bargaining." *Bel-Window*, 240 N.L.R.B. 1315, 1320-21 (1979), *rev'd* on other grounds sub nom. *H&D, Inc. v. NLRB*, 665 F.2d 257 (9th Cir. 2980). "There is nothing talismanic about the term 'employer organization.'" *Frito-Lay, Inc. v. Local Union No. 137*, 623 F.2d 1354, 1358 (9th Cir. 1980). The NLRB has formulated a court-approved test to determine whether a multi-employer bargaining unit has been established. The test is whether the employer members of the group have indicated from the outset an "unequivocal intention to be bound by group action" in collective bargaining, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative. *See, e.g.*, *id.*; *NLRB v. Hart*, 453 F.2d 215, 217 (9th Cir. 1971), *cert. denied*, 409 U.S. 844 (1972). "Substance rather than legalistic form" is all the Board has ever required in multi-employer bargaining. *Frito-Lay*, 623 F.2d at 1358.

Prime Healthcare alleges that the MOU and Code of Conduct "require that all signatories participate in the Committee and that all decisions of the Committee are to be

made by UHW and its ally CHA." (SAC ¶ 200, ECF No. 73.)  Plaintiff alleges that the Code of Conduct establishes the scope of the Committee, which includes "several core labor relations issues," including "jointly advocating for improved communication between representatives of labor and management"; "supporting 'the principle that compensation should include as consideration of a pay for performance model'"; and providing opportunities for healthcare workers and employers to improve working relationships, explore new approaches to organization effectiveness, and enhancing involvement of healthcare workers in making decisions affecting their working lives. (*Id.* ¶ 300.)  Plaintiff further alleges that both the MOU and Code of Conduct contain a "catch-all" statement that "the Committee may also address other mutually agreed upon issues as permitted by the LMCA." (*Id.* ¶ 301.)

Defendants argue that none of Plaintiff's arguments show "unequivocal intent" and instead "rest on the specious assertion that Defendants created a multi-employer bargaining group by giving the joint-labor management committee authority permitted under the LMCA." (Mot. Dismiss at 11, ECF No. 74.)  Plaintiff responds that Defendants misstate *Frito-Lay*, 623 F.2d at 1358, and "there is no need to delve into the issue of intent because Prime has pled an agreement that expressly delegates bargaining authority to Duane Dauner." (Opp'n at 16, ECF No. 78 (citing SAC ¶¶ 255, 273, ECF No. 73).)

The Court finds that the express Code of Conduct provisions establishing the scope of the Committee do not plausibly suggest that a multi-employer bargaining unit has been established.  Nor does the Court find persuasive Plaintiff's argument that the "catch all" provision suggests the same, as the catch-all provision is also limited to "issues as permitted by the LMCA." (*See* Order at 18, ECF No. 70.)  None of these provisions authorize the Committee to engage in collective bargaining with UHW.  Plaintiff's speculation that the Committee will nonetheless exceed the scope of the Agreements and exercise control over labor relations does not meet the plausibility standard.  That the "very purpose of the

LMCA is 'to encourage free collective bargaining' though 'the formation and operation of labor management committees'" (Opp'n at 15, ECF No. 78 (citing 29 U.S.C. § 175a note)) does not mean that the Committee is a multi-employer bargaining unit that can collectively bargain on behalf of members with respect to labor relations. Further, as discussed in its previous Order and *supra* at 15, Prime Healthcare acknowledges that Committee expenditures require 50/50 approval of both leaders of CHA and UHW. (*See, e.g.*, SAC ¶ 255, ECF No. 73.) Plaintiff's new allegations that Dauner is under Defendants' control (*id.* ¶¶ 246-47) and that that the Committee's purpose is Medi-Cal reform (*see, e.g., id.* ¶ 251) are inconsequential to the analysis.

In the proposed SAC, Plaintiff alleges that an unidentified CHA representative announced publicly that the alleged Unlawful Agreements "cover[] both public and employee/labor relations." (ECF No. 81-2 at ¶ 303a.) The Court finds that this ambiguous statement attributed to an unidentified speaker does not affect the Court's determination as to whether Defendants attempted to force Plaintiff to enter a multi-employer bargaining group. Accordingly, the Court finds that Prime Healthcare has not sufficiently averred that the alleged "Unlawful Agreements" create a multi-employer bargaining group.

### b) Standing

LMRA § 303 confers standing to "[w]hoever shall be injured in his business or property by reason o[f]" an unfair labor practice under NLRA § 8(b)(4). 29 U.S.C. § 187(b). A court determines whether Section 303 standing exists by looking to: (1) the nexus between the injury and the statutory violation; and (2) the relationship between the injury alleged and the forms of injury that Congress sought to prevent or remedy by enacting the statute. *Am. President Lines, Ltd.*, 721 F.3d at 1153 (9th Cir. 2013). To have standing, Prime must plead both injury and coercion. *See id.*

Prime Healthcare alleges that, as a result of Defendants' conduct to force Prime to enter into the Unlawful Agreement and thereby join the multi-employer bargaining unit

31

created thereby, Prime Healthcare "has suffered substantial injury to its business or property." (SAC ¶ 386, ECF No. 73.)  Plaintiff alleges that UHW engaged in this conduct with the intent to injure Plaintiff, and Plaintiff has been injured as a result in violation of Section 303(a) of the LMRA, including significant costs in the form of time, money and resources in defending against UHW's secondary conduct.  (*Id.* ¶¶ 19, 205, 316; *see* Opp'n at 18, ECF No. 78.)

As the Court noted in its previous Order, it is the "non-conclusory 'factual content,' and reasonable inferences from that content . . . [that] must be plausibly suggestive of a claim entitling plaintiff to relief." *Moss*, 572 F.3d at 969.  Stripping Plaintiff's pleading of conclusory allegations regarding injury stemming from its Count X claims leaves only "tens of thousands of dollars in legal fees" engaging its "legal counsel to review, evaluate and provide legal advice regarding, attempt to negotiate different agreement, and, ultimately, reject the Unlawful Agreements."  (SAC ¶ 317, ECF No. 73.)  Defendants contend that "attorneys' fees are not an injury that Congress sought to prevent or remedy by enacting LMRA § 303."  (Mot. Dismiss at 14, ECF No. 74.)  Plaintiff maintains that attorneys' fees damages are "precisely the type [of damages] held recoverable under Section 303 as compensatory damages caused by Defendants' NLRA Section 8(b)(4) violations." (Opp'n at 18, ECF No 78.)  Plaintiff states that attorneys' fees are recoverable because they are for "costs incurred to stop, mitigate, or otherwise deal with the union's unlawful activity," rather than attorneys' fees for litigation.  (*Id.* at 19.)

Attorneys' fees are not recoverable as damages in a suit brought under section 303 of the LMRA, 29 U.S.C. § 187, which authorizes an action for an employer that has been injured by a union's unfair labor practice.  *Summit Valley Indus. Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 727 (1982) (finding that attorneys' fees incurred during NLRB proceedings were not proper element of damages under LMRA § 303(b) based on "persuasive evidence" of congressional intent); *see also Abreen Corp.*

*v. Laborers' Int'l Union, N.A., AFL, AFL-CIO*, 709 F.2d 748 (1st Cir. 1983) (declining to award attorneys' fees incurred in an effort to stop unlawful secondary activity even though the fees did not arise from actual litigation before the NLRB). Prime Healthcare alleges that it incurred legal fees expressly to "defend[] itself from UHW's campaign to force it to sign the Unlawful Agreements." (SAC ¶ 317, ECF No. 73.) As in *Aberdeen*, the Court does not find that the fact that attorneys' fees did not arise from actual litigation meaningfully distinguishes this case from *Summit Valley*. In both *Summit Valley* and the instant case the attorneys' fees were incurred in order to achieve the termination of activity allegedly unlawful under LMRA § 303. As such, the Court finds that Prime Healthcare has not adequately pleaded injury with respect to Count X.

Having found that Plaintiff has not met the threshold of standing, it is unnecessary to address whether Plaintiff adequately alleges that Defendants' conduct amounts to coercion[9] and concludes that Plaintiff lacks standing under LMRA § 303(a). Accordingly, the Court GRANTS Defendants' motion to dismiss Prime Healthcare's LMRA claim in Count X.

## D.    THE SEIU AND CTW DEFENDANTS

Defendants argue in the alternative that even assuming that Prime Healthcare sufficiently pleads its LMRA and RICO claims, its complaint nonetheless fails under the *Twombly* plausibility standard with respect to the SEIU Defendants' (the SEIU and its President Mary Kay Henry) and CtW Defendants' (Change to Win, the CtW Investment

---

[9] Defendants argue that Plaintiff's allegations that Defendants threatened a campaign to urge elected officials to reject Plaintiff's political contributions based on Defendants' purportedly false allegations regarding patient care do not amount to coercion and constitute protected activity under First Amendment and *Noerr-Pennington* protections. (Mot. Dismiss at 15, ECF No. 74 (citing *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 894-95 (9th Cir. 1988).) Plaintiff responds that "all of Defendants' coercive (and extortionate) conduct was part of the same campaign and had the same goal: forcing Prime to sign the CHA-UHW agreements." (Opp'n at 20, ECF No. 78 (citing SAC ¶¶ 15, 18, 140-42, ECF No. 73).)

Group, and Thomas Woodruff) involvement in "new conduct." (Mot. Dismiss at 23-25, ECF No. 74.) Plaintiff responds that its pleading sufficiently details that the SEIU and CtW Defendants "were not only the architects of [the campaign against Prime], but have been and continue to be aware of it, agree to it, endorse it, participate in it, as well as aim to profit from its success." (Opp'n at 24, ECF No. 78.) Having found that dismissal is warranted for the reasons set for above as to all Defendants, the Court need not address whether Plaintiff's allegations meet the *Twombly* standard for plausibility as to the SEIU and CtW Defendants specifically.

## DISMISSAL WITH PREJUDICE

After a party has amended a pleading once as a matter of course, it may only amend further after obtaining leave of the court, or by consent of the adverse party. Fed. R. Civ. P. 15(a). Amendment under Fed. R. Civ. Pro. 15(a) is discretionary, and is generally permitted with "extreme liberality." *Chodos v. West Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). When a district court has already granted leave to amend, its discretion in deciding subsequent motions to amend is "particularly broad." *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc); *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 879 (9th Cir. 1999). "[A] district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir.2006); *see also Chodos*, 292 F.3d at 1003 ("When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic."); *Foman v. Davis*, 371 U.S. 178, 182 (1962). The factors are not of equal weight. "Prejudice to the opposing party is the most important

factor," *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990); delay alone is insufficient to deny leave to amend. *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981) (citing *Howey v. United States*, 481 F.2d 1187 (9th Cir. 1973)).

Here, Prime Healthcare has clearly put forth its best effort at articulating its claims. Prime Healthcare's 118-page Second Amended Complaint details all of the facts alleged to be relevant to its claims. Prime Healthcare has had two opportunities to amend its complaint in this action—once as of right pursuant to Federal of Procedure 15(a)(1)(B) (*see* ECF Nos. 47) and once after the Court granted leave to amend (*see* ECF No. 73)— resulting in a total of three complaints alleging RICO and LMRA claims against Defendants.

Prime Healthcare also alleged much of the same conduct in its earlier *Prime Healthcare I*. *See Prime Healthcare I*, No. 11-CV-2652-GPC-RBB (S.D. Cal.). In *Prime Healthcare I*, Plaintiff filed an initial complaint and a first amended complaint after the Court granted the Kaiser Defendants' motion to dismiss with leave to amend. (*See id.*, ECF No. 46.) This Court dismissed Prime Healthcare's first amended complaint under Federal Rule of Civil Procedure 12(b)(6), but granted leave to amend. *See Prime Healthcare I*, 2013 WL 3873074 (S.D. Cal. July 25, 2013). After Prime Healthcare did not file a second amended complaint, this Court granted Defendants' motion to dismiss with prejudice for lack of prosecution under Federal Rule of Civil Procedure 41(b). *See Prime Healthcare I*, 2013 WL 6500069 (S.D. Cal. Dec. 11, 2013). The Court has determined that the doctrine of res judicata bars allegations of pre-September 21, 2012 conduct. *See supra* 7-8.

Recently, Plaintiff moved to file a TAC which essentially adds three paragraphs to the SAC which relate to comments attributed to an unidentified CHA representative on June 1, 2015. (Proposed TAC ¶¶ 246a, 258a, 303a, ECF No. 81.) Plaintiff asserts that the comments provide further support for its claims. The Court disagrees. The statements are

ambiguous and unattributed to an individual who has the authority or knowledge to speak about the matters referenced. The Court finds that they do not cure the deficiencies identified in this Order and do not provide the basis for leave to amend. It is clear to the Court that permitting a TAC would be an exercise in futility.

Prime Healthcare has had ample opportunities to adequately plead its claims in the instant action. The Court cannot conceive of any new facts that could possibly cure the pleading. The Court finds that leave to amend would be futile in these circumstances and GRANTS Defendants' motion to dismiss Plaintiff's SAC with prejudice.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court hereby ORDERS:

1.  Defendants' Motion to Dismiss the SAC (ECF No. 74) is **GRANTED**;

2.  Plaintiff's Motion for Leave to File TAC (ECF No. 81) is **DENIED** and the hearing on the motion scheduled for December 17, 2015 is **VACATED**;

3.  The Court **DISMISSES WITH PREJUDICE** Prime Healthcare's entire SAC. The Clerk of the Court shall close the case.

**IT IS SO ORDERED**.

Dated: November 23, 2015

Hon. Gonzalo P. Curiel
United States District Judge